UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOSEPH G. BUTLER, as Chapter 7 Trustee,<br>JOHN W. STRACHAN, and TIMBERLINE<br>CONSTRUCTION CORPORATION,<br><br>       Plaintiffs,<br><br>       v.<br><br>EDWARD T. MOORE,<br>LAWRENCE W. ROSENFELD,<br>EASTERN TOWERS, LLC,<br>EASTERN PROPERTIES, LLC,<br>HORIZON TOWERS, LLC,<br>TOWER INVESTORS TRUST,<br>GLOVER PROPERTY MANAGEMENT, INC.,<br>5G TOWERS, LLC,<br>and 5G INVESTMENT TRUST, LLC,<br><br>       Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Civil No.<br>)   10-10207-FDS<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

SAYLOR, J.

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................  6

II.    NATURE OF PROCEEDINGS .......................................................  11

III.   FINDINGS OF FACT .....................................................................  12

     A.    The Parties ..........................................................................  12

     B.    The Cell Tower Industry .....................................................  14

     C.    John Strachan .......................................................................  16

     D.    Initial Discussions with Moore and Rosenfeld ....................  18

E.     Formation of Eastern Towers, Inc. .............................................................     25

F.     The Beginning of Operations ....................................................................     29

G.     The LLC Operating and Employment Agreements ...................................     30

    1.     The Negotiation of the Agreements .............................................     30

    2.     The Terms of the LLC Operating Agreement ...............................     41

    3.     The Terms of the Executive Employment Agreement .................     45

H.     The Purported Ownership Relationship Between the Corporation
    and the LLC ..............................................................................................     46

I.     The Initial Months of Operation and the Need for Financing .................     49

J.     Efforts to Obtain Bank Financing ............................................................     52

K.     The Proposed New Entity and Restructuring of the Bank Loan ..............     55

L.     The Proposed Withdrawal of Capital and Tower Purchase Agreement ....     59

M.     The June 2 Closing ...................................................................................     62

N.     The Tower Purchase Agreement ...............................................................     67

O.     The Purchase Price for the Towers ...........................................................     72

P.     The Financial Condition of the Business in June 2003 ............................     75

Q.     Tower Purchases between June 2003 and May 2004 ...............................     82

R.     The Operation of the Corporation and LLC as a Single Business ............     83

S.     The December 2003 Letter ........................................................................     85

T.     The Meetings on January 22 and 29, 2004 ..............................................     86

U.     Strachan's Termination .............................................................................     89

V.     Additional Tower Acquisitions in June and July 2004 ............................     95

W.     The Creation of Eastern Towers II/Horizon Towers ................................     97

X.     The Sale of the Wayland WIP ..................................................................     98

Y.     Subsequent TD Banknorth Financing .......................................................    105

Z.     Further Tower Acquisitions ......................................................................    107

AA.     The Timberline Construction Invoices ...................................................    109

BB.     Subsequent Litigation and Bankruptcy Petition ....................................    116

| | | | |
|---|---|---|---|
| IV. | | CONCLUSIONS OF LAW ................................................................ | 116 |
| | A. | Jurisdiction and Nature of Proceeding ...................................... | 116 |
| | B. | Claims for Breach of Fiduciary Duty Generally ...................... | 119 |
| | | 1. | Eastern Towers, Inc., Is a Closely Held Corporation .................... | 121 |
| | | 2. | Fiduciary Duties in a Closely Held Corporation ........................... | 121 |
| | | 3. | Eastern Towers, LLC Is a Closely Held LLC ............................... | 123 |
| | | 4. | Fiduciary Duties in a Closely Held LLC ..................................... | 124 |
| | | 5. | Self-Dealing Transactions ............................................................ | 125 |
| | | 6. | The Corporate Opportunity Doctrine ........................................... | 126 |
| | C. | Claims for Breach of Fiduciary Duty Based on the April 2002 Agreements .............................................................. | 127 |
| | | 1. | Summary of Claims ...................................................................... | 127 |
| | | 2. | Events Leading up to the April 9 Agreements ............................. | 128 |
| | | 3. | Analysis ....................................................................................... | 130 |
| | D. | The Doctrine of Corporate Disregard ........................................ | 132 |
| | | 1. | Introduction ................................................................................. | 132 |
| | | 2. | The Doctrine of Corporate Disregard Generally ......................... | 135 |
| | | 3. | Whether the Doctrine of Corporate Disregard Can Be Employed by the Trustee ............................................................. | 137 |
| | | 4. | Whether the Corporation and the LLC Should Be Treated as a Single Entity ......................................................... | 138 |
| | | 5. | Construction of Pleadings and Trial of Unpleaded Issues ............ | 143 |
| | E. | The Effect of § 5.2 of the LLC Operating Agreement ............... | 146 |
| | | 1. | Effect of Articles of Organization of Eastern Towers, Inc. .......... | 147 |
| | | 2. | Modifying Fiduciary Duties by Contract ...................................... | 148 |
| | | 3. | Scope of § 5.2 .............................................................................. | 149 |
| | | 4. | Effect of § 5.2 on Diversion of Financing and Tower Opportunities ...................................................................... | 151 |
| | | 5. | Application of § 5.2 to Fiduciary Duties Owed to Eastern Towers, Inc. .................................................................... | 153 |
| | F. | Other Claims for Breach of Fiduciary Duty ............................. | 153 |

|  | 1. | The Diversion of Bank Financing ................................................. | 154 |
|  |  | a. | Disclosure of Transaction ................................................. | 155 |
|  |  | b. | Assent of Disinterested Directors, Shareholders, or Members ....................................................................... | 155 |
|  |  | c. | Fairness of Transaction ...................................................... | 155 |
|  | 2. | The June 2, 2003 Capital Withdrawal ......................................... | 158 |
|  |  | a. | Disclosure of Transaction ................................................. | 158 |
|  |  | b. | Assent of Disinterested Directors, Shareholders, or Members ....................................................................... | 159 |
|  |  | c. | Fairness of Transaction ...................................................... | 159 |
|  | 3. | The Tower Purchase Agreement and Resulting Tower Sales ....... | 162 |
|  |  | a. | Disclosure of Transaction ................................................. | 163 |
|  |  | b. | Assent of Disinterested Directors, Shareholders, or Members ....................................................................... | 164 |
|  |  | c. | Fairness of Transaction ...................................................... | 165 |
|  |  |  | (i) | Value of the Repurchase Option ........................... | 166 |
|  |  |  | (ii) | Value of the Towers ............................................. | 167 |
|  | 4. | Sale of Wayland WIP ................................................................. | 168 |
|  |  | a. | Disclosure of Transaction ................................................. | 168 |
|  |  | b. | Assent of Disinterested Directors, Shareholders, or Members ....................................................................... | 169 |
|  |  | c. | Fairness of Transaction ...................................................... | 170 |
|  | 5. | The Diversion of Tower Opportunities to New Entities .............. | 171 |
|  |  | a. | Disclosure of Transaction ................................................. | 174 |
|  |  | b. | Assent of Disinterested Directors, Shareholders, or Members ....................................................................... | 174 |
|  |  | c. | Fairness of Transaction ...................................................... | 174 |
| G. | Strachan's Individual Claim for Breach of Fiduciary Duty ...................... | 175 |
| H. | Strachan's Contract and Tort Claims ........................................................ | 185 |
|  | 1. | Breach of Oral Contract ................................................................. | 185 |
|  | 2. | Promissory Estoppel ...................................................................... | 186 |

|  | 3. | Breach of Implied Covenant of Good Faith and Fair Dealing ...... | 187 |
|  | 4. | Wrongful Termination ................................................................. | 187 |
| I. | | Claims Asserted by Timberline ................................................. | 187 |
| J. | | Fraudulent Transfer ................................................................... | 192 |
|  | 1. | Fraudulent Transfers Generally .................................................... | 192 |
| K. | | Accounting ................................................................................. | 198 |
| L. | | Constructive Trust ..................................................................... | 199 |
| V. | | CONCLUSION ................................................................................. | 200 |
| A. | | Findings of Liability ................................................................. | 200 |
| B. | | Relief ......................................................................................... | 201 |

# I.   **INTRODUCTION**

This is a dispute concerning a closely held business that developed towers for the cellular telephone industry.  The principal dispute involves a series of transactions in which the majority owners of the business froze out the minority owners and appropriated assets and business opportunities for their own benefit.  The matter also involves claims by the construction company that built the towers, which was not paid in full for its services.

John Strachan and Matthew Sanford had substantial experience and contacts in the cellular telephone industry, particularly in the siting of towers.  In 2002, Strachan and Sanford decided to try to create a company to develop towers on their own.  They had little experience operating a business, and did not have substantial financial resources or access to capital.  They approached two wealthy and sophisticated businessmen, Edward Moore and Lawrence Rosenfeld, about joining forces in a new enterprise.  Moore and Rosenfeld agreed to do so, and in February 2002, the four men founded a corporation called Eastern Towers, Inc.  Each of the four men held an equal one-quarter interest in the new company.

Within a few weeks, and when the business had scarcely begun operations, Moore and Rosenfeld proposed a revised corporate structure.  The new structure included the creation of a separate limited liability company that would own the towers, in which Moore and Rosenfeld would hold a combined 60% interest.  Moore and Rosenfeld also proposed that the equity interests of Strachan and Sanford in the LLC would vest over time, and that the operating agreement for the LLC would provide that Moore and Rosenfeld could own interests in competing tower companies and did not have to present tower opportunities to the business.  After a period of negotiation and discussion, Strachan and Sanford reluctantly agreed to the new

6

arrangement.

An agreement embodying those changes was signed in April 2002. However, the new LLC—called Eastern Towers, LLC—was not actually created until September 2002. Furthermore, the evidence as to the intended, and actual, relationship between the corporation and the LLC is confused and contradictory. Moore and Rosenfeld claim that the LLC owned the corporation; Strachan thought that the corporation owned the LLC. In fact, neither owned the other, and the two entities existed in parallel while the business was in operation. Furthermore, the parties freely transferred funds between the two entities, and generally treated the two as a single business enterprise.

The business began to develop towers, but at a slower pace than anticipated. Moore and Rosenfeld provided virtually all of the working capital to the new business. For their part, Strachan and Sanford worked for free for six months, and transferred a tower site that they owned in Beverly, Massachusetts, to the business. By early 2003, it was clear that the company needed new capital or debt financing to survive.

Moore approached TD Banknorth, a bank with which he had a lending relationship, with a proposal to establish lines of credit to permit construction of towers and ongoing operations of the company. The bank approved a somewhat less favorable arrangement than Moore had proposed. Instead of seeking financing elsewhere, or attempting to negotiate further with the bank, Moore and Rosenfeld developed a plan that effectively permitted the two of them to acquire every completed tower at a discounted price, with little risk, and to the considerable disadvantage of Eastern Towers and its minority shareholders.

Moore and Rosenfeld created a new entity called Eastern Properties, LLC, in which

7

Strachan and Sanford had no interest.  Without telling Strachan and Sanford, they diverted part of the bank-financing opportunity to the benefit of their new company.  They then caused Eastern Towers to enter into a "Tower Purchase Agreement" under which it was required to sell completed towers to Eastern Properties (that is, to Moore and Rosenfeld) at less than half their fair market value.  Eastern Towers purportedly had an option to repurchase the towers under certain conditions.  Those conditions, however, were so elaborate, and so onerous, that the option would never be exercised, and thus was essentially worthless.

The closing occurred on June 2, 2003.  That same day, Moore and Rosenfeld withdrew virtually all of their capital from Eastern Towers—$520,000—without the knowledge of the bank, and over the protests of Strachan and Sanford.  That capital withdrawal permanently crippled Eastern Towers, leaving it insolvent or nearly so; by the end of the month, it had only $5,000 in its bank accounts, about enough to sustain operations for four or five days.  Also on June 2, four towers were transferred from Eastern Towers to Eastern Properties under the Tower Purchase Agreement.

Eastern Towers stayed in business for about another fourteen months.  It developed five more towers after June 2003, all of which were sold to Eastern Properties under the Tower Purchase Agreement for less than half their true value.  Relations between Moore and Rosenfeld, on the one hand, and Sanford and (particularly) Strachan on the other, deteriorated considerably.

One of the assets of Eastern Towers was a ground lease and other work-in-process for a site in Wayland, Massachusetts.  In December 2003, the lessor sent a letter to Strachan purporting to terminate the lease.  The letter proved to be defective as a notice, and the issue was ultimately resolved.  Strachan, however, did not inform Moore and Rosenfeld about the letter,

8

and sought to resolve the issue on his own. Moore and Rosenfeld soon learned of it and used the incident as a reason to terminate Strachan for cause. Strachan was fired on February 26, 2004. His ownership interest in the business remained, although it had not fully vested.

In June 2004, Eastern Properties purchased four towers in New Hampshire directly from third parties, without going through Eastern Towers. All of those towers had been identified as opportunities through the efforts of Eastern Towers employees, but all were diverted by Moore and Rosenfeld to their own company. In July 2004, Eastern Properties purchased four more towers, all in the Midwest.

By August 2004, the only valuable asset owned by Eastern Towers was the site in Wayland. The Wayland tower was considered by Sanford to be the potential crown jewel in the business, as a virtual-monopoly tower with coverage over some of metropolitan Boston's wealthiest suburbs. The tower was eventually developed, but not by Eastern Towers. Instead, Moore and Rosenfeld—using, among other things, an extortionate threat against Sanford—caused Eastern Towers to sell the Wayland site to a new company that they had created called Horizon Towers for less than its fair market value.

By that point, Moore and Rosenfeld owned seventeen towers (through Eastern Properties) and the Wayland site (through Horizon). Moore and Rosenfeld had also set up new companies to acquire towers in other states, in order to keep them away from Eastern Towers—in other words, away from the enterprise in which Strachan and Sanford had an interest. By 2008, they had acquired fifteen additional towers.

During the period in which it was constructing towers, Eastern Towers used the services of Timberline Construction Company to erect the towers and perform related construction

9

services. As Moore and Rosenfeld began to strip Eastern Towers of its assets, they also began to slow and eventually stop payments to Timberline. They nonetheless induced Timberline to keep working, and then tried to strong-arm it into accepting less than full payment. By April 2005, Timberline had filed suit for damages on its unpaid invoices.

Strachan, meanwhile, had also filed suit, alleging breaches of fiduciary duty and other claims against Moore, Rosenfeld, and their various entities. In November 2006, Moore and Rosenfeld caused Eastern Towers, Inc., to file a Chapter 7 bankruptcy petition.

At the end of the day, Moore and Rosenfeld (through entities they owned or controlled) had acquired 33 telecommunication towers. None of those entities had minority shareholders. Strachan and Sanford—who had contributed the Beverly tower to the enterprise, and who worked for free for six months—wound up with virtually nothing. And Timberline—which had constructed multiple towers, and performed all of its contractual obligations—was left with unpaid invoices of more than $264,000.

The dispute is in this Court after a withdrawal of the reference to the Bankruptcy Court. It is a tangled case that has not proved simple to resolve. Among other things, Moore and Rosenfeld created multiple entities with different ownership structures, many of which were intended to own tower assets that were usurped or diverted from Eastern Towers. But they did not observe corporate formalities with care, and many of their arrangements were haphazard and sloppy. Furthermore, the case involves an overlay of multiple contracts, some of which modify, or purport to modify, the fiduciary duties at issue. As a result, the fair resolution of this dispute requires the use of some equitable devices and remedies—most notably, disregarding the separate identities of Eastern Towers, Inc., and Eastern Towers, LLC.

In any event, and for the reasons that follow, the Court finds that Moore and Rosenfeld violated their fiduciary duties to Eastern Towers and to Strachan as a minority shareholder, and violated Mass. Gen. Laws ch. 93A in connection with their dealings with Timberline.

## II.   NATURE OF PROCEEDINGS

As noted, this matter is here on a withdrawal of reference from the Bankruptcy Court. In November 2006, Moore and Rosenfeld caused Eastern Towers, Inc., to file a voluntary petition under Chapter 7 of the Bankruptcy Code. With two very minor exceptions, Strachan and Timberline are the only creditors. The reference was withdrawn in 2010, and the matter was then tried to the Court.

The case involves three sets of claims by three different plaintiffs. First, the bankruptcy Trustee has brought shareholder derivative claims against Moore and Rosenfeld on behalf of the debtor, Eastern Towers, Inc., for breach of fiduciary duty. The Trustee has also asserted claims against Moore, Rosenfeld, and various entities for avoidance and recovery of fraudulent or constructively fraudulent transfers. Second, Strachan has brought individual claims against Moore and Rosenfeld for breach of fiduciary duty, promissory estoppel, breach of contract, breach of the implied covenant of good faith and fair dealing, and wrongful termination. Third, Timberline Construction Corporation has brought claims against Moore and Rosenfeld for violations of Mass. Gen. Laws ch. 93A.  The Trustee seeks various forms of declaratory, equitable, and monetary relief, including transfer of various properties to the estate, an accounting, and the imposition of a constructive trust; Strachan and Timberline seek money damages. Matthew Sanford is neither a plaintiff nor a defendant.

The following constitutes the Court's findings of fact and conclusions of law under Fed.

11

R. Civ. P. 52.

## III.   FINDINGS OF FACT

### A.   The Parties

1.   Eastern Towers, Inc., is a closely-held Massachusetts corporation with a former place of
     business in Marblehead, Massachusetts.  (Sanford, 5:90; Ex. 21).

2.   Eastern Towers, Inc., filed a bankruptcy petition under Chapter 7 of the Bankruptcy Code
     on November 6, 2006.  (Third Amended Complaint (hereinafter Compl.) ¶ 2).

3.   Plaintiff Joseph G. Butler is the Chapter 7 Trustee of Eastern Towers, Inc.  (Compl. ¶ 3).

4.   Plaintiff John Strachan is currently a mortgage broker.  (Strachan, 2:106).  He formerly
     served as President of Eastern Towers, Inc.  (Strachan, 2:129; Ex. 19).

5.   Plaintiff Timberline Construction Corporation is a construction company.  (Strachan,
     4:144-45).

6.   Defendant Edward T. Moore is a self-employed businessman and real estate developer.
     He is an officer and director of Eastern Towers, Inc.  (Moore, 15:115; Exs. 16, 20, 21,
     146).  He graduated from Harvard Law School and Harvard Business School in 1975, and
     has been a lawyer and a member of the Massachusetts bar since that time.  (Moore,
     16:146).

7.   Defendant Lawrence W. Rosenfeld is a businessman.  He is an officer and director of
     Eastern Towers, Inc.  (Exs. 16, 19, 20, 21, 146).  He has worked with a number of start-
     up companies and currently holds a number of officer, director, and management
     positions at several companies.  (Rosenfeld, 11:5-8, 12-14, 25; 13:70-77).

8.   Defendant Eastern Towers, LLC is a Massachusetts limited liability company.  (Exs. 45,

54).

9.      Defendant Eastern Properties, LLC is a Massachusetts limited liability company. (Ex. 94).

10.     Defendant Horizon Towers, LLC, formerly known as Eastern Towers, II, LLC, is a Massachusetts limited liability company. (Exs. 154, 165). At all relevant times, Moore owned an 85% interest in Horizon and the Joan Rosenfeld Trust f/b/o Lawrence W. Rosenfeld owned the remaining 15% interest. (Moore, 15:131-32; Ex. 509).

11.     Defendant Tower Investors Trust is a nominee trust through which Moore and Rosenfeld hold their interest in Eastern Towers, LLC. (Moore, 15:129; Ex. 45). Moore holds a majority interest in Tower Investors Trust, and Rosenfeld holds a minority interest. (*Id.*).

12.     Defendant Glover Property Management, Inc., is a corporation engaged in property management. (Moore, 15:139-42). At all relevant times, it was owned by Moore. (Moore, 19:55).

13.     Defendant 5G Investment Trust is a Massachusetts nominee trust formed under a declaration of trust dated December 9, 2004, by Moore on behalf of Glover Property Management, Inc. (Moore, 15:130-32; Ex. 177). Moore has a 90% beneficial interest in the trust, and Rosenfeld has a 10% interest as beneficiary of the Joan W. Rosenfeld Trust. (*Id.*).

14.     Defendant 5G Investment Trust, LLC is a Massachusetts limited liability company organized on July 7, 2006. (Ex. 190). Moore is the sole manager of 5G Investment Trust, LLC. (*Id.*). On July 18, 2006, its name was changed from 5G Towers, LLC to 5G Investment Trust, LLC. (Moore, 15:133-35; Ex. 191).

13

### B.    The Cell Tower Industry

15.    A cellular telephone is a mobile device that uses radio signals to connect to a cellular
network and allows the user to engage in voice and data communication while moving
about a specific geographic area.

16.    A cellular network consists of a series of "cells." A cell is a geographic area that contains
a "base station" with which cell phones can communicate. The base station ordinarily
consists of a tower, an antenna mounted on the tower, and a small building that contains
equipment.

17.    In a fully developed wireless carrier network, cells overlap and cell phones switch cells as
they are carried through different geographic areas. Where cells do not overlap, there is a
"coverage gap" in a wireless carrier's network—that is, an area with no cell service
coverage or where coverage is less than acceptable. (Orlandi, 1:69-70).

18.    During the early 2000s, several of the major cell carriers (such as AT&T, T-Mobile,
Verizon, and Sprint) were trying to build out their networks in order to offer more
comprehensive coverage to their customers. (*See* Orlandi, 1:66-69; Moore, 18:111-12).

19.    A "build-out" is an industry term used to describe the process of completing a wireless
carrier network by filling coverage gaps. (Orlandi, 1:69-70).

20.    In the early 2000s, carriers were particularly focused on building out their networks in
areas with potentially high usage that had gaps in coverage. At the time, that included
certain suburbs of major cities, popular vacation destinations, and areas along major
highways. (*See* Strachan, 1:129-30; Chandler, 4:23; Mallinson, 8:24).

21.    For various reasons, some communities were reluctant to allow cell-tower construction.

14

These locations are known as "hard-to-zone" sites. (Moore, 18:111).

22.     The Telecommunications Act of 1996 prohibits communities from making zoning

        decisions that would effectively prohibit the provision of wireless communications

        services.  47 U.S.C. § 332(c)(7)(B)(i)(II).  If a local zoning board denies a permit

        application, under the Act, the applicant has twenty days to appeal to the United States

        District Court.  47 U.S.C. § 332(c)(7)(B)(v).  (*See* Rosenfeld, 14:51).  The Act requires

        that any decision to deny a request to construct personal wireless service facilities be in

        writing and supported by substantial evidence.  47 U.S.C. § 332(c)(7)(B)(iii).

23.     Because of that regulatory framework, there is a significant economic advantage to

        obtaining the first tower in a "hard-to-zone" site.  (*See* Mallinson, 8:24-25; Moore,

        18:110-11, 19:71-75).

24.     A "search ring" is an identified area where there is a coverage or capacity gap in cellular

        service.  (Orlandi, 1:70-71).

25.     In the early 2000s, a typical process for filling a gap in coverage was as follows.  First,

        the tower company would attempt to locate a suitable site where a landowner was willing

        to permit the construction of a tower.  (Strachan, 1:136-37; Orlandi, 1:72).

26.     When a suitable site was located, the tower company would enter into a ground lease with

        the landowner for the site.  (Strachan, 1:118, 137; Orlandi, 1:82-83).

27.     After a ground lease was signed, a tower company would attempt to obtain carrier support

        (that is, a commitment to lease space on the tower) before applying for zoning approval

        and building permits and starting construction.  (Strachan, 1:137, 140-41; Orlandi, 1:82-

        83).

15

28.  The tower company would then seek to obtain the necessary zoning and permit approval. (*Id.*).

29.  If approval was obtained, the tower company would then build the tower and enter into one or more leases with the carrier for use of the tower. (*Id.*).

30.  Once zoning is approved and permitting is in place, construction of the tower is usually relatively simple. Depending on the type of tower, construction may take less than a day to six weeks. (Moore, 19:200-01). Maintenance is also relatively simple; costs vary depending on the type of tower and could range from nearly zero to approximately $1,000 per year. (*See* Moore, 18:123-25, 19:173-74).

31.  In the early 2000s, it typically took about one year from the time a search ring was identified until a tower within the search ring was constructed and generating income. (Strachan, 1:135-36).

32.  Normally, because the costs to construct and maintain a tower are fixed, the more carriers (or tenants) a tower company can secure on a tower, the greater the revenue and cash flow for the company. (Strachan, 2:22-23; Mallinson, 8:24-27).

    C.   **John Strachan**

33.  John W. Strachan was employed as the Northeast Regional Marketing and Sales Manager at American Tower Corporation for a nine-month period in 2001. (Strachan, 1:114-15). American Tower was a company that developed, acquired, and owned cell towers. (Strachan, 1:115). Strachan's responsibilities included leasing tower space to wireless carriers and identifying areas in which they could build new towers. (*Id.* at 115).

34.  In the early 2000s, the major tower companies, including American Tower, had been

16

building towers aggressively. Many companies had overestimated the cash flow and profitability of the towers they built, leading to significant financial problems. (*See* Strachan, 1:125-26).[1] As a consequence, those companies began to drastically reduce the number of towers they built and became more selective, building only those towers they believed were likely to be profitable. (*See* Strachan, 1:125-27).

35.    In November 2001, Strachan was laid off by American Tower. (Strachan, 1:128).

36.    Strachan believed that because the carriers' demand exceeded the limited number of towers being built by the major tower companies, there was an opportunity for smaller, independent tower development companies. (Strachan, 1:125-27; Rosenfeld, 13:82-83; *see* Wendt, 18:57-58).

37.    While at American Tower, Strachan had developed relationships with several wireless carriers, particularly AT&T. He believed that he could use those relationships to start a small cell-tower company to help those carriers build out their networks. (Strachan, 1:124-30).

38.    Strachan considered joining with Matt Sanford and Chris Hesse as potential partners in a new cell-tower venture. (Strachan, 1:142). Strachan originally decided to move forward with Hesse as a partner. (Strachan, 1:150-53; Hesse, 5:11-12).

39.    Strachan and Hesse formed a limited liability company called U.S. Tower Group, LLC. From December 2001 to early February 2002, they spent significant time exploring

---

[1] In fiscal years 2001 and 2002, American Tower reported substantial operating losses. (Mallinson, 9:50). By late 2001, American Tower had approximately 300 so-called "naked" towers—that is, towers without tenants. (Strachan, 1:126-27).

potential locations for cell towers and talking to carriers. (Strachan, 1:144-47, 3:87).

40.    Strachan and Hesse also contacted Citizens Bank and Brookline Savings Bank to seek

financing for their new enterprise. (Strachan, 1:151-53).  At some point, they met with

Charles Devens of Brookline Savings Bank.  Devens suggested that Strachan and Hesse

meet with a client of his, with whom he had a relationship, named Edward Moore.

(Strachan, 1:153-54).

**D.    Initial Discussions with Moore and Rosenfeld**

41.    On February 12, 2002, Strachan and Hesse met with Moore for the first time. (Strachan,

1:154).  At the initial meeting, Strachan and Hesse explained they were looking for

financing or capital for a tower company, and that they needed someone with experience

who could provide it.  (Strachan, 1:155-56; Hesse, 5:14-16).

42.    Moore described his background, stating, among other things, that he was a real estate

developer and was familiar with cell towers.  He in fact owned one himself, in

Marblehead. (Strachan, 1:155; Hesse, 5:16-17).  Strachan described his relationships

with carriers, his knowledge of their build-out plans, and what he saw was a "real

opportunity to build a legitimate business."  He also described the sites he had in

progress. (Strachan, 1:156; Hesse, 5:14-16; Moore, 18:104-05).

43.    After subsequent conversations, Strachan and Moore both decided that they did not want

to go into business with Hesse. (Strachan, 1:160-61).  Both agreed to speak further about

the potential business opportunity, including bringing in other potential partners.

(Strachan, 1:161-63).  Strachan brought in Matthew Sanford, a friend who was employed

in the wireless industry.  Moore introduced Strachan to Lawrence Rosenfeld. (Strachan,

18

1:163).

44.    The first meeting between Moore, Rosenfeld, Strachan, and Sanford occurred on

       February 15, 2002, at Moore's office in Marblehead. (Strachan, 2:8; Moore, 18:108-09;

       Rosenfeld, 11:23-24).

45.    During the meeting, the parties discussed a number of topics, including what each of

       them believed they could contribute to the venture. (Strachan, 2:12-13; Sanford, 5:76-80;

       Moore, 18:115). Among other things, Moore discussed his business experience and legal

       background. He also advised that he had an assistant who could help with the formation

       of the business. (Strachan, 2:13; Sanford, 5:81-82). He stated that he had experience

       building and negotiating the leases for his Marblehead tower. (Moore, 18:110-12).

       Rosenfeld also discussed his business background and experience, and stated that he was

       experienced and capable at creating business models for companies. (Strachan, 2:9;

       Rosenfeld, 11:25).

46.    As of February 2002, Strachan and Sanford had been negotiating a ground lease for a

       tower with Endicott College in Beverly, Massachusetts. (Strachan, 2:29; Sanford, 5:70-

       73). The college was prepared to sign such a lease. (Id.).

47.    Strachan described his background, his business relationships, and why he thought there

       was an opportunity to create a tower company. (Strachan, 2:11; Rosenfeld, 11:24-25).

       The parties specifically discussed the Beverly tower opportunity. (Strachan, 2:10-11).

       They also discussed Moore's existing cell tower, the advantages of hard-to-zone site

       opportunities, and potential carrier interest in general. (Moore, 18:110-12).

48.    The parties continued discussing the opportunity over lunch. (Strachan, 2:11-12). At

some point, Moore drew a circle on a napkin and divided it down the middle, with one side representing a 50% investor interest and the other a 50% working partner interest. He said that he and Rosenfeld "like to keep things simple," and that "this is how we do our business." (Strachan, 2:12; *see* Rosenfeld, 11:30-31; Moore, 18:114).

49.    The parties understood from the outset that Moore and Rosenfeld would provide the initial capital for the venture. (Moore, 18:115; Rosenfeld, 14:14, 16:9). Rosenfeld asked if Strachan and Sanford could contribute any capital to the venture; they responded that they were not in a position to do so. (Strachan, 2:13). Strachan and Sanford suggested that they could work for free for six months as their capital contribution. Rosenfeld responded that that "made sense." (Strachan, 2:13).

50.    At the end of the meeting, Moore and Rosenfeld asked Strachan and Sanford to send them a proposal and a *pro forma* so that they could begin modeling the business. (Strachan, 2:14; Rosenfeld 11:31-32; Moore, 18:115). Rosenfeld wanted to use the proposal to learn more about the strengths of his potential partners. He also wanted to use it as a starting point to develop other models for the business. (Rosenfeld, 11:33-35). Rosenfeld was specifically interested in the number of towers Strachan and Sanford thought could be built over the short- and long-term. (*Id.*, 11:34-35).

51.    On February 18, 2002, Strachan and Sanford sent Moore and Rosenfeld a letter by e-mail containing an investment proposal with a *pro forma* for a business that they called "Northeast Towers." (Strachan, 2:14; Ex. 2). The proposal set forth projected income and expenses associated with the proposed business and also projected how the business might grow over time. (Strachan, 2:14-28; 3:103-04; Ex. 2).

52.   The proposal included a model "based on signing twenty ground leases in the first year
      and adding additional ground leases until the fourth year." (Ex. 2 at 7).

53.   The proposal indicated that the company would need between $300,000 and $500,000 in
      capital over the first five years. In exchange, the investors (Moore and Rosenfeld) would
      receive 50% ownership of the company. (Ex. 2 at 2). It also stated that Sanford and
      Strachan would commit five years to the business and work without pay for six months,
      that Strachan would be president, and that Sanford would be vice-president. (*Id.*).[2]

54.   In calculating the amount of initial capital needed, Strachan and Sanford believed that it
      would cost about $100,000 to $125,000 to construct a cell tower. They believed that as
      soon as a tower was constructed, the company would be able to utilize bank financing,
      obtained by borrowing against the cash flow of the tower, to fund the business as more
      towers were built. (Strachan, 3:110-11, 4:128; Sanford, 6:125-26).

55.   On February 19, 2002, Strachan and Sanford set up a Delaware limited liability company
      called Eastern Towers, LLC. (This was a different entity than the Eastern Towers, LLC
      that is a defendant in this litigation.) (Strachan, 2:28-29; Ex. 3).[3]

56.   Strachan and Sanford wanted to create an entity to sign the lease to ensure that they did
      not lose the opportunity. (Strachan, 2:29, 4:18).

57.   On February 19, 2002, Eastern Towers, LLC (Delaware) entered into an option for a
      ground lease for the Beverly site. (Strachan, 2:29-30; Sanford, 5:71-73; Ex. 34; Ex.

---

[2] The proposal also stated that all of the profits would be "dispersed between all parties" annually; that
"[t]here will be a sign-off required by at least three of the four parties to go ahead in zoning for a potential site"; and
that the business should be set up as "a LLC. Corp." [*sic*] (Ex. 2 at 2).

[3] The Delaware LLC was cancelled on January 23, 2003. (Ex. 74).

900.201).

58.     While on a ski vacation shortly afterward, Moore and Rosenfeld spent time creating a
        more sophisticated model of the business, among other things providing projections on a
        quarterly, rather than an annual, basis. (Rosenfeld, 11:33, 13:89-90; Moore, 18:120-21;
        Ex. 4).

59.     While working on the model, Rosenfeld concluded that the 20-tower model in the
        proposal was not feasible as a projection for the new tower business, and worked to create
        a more realistic model. (Rosenfeld, 11:35, 52-53). Moore and Rosenfeld exchanged
        several drafts, revising the model; among other things, they reduced the projected number
        towers built during the first year to six. (Rosenfeld, 11:35; Exs. 4, 5, 6, 7, 8, 9).[4]

60.     On February 25, 2002, the parties met again to discuss the proposed business. (Strachan,
        2:32-33; Ex. 600). During that meeting, Strachan and Sanford reported that they had
        signed the ground lease for the Beverly site, using the Delaware LLC that they had
        formed. (Strachan, 2:33-34; Rosenfeld, 13:95-96).

61.     The parties also discussed the financial model that Moore and Rosenfeld had created.
        (Strachan, 2:34-35; Moore, 18:130, 133-34; Sanford, 6:130; Rosenfeld, 11:46). Strachan
        and Sanford provided comments on the model based on their experience in the industry.
        (Strachan, 3:120; Rosenfeld, 11:53).

62.     The refined model as of February 25, 2002, projected that the business would have two
        working towers by December 2002, five working towers by March 2003, nine working

---

[4] These models also included references to loans and interest payments reflecting some amount of debt
financing. (*See* Exs. 4, 5, 6, 7, 8, 9).

towers by June 2003, 13 working towers by September 2003, and 17 working towers by December 2003. (Ex. 9). The model also projected that substantial working capital would be required to form a viable business. (*Id.*).

63.   All of the financial models prepared by Rosenfeld and Moore assumed that the new business would require financing over time in order to develop new towers. (Moore, 18:134; Exs. 4-9).

64.   As of the February 25 meeting, it was undecided what organizational structure the new business would have. In particular, it was undecided whether the parties would use a "C" corporation, an "S" corporation, an LLC, or a combination of entities in a multi-level structure. Although any of those options would provide limited liability, they were not interchangeable. Among other things, there were various advantages and disadvantages from the standpoint of taxes and corporate governance.

65.   Moore and Rosenfeld wanted to ensure that they had adequate protections before contributing a significant amount of capital to the business. (Rosenfeld, 11:57, 65, 70-73; *id.*, 13:100-01). Among other things, they wanted to structure the business to avoid double taxation if they incorporated, but wanted to have two classes of equity ownership so that Moore and Rosenfeld could recover their capital investment before any profits were divided among the principals. (Rosenfeld, 11:61-63).

66.   Moore and Rosenfeld contend that they discussed the organizational structure at the February 25 meeting. Among other things, they expressed concerns about possible self-employment tax consequences if only an LLC were used. (Rosenfeld, 13:92; Moore, 18:136-39). Strachan and Sanford deny that an organizational structure was discussed on

23

February 25, other than the fact that a corporation would be created.  (Strachan, 2:36, 39; Sanford, 6:131).

67. The agenda for the meeting also reflected that the four intended to discuss "vesting" and a "shareholder agreement."  (Moore, 18:139-40; Ex. 601).  Moore and Rosenfeld testified that the issue of vesting was discussed at the February 25 meeting.  (Moore, 18:139-40; Rosenfeld, 13:96-97).  Among other things, they contend that they indicated that the equity interests of Strachan and Sanford would have to vest over time if the two were not contributing any capital, and that a shareholder agreement would have to be put into place to establish the rights of the parties.  (*Id.*).  Strachan testified that he did not recall whether those subjects were discussed on February 25.  (Strachan, 2:36).  Sanford testified that the subject of vesting was introduced at a later point, although he did not provide a specific date.  (Sanford, 5:96-99; *id.*, 6:131-32).

68. At a minimum, it seems clear that the subject of vesting was discussed at the February 25 meeting.  Furthermore, and without resolving the dispute as to every detail, it is clear that the organizational structure of the new business, and whether the equity interests of Strachan and Sanford would vest over time, had not been resolved by February 25.

69. Moore and Rosenfeld were sophisticated businessmen who intended to contribute significant capital to the proposed enterprise.  It is very unlikely that they would follow through on the creation of the business if the enterprise were not organized in a way to optimize tax and business advantage.  It is also very unlikely that they would agree to an arrangement where Strachan and Sanford's equity interests would vest in full on the first day, notwithstanding the fact that Strachan and Sanford were essentially strangers to

Moore and Rosenfeld and had contributed no financial capital to the enterprise.

### E.    Formation of Eastern Towers, Inc.

70.    After the meeting on February 25, Rosenfeld sent Moore a copy of a revised version of the financial model, along with an agenda for a further meeting to be held on February 27. (Rosenfeld, 11:44-46; Exs. 10, 14). The model included information provided by all four parties. (Rosenfeld, 11:46; Strachan, 2:40; Sanford, 6:137-38).

71.    The model contained the same tower construction projections as the previous model. It anticipated that, after about a year, about half of the working towers would be two-carrier towers, about half would be four-carrier towers, and that there would be one- and three-carrier towers as well. (Ex. 10; Strachan, 3:134-35; Moore, 19:7). The model also included a capital requirement of approximately $500,000 and assumed that outside financing would be obtained for the acquisition and development of additional towers. (Rosenfeld, 13:99; Ex. 14 at 3).

72.    On February 27, 2002, the parties met again. (Strachan, 2:39; Moore, 19:8; Ex. 602). They again discussed the business model that Moore and Rosenfeld had been refining. (Strachan, 2:40-41).

73.    The agenda for the February 27 meeting listed, among other items, "vesting." (Ex. 602). Strachan and Sanford testified that the subject of vesting was not discussed at the meeting. (Strachan, 2:53; Sanford, 5:85). Rosenfeld and Moore testified that the subject was discussed, at least to a limited extent. (Rosenfeld, 11:66; Moore, 18:136-39, 19:11, 15). At a minimum, however, the fact that the subject was on the agenda indicates that the issue had not been finalized.

74.     At that point, all four principals were willing to move forward, although many of the
        specific details of the business had not yet been settled.  Among other things, there were
        no formal shareholder and employment agreements, and Moore and Rosenfeld had not yet
        made a substantial financial contribution to the business.  (*See* Strachan, 2:50-54;
        Sanford, 5:88; Rosenfeld, 11:94).

75.     At some point, the parties had learned that the name Strachan and Sanford preferred,
        "Northeast Towers," was taken.  They discussed forming a new entity in part to save their
        second-choice name, which was "Eastern Towers."  (Strachan, 3:131-32; Sanford, 6:132).

76.     Strachan and Sanford were ready to start the business and expressed the need for the
        formation of an entity, so that when they contacted carriers and landowners they would
        have more credibility than if they were acting solely as individuals.  (Rosenfeld, 11:73-
        76).[5]

77.     According to Rosenfeld, the formation of a corporation would save the name "Eastern
        Towers" and allow Strachan and Sanford to pursue various opportunities while the parties
        worked to develop more comprehensive shareholder and employment agreements.
        (Rosenfeld; 11:63-64).

78.     Strachan and Sanford testified that the principals did not discuss any other form of
        organizational structure at the February 27 meeting.  (Strachan, 2:96; Sanford, 5:89).
        Rosenfeld and Moore testified that the subject was discussed.  (Rosenfeld, 11:71-72;
        Moore, 19:10).  Without resolving the dispute completely, it is nonetheless clear that the

---

[5] Strachan testified that immediately after the corporation (Eastern Towers, Inc.) was formed, Sanford "was focused on the business cards and stationery."  (Strachan, 2:54).

issue of the organizational structure of the enterprise had not been resolved by February 27.

79.     The parties signed the necessary papers to form Eastern Towers, Inc., as a Massachusetts corporation during the February 27, 2002 meeting. (Rosenfeld, 13:100; Ex. 21). The documents were prepared by Moore's assistant, Laura Whitney, and were signed by the four principals. (Strachan, 2:46-47; Rosenfeld, 13:100; Moore, 19:9-10).

80.     The parties conducted various corporate votes on February 27. Strachan, Moore, and Rosenfeld were elected as the directors of the corporation. (Ex. 16). Strachan was elected president; Rosenfeld was treasurer; and Toyo Johnson, one of Moore's assistants, was clerk. (Strachan, 2:39, 44, 47-49; Sanford, 5:84; Rosenfeld, 11:57; Exs. 16, 18, 19). Sanford was not included as an officer or director because at the time he was still employed at another firm in the wireless industry. (Strachan, 2:44, 3:141-42; Sanford, 5:83-84; Rosenfeld, 11:77-78).[6]

81.     The Articles of Organization also established the voting rights and limited the liability of the directors. (Ex. 21).[7]

---

[6] The parties intended that Sanford would continue working for his current employer for at least several months before becoming a director. (Sanford, 5:83-84; *see also* Ex. 81).

[7] Specifically, Article VI(h) stated:

Vote Required for Certain Transactions. The vote of a majority of the outstanding shares of each class of stock outstanding and entitled to vote thereon shall be sufficient to approve any agreement of merger or consolidation of the corporation with or into another corporation or of another corporation into the corporation, or to approve any sale, lease or exchange of substantially all of the assets of the corporation, notwithstanding any provision of law that would otherwise require a greater vote in the absence of this provision of Article VI.

(Ex. 21 at 3-4). Article VI(j) stated:

Elimination of Directors' Personal Liability. No director shall be personally liable to the

82.    Toyo Johnson, as clerk, signed a document on February 27, 2002, titled "Issuance of
       Common Shares" that stated that the directors had "voted to issue 10,000 shares of
       common class stock . . . ." (Ex. 17; *see also* Strachan, 2:47-50; Sanford 5:84-87;
       Rosenfeld, 11:78-80). There were no classes of stock other than common stock.

83.    The February 27 "Issuance of Common Shares" did not designate who received shares, or
       how many. (Ex. 17; Rosenfeld, 11:79-80; Moore, 19:10-11).

84.    No stock certificates for shares of Eastern Towers, Inc., were ever created or provided to
       the shareholders. (Strachan, 2:50; Sanford, 5:85; Moore, 20:38).

85.    There is no stock register or other corporate record indicating the ownership of the shares
       of Eastern Towers, Inc., as of March 1, 2002.

86.    Under the circumstances, the ownership of the shares of Eastern Towers, Inc., must be
       inferred from the available evidence.

87.    As of the end of February 2002, the parties understood and expected that the equity split
       in Eastern Towers, Inc., would be 25% each for Strachan and Sanford, and 50% between
       Moore and Rosenfeld. (Strachan, 2:43-44, 48; Sanford, 5:84-87; Moore, 20:38-39).

88.    Accordingly, as of March 1, 2002, the ownership of shares of Eastern Towers, Inc., was

---

corporation or its stockholders for monetary damages for breach of fiduciary duty as a director
notwithstanding any provision of law imposing such liability; provided, however, that this
provision shall not eliminate or limit the liability of a director (i) for any breach of the director's
duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or
which involve intentional misconduct or a knowing violation of law, (iii) under section sixty-one or
sixty-two of Chapter 156B of the Massachusetts General Laws, or (iv) for any transaction from
which the director derived an improper personal benefit. No amendment to or repeal of this
paragraph shall apply to or have any effect on the liability or alleged liability of any director of the
Corporation for or with respect to any acts or omissions of such director occurring prior to the date
of such amendment of repeal.

(Ex. 21 at 4). That article tracked the provisions of Mass. Gen. Laws ch. 156B, § 13(b)(1½).

as follows: each of four persons (Edward Moore, Lawrence Rosenfeld, John Strachan, and Matthew Sanford) owned 2,500 shares, for a total of 10,000 shares of common stock.

89.    The parties also discussed the Beverly tower project at the February 27 meeting. Strachan and Sanford still owned the rights to build the Beverly tower through Eastern Towers, LLC (Delaware). (Moore, 19:17). Moore and Rosenfeld asked, and Strachan and Sanford agreed, to transfer those rights to the new enterprise. (Strachan, 2:51; Sanford, 10:158-60).

90.    The parties intended (and apparently were under the impression) that the Beverly site would be transferred to the new business in April 2002. (Rosenfeld, 11:162-63). However, the Beverly site was not actually transferred until June 2003. (Rosenfeld, 11:160-63; Sanford, 10:160; Moore, 19:17).[8] As noted, the Delaware LLC had formally ceased to exist in January 2003. (Ex. 74).

91.    On February 28, 2002, Moore contributed $5,000 in capital to Eastern Towers, Inc. (Ex. 695; *see* Rosenfeld, 11:98-101, 165).

92.    The articles of organization for Eastern Towers, Inc., were filed with the commonwealth on March 1, 2002. (Ex. 21).

   **F.    The Beginning of Operations**

93.    At some point after February 27, Strachan signed a lease on behalf of Eastern Towers, Inc., for office space in a newly-built, vacant office building at 40 Tioga Way in Marblehead, Massachusetts. An entity owned by Moore owned the building, and the

---

[8] In the meantime, on September 30, 2002, a Tower Lease Agreement was entered into between the college and "Eastern Towers, LLC." (Ex. 900.301). Moore signed the agreement as a member of the LLC. (*Id.*) At the time, the tower was owned by the Delaware LLC, of which Moore was not a member.

company paid rent of approximately $1,200 to $1,300 per month to that entity. (Strachan, 2:37-38, 54-56; Sanford, 5:90; Rosenfeld, 12:129; Moore, 16:125).[9]

94.    Glover Property Management, Inc., a corporation owned by Moore, performed accounting and bookkeeping services for Eastern Towers, Inc. (and, eventually, Eastern Towers, LLC). (Moore, 15:140-42, 19:55-58). Both entities paid Glover for its services. (Moore, 19:58-60).

95.    Strachan and Sanford began reviewing potential tower sites in Massachusetts and New Hampshire and attempting to use their relationships and knowledge to begin developing business opportunities for the company. (Strachan, 2:75-80; Sanford, 5:93).

96.    Among other things, Strachan met with representatives from AT&T (and AT&T's project manager, Bechtel), T-Mobile, and Cingular to seek business opportunities. (Strachan, 2:57-58, 77; Chandler, 4:24).

97.    As a result of those meetings, Strachan received search rings and began conducting site visits to find potential sites for AT&T. (Strachan, 2:61-67).

G.    **The LLC Operating and Employment Agreements**

1.    **The Negotiation of the Agreements**

98.    In early March 2002, Moore and Rosenfeld continued to discuss among themselves the organizational structure of the new enterprise. At some point, Moore and Rosenfeld decided to create a limited liability company in addition to the corporation.

99.    During the same period, Moore and Rosenfeld began to discuss among themselves

---

[9] The rent appears to have been paid to Office Realty Trust or New Office Realty Trust. (Ex. 193). The office for Eastern Towers, Inc., was located at 40 Tioga Way, approximately one mile from Moore's office, which was located at 8 Doaks Lane, Marblehead. (Strachan, 3:20).

adjusting the equity split of the business. (Rosenfeld, 11:154-57, 13:112-13). They did not initially discuss that fact with Strachan or Sanford. (Sanford, 5:107; Rosenfeld, 11:153-55, 13:113-14).

100.    After the February 27, 2002 meeting, Rosenfeld began working with attorney William Kelly at the Nixon Peabody law firm to create an LLC and to prepare detailed operating and employment agreements. (Rosenfeld, 11:69-70; Ex. 26).

101.    Strachan was not aware at the time that Rosenfeld was communicating with a lawyer about creating a new entity and preparing various agreements. (Strachan, 2:97, 130).[10]

102.    On March 4, 2002, Rosenfeld e-mailed a term sheet to Kelly and sent a copy to Moore. (Rosenfeld, 13:103-04; Ex. 26). It was not sent to Strachan or Sanford. (Ex. 26). The term sheet contained, among other things, terms that Moore and Rosenfeld wanted in the operating and employment agreements. (*Id.*). Neither Strachan nor Sanford received a copy of the March 4 e-mail. (Strachan, 2:96-97, 129-30; Sanford, 5:112; *see also* Ex. 26).[11]

103.    On March 5, 2002, Kelly forwarded Rosenfeld a draft operating agreement for a new entity to be called Eastern Towers, LLC. Rosenfeld then forwarded it to Moore. (Ex. 27).

104.    The draft operating agreement as of March 5 included a proposed § 5.2. That section would permit Moore and Rosenfeld to: "engage or have an interest in other business

---

[10] Sanford testified that he believed that outside counsel had assisted in drafting the agreements, but also said that his memory was not clear and did not give a date as to when he learned that fact. (Sanford, 5:108-09).

[11] Rosenfeld testified that he did not send the draft operating agreement that he received on March 5 to either Sanford or Strachan because he wanted to come to an agreement with Moore first before sending it out. (Rosenfeld, 11:113-15; *see* Ex. 27).

ventures which are similar to or competitive with the business of the Company." It also

provided that Moore and Rosenfeld would not be "obligated to present an investment

opportunity to the Company even if it is similar to or consistent with the business of the

Company," and would have the "right to take for their own account or recommend to

others any such investment opportunity." (Ex. 27).

105.   Rosenfeld called Strachan on March 11, 2002, to discuss a proposed vesting schedule and

an insurance policy for Strachan and Sanford that he and Moore had been developing.

(Rosenfeld, 11:128-29); Strachan, 2:91, 3:151).   Rosenfeld proposed a vesting schedule

of five years for equity in the LLC.   (Rosenfeld, 11:111-12; *see* Ex. 29).   He did not

mention § 5.2.

106.   Strachan thought vesting was inappropriate because he and Sanford had agreed to put the

Beverly tower site into the company and to work six months without pay, and that to the

extent that there would be vesting, a five-year-vesting schedule was too long.   (Strachan,

2:91-92; Rosenfeld, 11:111-12).[12]

107.   Neither Strachan nor Sanford objected at the time to the fact that a separate LLC would

be created.

108.   Rosenfeld told Strachan and Sanford that if they desired they could obtain advice from a

lawyer before they signed the agreements.   (Sanford, 10:166-67; Rosenfeld, 13:106-07).[13]

109.   Although Moore was a lawyer, Strachan understood that Moore was not representing him

---

[12] When Strachan asked "[W]hy aren't you guys vesting too?"  Rosenfeld replied, "Because we're putting
the money in."  (Strachan, 3:162, 2:92).

[13] On March 6,  Rosenfeld had e-mailed Strachan an attorney's name and contact information.  (Strachan,
3:150-51; Rosenfeld, 11:137; Ex. 604).

personally. (Strachan, 2:133-34, 3:159). Sanford and Strachan understood that Moore was effectively serving as in-house counsel for the company. (Strachan, 2:13, 59-60, 133-35; *see* Sanford, 10:174).[14]

110. Strachan and Sanford did not seek outside counsel because they trusted Moore and Rosenfeld and were relying on Moore's legal training and experience. (Strachan, 2:133-34, 3:158; Sanford, 10:174).

111. After that discussion, Rosenfeld revised the draft term sheet to reflect a shorter vesting period of four years, with accelerated vesting for the first six months. (Ex. 29). Rosenfeld shared the revised term sheet with Moore, who accepted the change and directed Rosenfeld to send the term sheet to Kelly. (Ex. 30). The revised term sheet also identified the equity split as 50% between Moore and Rosenfeld and 50% between Strachan and Sanford. (Ex. 29). Rosenfeld did not send the revised term sheet to either Sanford or Strachan. (Rosenfeld, 11:124-25, 12:19-20, 14:114-15).[15]

112. Rosenfeld continued to work on the term sheets and sent copies to Kelly and Moore. (Exs. 32, 35). As late as March 23, the revised term sheets identified the equity split as 50% between Moore and Rosenfeld, and 50% between Strachan and Sanford. (Exs. 32,

---

[14] Moore acted as an attorney for the company on multiple occasions. For example, the day after Eastern Towers, Inc., was formed, Moore copied Strachan on his letter to the Massachusetts Secretary of the Commonwealth enclosing the corporation's Articles of Organization. (Ex. 22). The letter was drafted on "Edward T. Moore Attorney at Law" letterhead, and signed by Moore as the attorney for the company. (*Id.*). On February 27, 2002, Moore also sent a letter to Attorney Daniel Creedon concerning a potential tower site in Falmouth. (Strachan, 2:72; Ex. 400). The letter and the fax transmittal sheet were on "Edward T. Moore Attorney at Law" letterhead, and the letter itself was also signed by Moore as the attorney for the company. (Ex. 400).

[15] Rosenfeld testified that he did not send the term sheet in advance to Strachan. (Rosenfeld, 11:115, 124; 12:20-21). He testified that he felt "it was better to talk in person." (Rosenfeld, 12:210). He also testified that he did not call Sanford or send him a copy of the revised term sheet because Sanford wanted him to deal directly with Strachan. (Rosenfeld, 11:116).

35).

113.    The four principals met on March 26, 2002, to discuss the proposed operating and
employment agreements. (Strachan, 2:93-95; Ex. 13). Rosenfeld shared the current
version of the term sheet that he and Moore had developed with Strachan and Sanford
and said that he would circulate drafts of the operating and employment agreements.
(Strachan, 3:162; Rosenfeld, 11:107-08; Ex. 35).[16] It was the first time Strachan and
Sanford had seen the term sheet. (Rosenfeld, 14:115). Rosenfeld did not provide copies
of the draft agreements at the meeting. (Strachan, 2:96).

114.    The term sheet described Eastern Towers, Inc., as a "Sub-S service" corporation and set
out other key terms of the proposed business, including the creation of an LLC. (Ex. 35).
Rosenfeld explained that having a separate "operating arm" for the business would be
beneficial for tax reasons and to help the business obtain financing. (Strachan, 2:95-96).

115.    The meeting on March 26, 2002, was the first meeting of the principals since the creation
of Eastern Towers, Inc., on February 27. During that four-week period, Strachan had
begun work for the new enterprise, but had also taken a family vacation that was
apparently one week long. (Strachan, 2:93; Rosenfeld, 11:115).

116.    On March 27, 2002, Rosenfeld circulated a draft of an LLC Operating Agreement for
Eastern Towers, LLC to Strachan and Sanford. (Ex. 36). Strachan acknowledged receipt
of the draft. (Ex. 37).

117.    The draft LLC Operating Agreement included § 5.2, which permitted Moore and

---

[16] Strachan testified that Rosenfeld had told them that the documents were going to be boilerplate
agreements, and would include vesting schedules. (Strachan, 2:96, 110).

Rosenfeld to engage in competing business ventures.  (Ex. 36, § 5.2).

118.    The draft LLC Operating Agreement did not include a specific division of equity of the
        LLC among the principals.  However, it listed Moore and Joan Rosenfeld Trust f/b/o
        Lawrence W. Rosenfeld as Class A members, and Strachan and Sanford as Class B
        members.  It also provided a vesting schedule for the Class B members, with 25% vesting
        after six months and periodic vesting thereafter in three-month increments, with full
        vesting after four years.  (*See id.*, Sched. A).

119.    Rosenfeld also sent Strachan and Sanford a draft of an Executive Employment
        Agreement on March 27.  (Strachan, 2:103; Sanford, 10:26-27; Ex. 38).

120.    None of the draft agreements that were circulated in March 2002 specifically addressed
        the ownership relationship, if any, between Eastern Towers, Inc., and Eastern Towers,
        LLC.

121.    The draft Executive Employment Agreement was an agreement between Eastern Towers,
        Inc., and Strachan, as president of the corporation.  (Ex. 38).

122.    The draft Executive Employment Agreement also provided, among other things, that
        Strachan could be terminated with or without cause.  (*Id.* §§ 3.2, 3.3).  The agreement
        was for a two-year term.  (*Id.* § 3.1).

123.    Strachan and Sanford discussed the various provisions of the agreements, including § 5.2,
        the non-competition provisions, and the vesting terms.  (Strachan, 2:99-104; Sanford,
        10:15).  Neither Strachan nor Sanford understood why § 5.2 was necessary or appropriate.
        (Strachan, 2:101-04).

124.    On March 28, 2002, Moore contributed another $5,000 in capital to Eastern Towers, Inc.

(Ex. 695).

125.   On March 30, 2002, Sanford e-mailed Moore and Rosenfeld his and Strachan's
       comments on the draft LLC Operating Agreement and the draft Executive Employment
       Agreement. (Strachan, 2:104-05, 4:43-44; Sanford, 10:16-18; Ex. 41).

126.   In an attachment to the e-mail, Strachan and Sanford specifically identified § 5.2 of the
       LLC Operating Agreement as something they wished to discuss. (Ex. 41 at 2). They also
       requested clarification of the vesting provisions in the agreement, and addressed the
       employee benefit plan, Class A membership interests, and insurance. (*Id.*). Strachan and
       Sanford concluded by stating: "We are fine with all the other sections and language in
       the Operating Agreement." (*Id.*).

127.   In that e-mail, Strachan and Sanford did not object to the creation of the LLC.

128.   Strachan and Sanford addressed the Executive Employment Agreement in a separate
       attachment. (Ex. 41 at 3). Specifically, they expressed their concern that the non-
       competition provisions in the employment agreement should also apply to Moore and
       Rosenfeld. (*Id.*). They also expressed concern with the provisions regarding vacation
       time, benefits, the two-year term of the agreement, the termination provisions, the length
       of continuing assistance required if terminated for cause, and the two-year non-
       solicitation provision. (*Id.*). They concluded by stating: "Everything else in the
       Agreement is fine." (*Id.*).

129.   On April 3, 2002, the parties met and discussed the issues Strachan and Sanford had
       raised with respect to the LLC Operating Agreement and the Executive Employment
       Agreement. (Strachan, 2:107, 4:45).

130.   The discussion concerning § 5.2 at the April 3 meeting was "heated and emotional."
       (Sanford, 5:103, 10:19-20). Sanford and Strachan understood § 5.2 would allow Moore
       and Rosenfeld to compete against Eastern Towers. (Strachan, 2:101-02; Sanford, 5:102-
       03, 6:79). Strachan felt that this provision made "no sense" given their business plan;
       Sanford believed it was a "huge concern" and "fundamentally wrong" and wanted it taken
       out. (Strachan, 2:101-02; Sanford, 5:102-05).

131.   Sanford testified that if he had known about § 5.2 in advance, "It would have made me
       look a lot harder at going into business . . . and who I was joining forces with . . . [and]
       whether I'd want to start a company with people who had the right to compete against
       that company." (Sanford, 5:110). Strachan testified that if he had known that Section 5.2
       existed he "never would have gone ahead with these men." (Strachan, 2:133).

132.   Moore and Rosenfeld told Strachan and Sanford that they had numerous investments and
       did not want to limit their investments only to those that did not compete with Eastern
       Towers. (Strachan, 2:107-09; Sanford, 6:79-80, 10:173-74; Rosenfeld, 11:151-52,
       13:118-19; Moore, 19:37-38). Moore said that he already had a cell tower and was an
       investor in American Tower, and that he wanted to be free to continue to make
       investments in the cell tower industry. (Sanford, 10:173-74; Rosenfeld, 11:151-52).
       According to Rosenfeld, the vehicles for his venture capital investments often invest in a
       "theme" or similar companies, and he wanted to reserve the right to do so here.
       (Rosenfeld, 11:119-20).

133.   Moore and Rosenfeld specifically represented to Strachan and Sanford that they did not
       intend to compete directly with Eastern Towers and that the provision was designed to

                                              37

protect their "existing interests" and allow them to invest in other tower companies, such
as American Tower. (Sanford, 6:79-80,10:173-74; *see* Rosenfeld, 13:118-19; Moore,
19:38-39).[17]

134.  After the discussion, Strachan and Sanford reluctantly agreed to include § 5.2 in the
      Operating Agreement. (Strachan, 2:108-09, 125; Rosenfeld, 13:119).

135.  During the discussions, the parties also negotiated and amended the length of the non-
      competition provision in the Executive Employment Agreement from five years to two
      years. (Strachan, 3:154; *compare* Ex. 38 *with* Ex. 35).

136.  On approximately April 2 or 3, 2002, Rosenfeld called Strachan to discuss adjusting the
      equity split of the business. (Strachan, 2:120).[18]  Rosenfeld told him that he and Moore
      wanted additional equity in the business because they were doing more work than they
      had originally planned. (Strachan, 2:120-21). As a result, Rosenfeld told him that he and
      Moore determined that a 60-40 split of the equity was appropriate. (Rosenfeld, 11:155,
      13:115).

137.  Strachan was not happy with the demand for a different equity split.  He felt he had been
      "blind-sided," that they had already started the business, and that he did not feel that the
      arrangement "was a very fair thing." (Strachan, 2:121).  Rosenfeld told Strachan to talk

---

[17] Strachan and Sanford testified that the discussion was focused solely on the subject of stock investments
in companies such as American Tower and Moore's rights in his own existing tower or buildings, not investments in
new ventures. (Strachan, 2:107-09; Sanford, 10:173-74).

[18] Moore and Rosenfeld testified that the telephone call took place on April 2, and that the parties discussed
the proposed equity change during the April 3 meeting. (Rosenfeld, 14:117-19; Moore, 19:45-46). Strachan
testified that the call occurred after the April 3 meeting but before they signed the documents on April 9. (Strachan,
2:120). Sanford testified that he first heard about the proposed change in the equity split "a couple of days [or] a
week" before the April 9 meeting. (Sanford, 5:114).

with Sanford and get back to him. (*Id.*).

138.   The parties had several "emotional" and "heated" discussions about the proposed change
       in the equity split. (Sanford, 5:107-08). Moore and Rosenfeld maintained that they
       would not move forward without the change. (Sanford, 5:111-12). Strachan and Sanford
       did not see the value in the work Moore and Rosenfeld had contributed, and thought they
       should make additional capital contributions or secure additional bank financing in
       exchange for the additional equity. (Strachan, 2:122-24).

139.   As of the beginning of April 2002, Strachan and Sanford had not yet contributed the
       Beverly tower or any other assets to the company, and Sanford was still employed at
       another company. (Sanford, 10:37-40; Rosenfeld, 11:160-64; Moore, 20:26; *see also* Ex.
       29).

140.   Strachan testified that he felt that he could not walk away from the business because he
       had committed to contribute the Beverly tower and because he had used his relationship
       with AT&T to secure search rings and sites. (Strachan, 2:124). Sanford testified that he
       did not walk away because they "had committed the Beverly tower," they had "committed
       other work product," he intended to leave his job, and he had small children and a house.
       (Sanford, 5:106, 10:20-21).[19]

141.   On April 8, 2002, Rosenfeld contributed $10,000 in capital to Eastern Towers, Inc. (Ex.
       695).

142.   On April 9, 2002, at 10:02 a.m., Rosenfeld e-mailed attorney Kelly with revisions to the
       LLC Operating Agreement. (Ex. 48). In that e-mail, Rosenfeld informed Kelly "[b]y the

---

[19] Sanford did not become a director of Eastern Towers, Inc., until February 14, 2003. (Ex. 81).

way, we have changed the %'s to 60% for A and 40% for B." (*Id.*).

143.    Rosenfeld also inquired about "[w]ho makes decisions about hiring and firing" for the

company, and the impact of the equity change. (*Id.*).[20]

144.    The April 9 e-mail from Rosenfeld to Kelly also asked: "Have we decided on the best

stockholding and board structure for ET, Inc? It has been set up as a Massachusetts

company and although it had originally been expected to be an S corp, we haven't made

the election yet, so we can keep it as a C corp." (Ex. 48).

145.    The parties appear to agree that they signed the LLC Operating Agreement on April 9,

2002. (Strachan, 2:125; Ex. 45).

146.    Nonetheless, the LLC Operating Agreement, which is dated "as of" April 9, states (in the

past tense) that "the Company [Eastern Towers, LLC] was formed as a limited liability

company under the Massachusetts Limited Liability Company Act . . . on April 24,

2002." (Ex. 45 at 1).

147.    In fact, Eastern Towers, LLC was not created until September 17, 2002, when its

certificate of organization was filed with the secretary of the commonwealth. (Ex. 54).

That document indicates that the certificate of organization was executed on April 30,

_____

[20] Specifically, the e-mail stated:

Who makes decisions on hiring and firing. I am assuming the president can hire or fire the VP and
the board can hire or fire the Pres.

* * *

The decision making of the LLC based on the 60/40 interest holding? This obviates the need for a
standoff vote, I assume. Are there any decisions that only managers can make and cause a standoff
even though we have 60% interest?

(Ex. 48). Neither Moore nor Rosenfeld discussed that issue with Strachan or Sanford at the time. (Strachan, 2:126-
27; Sanford, 5:107-08, 112; *see also* Rosenfeld, 11:159-60).

2002. (*Id.*).[21]

148.   Strachan also signed the Executive Employment Agreement on April 9, 2002. (Ex. 44).

### 2.     The Terms of the LLC Operating Agreement

149.   The LLC Operating Agreement identified the members of Eastern Towers, LLC as
       Strachan, Sanford, and Tower Investors Trust (an entity owned and controlled by Moore
       and Rosenfeld). (Ex. 45 at Schedule A).

150.   The agreement identified the managers of the LLC as Moore, Rosenfeld, Strachan, and
       Sanford.

151.   The agreement provided for two classes of members:  class A (Tower Investors Trust)
       and class B (Strachan and Sanford). (Ex. 45, § 2.3 and Schedule A).

152.   The agreement stated that Tower Investors Trust owned 60% of the membership interests
       and Strachan and Sanford would eventually, after vesting, together own 40%. (Ex. 45,
       Scheds. A, B; *see also* Moore, 19:35).

153.   Vesting for Strachan would begin in six months, on October 9, 2002, at 5%, and would
       increase every three months in increments of 1.072%.  Strachan would be fully vested at
       20% in four years.

154.   The agreement further provided that "Class B Membership Interests may be held only by
       (i) employees, directors, officers, consultants or advisors of or to the Company, Eastern
       Towers, Inc., . . . or entities affiliated with the Company or ETI ("Service Providers")."
       (Ex. 45, § 2.3(b)).

---

[21] The parties were apparently under the mistaken impression that the LLC Operating Agreement transferred
ownership of the Beverly site from the Delaware LLC to Eastern Towers, LLC. (Rosenfeld, 11:160-64).  In fact, it
did not address the issue at all.

155.    Under the agreement, "If for any reason (whether voluntary or involuntary) a Class

Member ceases to be a Service Provider, the unvested portion of such Class Member's

Membership Interest shall automatically be terminated." (Ex. 45, Sch. B).  In the event of

such a termination, the percentage membership interests of the other members would be

increased pro rata.  (*Id.*, § 2.3(b)).

156.    If a Class B member ceased to be a "Service Provider," the company could, at its option

by giving written notice within six months, redeem that member's interest at a price set

according to a formula based on certain financial data.  (*Id.*, Sch. B).

157.    The agreement indicated that Tower Investors Trust would make an initial capital

contribution of $25,000 and that it had made a "commitment to make additional capital

contributions" in the amount of $475,000.  (Ex. 45, Schedule A)

158.    Section 2.9 of the agreement provided that "[n]o member shall have any right . . . to

receive any distribution or the repayment of his capital contribution except as expressly

provided in this Agreement."  (Ex. 45, § 2.9).

159.    Section 6.2 of the agreement addressed capital contributions.  (Ex. 45, § 6.2).  Nothing in

that section addressed capital withdrawal.

160.    Sections 7.1 and 7.2(a) of the agreement provided as follows:

7.1.    Capital Recovery.

For purposes of this Article VII, the term "Capital Recovery" with
respect to a Member or class of Members, shall mean the receipt of cash
and/or property with a value equal to the Contribution of such Member or
class of Members.

7.2    Allocation of Profits and Losses.

       (a)     All profits realized by the Company arising from any source shall be allocated to the Members pro rata in accordance with their respective Membership Interests, provided that profits shall not be allocable to Class B Members until Capital Recovery by the Class A Members.

(Ex. 45, §§ 7.1, 7.2(a)).

161.   Sections 7.3(c) and (d) of the agreement addressed distributions of net cash proceeds

from the sale of capital assets.  Specifically, those sections provided as follows:

       (c)     The Company shall promptly distribute to the Members the net cash proceeds it receives from the sale of capital assets, except to the extent that, in the opinion of the Managers, the Company is likely to require such proceeds to pay Company expenses.  The Company may, at the discretion of the Managers, distribute to the Members at any time additional amounts in cash or in kind.  All distributions pursuant to this Section 7.3(c) shall be made to the members pro rata in proportion to the balances of their respective Capital Accounts; provided, however, that no distributions pursuant to this Section 7.3(c) shall be made to Class B Members until Capital Recovery by the Class A Members.

       (d)     Anything in this Section 7.3 to the contrary notwithstanding, no distribution shall be made to any Member unless all liabilities of the Company to persons other than Members have been satisfied or, in the good faith judgment of the Managers, there remain assets of the Company sufficient to satisfy such liabilities.

(Ex. 45, §§ 7.3(c), (d)).

162.   The agreement also contained provisions concerning transfer of membership interests and

the dissolution and liquidation of the company.  (Ex. 45, §§ 8.1-8.7, 9.1-9.2).

163.   Under the agreement, membership interests in the LLC could only be transferred under

limited circumstances, with a right of first refusal granted to the company and the other

members, and with various other conditions, including consent of the managers to any

assignment.  (Ex. 45, §§ 8.1-8.7).

164.    Taken as a whole, the LLC Operating Agreement "expressly" provided for recovery of

        capital contributions only under certain limited circumstances:  as part of a distribution of

        profits (§§ 7.1, 7.2); as part of a distribution of proceeds from the sale of capital assets

        (§ 7.3); or upon liquidation or dissolution (§§ 9.1-9.2).

165.    Nothing in the LLC Operating Agreement permitted the withdrawal of capital

        contributions simply on request or direction of the members.

166.    The final version of the LLC Operating Agreement also included § 5.2, which provided in

        part as follows:

>       Any Manager, Officer or Member who is not an employee of the Company or ETI
>       may engage or have an interest in other business ventures which are similar to or
>       competitive with the business of the Company, and the pursuit of such ventures,
>       even if competitive, shall not be deemed wrongful or improper or give the
>       Company, its Managers or the other Members any rights with respect thereto.  No
>       Manager or Member who is not an employee of the Company or ETI shall be
>       obligated to present an investment opportunity to the Company even if it is similar
>       to or consistent with the business of the Company, and such Member, Officer or
>       Manager shall have a right to take for their own account or recommend to others
>       any such investment opportunity.

(Ex. 45, § 5.2).

167.    The LLC Operating Agreement also stated that the LLC and Eastern Towers, Inc., had

        "entered into" a "Management Services Agreement."  (Ex. 45, § 2.3(b)).  No such

        agreement, however, was ever drafted or executed.

168.    Section 2.7 of the agreement provided that "[t]he failure of the Company to observe any

        formalities or requirements relating to the exercise of its powers or management of its

        business or affairs under this Agreement or the [Massachusetts Limited Liability

        Company] Act shall not be grounds for making its Members or Managers responsible for

the liabilities of the Company."  (Ex. 45, § 2.7).

169.  The LLC Operating Agreement also contained an integration clause.  (Ex. 45, § 12.3).

### 3.    The Terms of the Executive Employment Agreement

170.  The Executive Employment Agreement was between Strachan and Eastern Towers, Inc. (Ex. 44).

171.  The Executive Employment Agreement provided, among other things, as follows:  "The Executive [Strachan] acknowledges that the principal business activity of the Company [Eastern Towers, Inc.] is the provision of management services to Eastern Towers LLC . . . ."  (Ex. 44 § 1.2).

172.  The agreement provided that Strachan would work without pay for six months (from April 9 to September 9, 2002), after which he would be paid a salary of $75,000.  (Ex. 44 § 2.1).

173.  The term of the agreement was two years (or until April 9, 2004), and could be extended by "mutual agreement between the Company and [Strachan]."  (Ex. 44 § 3.1).

174.  The agreement provided Strachan could be terminated for cause, based on the occurrence of one of the following:

(a) any single act or series of acts by the Executive to the material detriment of the Company or any of its affiliates, or in a manner otherwise inconsistent with the Company's policies or practices; (b) indictment for, or conviction of, a crime which materially adversely affects the reputation of the Company or any of its affiliates; (c) willful disloyalty to the Company; (d) substantial or continuing inattention to or neglect of duties and responsibilities reasonably assigned to the Executive by the Company's Board of Directors; (e) failure to comply with lawful directives of the Company's Board of Directors; or (f) the commission of an act of dishonesty or moral turpitude (including without limitation, embezzlement or misappropriate of Company property.

(Ex. 44 § 3.2).

175.   The agreement also provided that Strachan could be terminated without cause, in which

case he would be entitled to a severance payment of one month's salary followed by 60%

of his salary for two additional months. (Ex. 44 § 3.3).

176.   The agreement also contained a non-competition clause with a two-year term. (Ex. 44 §

4.3).

### H.   The Purported Ownership Relationship Between the Corporation and the LLC

177.   As noted, none of the agreements or corporate records specifically addressed the

ownership relationship, if any, between the corporation and the LLC.

178.   According to Moore, it "was determined" at some point before April 2002 that Eastern

Towers, Inc., would be a wholly-owned subsidiary of Eastern Towers, LLC. (Moore,

19:40). He testified that by March 26 or 27, 2002, "we all understood" that the LLC

would be the parent of the corporation. (Moore, 20:44). He also testified that such a

structure was discussed at a meeting between the four principals on April 3, 2002. (*Id.*,

19:42). The Court does not credit Moore's testimony in any of those respects.

179.   Eastern Towers, Inc., occasionally represented to third parties, including the IRS in its tax

returns, that Eastern Towers, LLC owned 100% of its shares. (Ex. 610 (draft of letter that

was sent in substantially the same form to Charlie Devens of Brookline Savings Bank);

Ex. 611 (e-mail to Sanford attaching Introduction to Eastern Towers); Ex. 659

(Introduction to Eastern Towers); Ex. 801 (TD Banknorth approval memo indicating that

the bank understood that Eastern Towers, LLC owned Eastern Towers, Inc.); Ex. 68

46

(Eastern Towers, Inc., 2002 federal income tax return)).

180.    On April 3, 2002, Moore gave Strachan a blank IRS Form 2553 (Election by a Small
        Business Corporation) and told him that he needed to sign it as the President of Eastern
        Towers, Inc., for tax purposes. (Strachan, 2:111, 116-17; Ex. 42).

181.    The form was blank at the time, other than a hand-written "JS" next to the signature line
        at the bottom of the form. (Strachan, 2:116-17).

182.    Moore had hoped that Eastern Towers, Inc., could elect to be treated as an S corporation
        for tax purposes. (Moore, 19:43-44).

183.    Strachan signed the Form 2553. (Strachan, 2:116; Ex. 42).

184.    Moore subsequently filled out the Form 2553 by hand, dated it April 4, 2002, and signed
        it as attorney for the corporation.  (Ex. 42; *see also* Moore, 20:28).

185.    In box "L" of Form 2553, Moore wrote that Eastern Towers, LLC had acquired 1000
        shares of the stock of Eastern Towers, Inc., on February 27, 2002. (Ex. 42).

186.    In fact, and as noted, Eastern Towers, LLC was not even formed until September 17,
        2002. (Ex. 54; *see also* Rosenfeld, 12:24-25).  Furthermore, the LLC never acquired any
        shares of the corporation.

187.    Moore's representation to the IRS on Form 2553 concerning the ownership of shares of
        Eastern Towers, Inc., was false.[22]

188.    Ultimately, on March 24, 2004, the IRS rejected the application of Eastern Towers, Inc.,
        for S-corporation status. (Ex. 151).  The reason given was that Eastern Towers, LLC, as a

---

[22] Moore signed the 2002 Massachusetts tax return for Eastern Towers, Inc., on October 9, 2003.  (Ex. 69).
He identified himself on the return as Treasurer for Eastern Towers, Inc., when in fact Rosenfeld was Treasurer.
(Moore, 20:47-48; Exs. 69, 80, 81,144).

multi-member LLC, was not eligible under IRS regulations to be a shareholder of an S corporation. (Moore, 19:48-49; Ex. 151).

189. Although Moore testified that the parties intended that the LLC would own the corporation, there is no evidence that Strachan and Sanford ever agreed to that arrangement, or that the parties actually executed such an arrangement.

190. Sanford testified that he did not understand that the LLC owned the corporation. (Sanford, 6:143). Strachan testified that the thought the corporation was going to own the LLC. (Strachan, 2:125-26).

191. There is no contemporaneous record that the LLC ever purchased, or was assigned, any stock of the corporation.

192. There was never a formal vote taken to issue shares of the corporation to the LLC, or to transfer shares of stock from any of the principals of the corporation to the LLC. (Rosenfeld, 12:24-25; Strachan, 2:114, 4:127; Sanford, 5:117).

193. There is no corporate stock register reflecting any transfer of shares from the corporation to the LLC.

194. There is no corporate record reflecting the issuance of any additional shares of the corporation after the initial issuance to the four principals.

195. The LLC Operating Agreement, signed on April 9, 2002, states that the corporation could own Class B membership interests in the LLC. (Ex. 45, § 2.3(b)). It does not state that the LLC owns shares of the corporation. (*See* Ex. 45).

196. In June 2003, Moore and Rosenfeld affirmed that Eastern Towers, LLC had no subsidiaries when they signed the Revolving Construction Loan Agreement with TD

Banknorth.  (Ex. 801.8, § 4.2).

197.   Accordingly, Eastern Towers, Inc., is a Massachusetts corporation that is owned in equal

(25%) shares by four persons:  Moore, Rosenfeld, Strachan, and Sanford.  It is not owned,

in whole or in part, by Eastern Towers, LLC.

198.   Eastern Towers, LLC is a Massachusetts limited liability company that is owned by

Tower Investors Trust, Strachan, and Sanford.  It is not owned, in whole or in part, by

Eastern Towers, Inc.

I.     **The Initial Months of Operation and the Need for Financing**

199.   At some point after April 2002, Sanford joined the new company.  (Moore, 19:66).

200.   Over the course of the next few months, Moore and Rosenfeld periodically contributed

capital to Eastern Towers, LLC and Eastern Towers, Inc., on an as-needed basis, usually

in $5,000 or $10,000 increments.  (Ex. 695).

201.   By May 22, 2003, Moore and Rosenfeld had contributed a total of $522,000 to the two

entities, comprising $270,000 to Eastern Towers, LLC and $252,000 to Eastern Towers,

Inc.  (Rosenfeld, 11:99-102; Ex. 695 (summarizing data from Ex. 206 and Ex. 309)).

202.   During the early stages of the business, the principal role of Strachan and Sanford was to

develop tower opportunities, in particular to try to acquire and develop hard-to-zone sites.

(Moore, 19:60-61).

203.   After April 2002, the four men held meetings approximately every week to manage the

business.  (Sanford, 10:49; Moore, 19:53).

204.   During the first six months, the company was only able to generate a limited number of

tower sites, and the pace of acquiring and building towers was slower than the men had

49

expected.  (Sanford, 10:45; Moore, 19:61-69, 69; *see* Ex. 607).

205.    The first sites that the company developed were Beverly, Massachusetts; Franklin

(Church), New Hampshire; Franklin (Industrial), New Hampshire; and Weare, New

Hampshire.  A carrier lease for the Beverly tower, however, was not executed until

September 30, 2002, and the other three towers were not operational until 2003.  (Ex.

900.301; *see* Ex. 614).

206.    By October 2002, the overhead expenses were increasing substantially, because the

company now had to pay Strachan's and Sanford's salaries after their six months of free

work.  (Moore, 19:66-67; *see also* Ex. 193 at 31-32).  The business, however, was

generating little or no revenue.  (Moore, 19:66-67).

207.    Strachan's annual salary, after the expiration of the six-month period, was $75,000.  (Ex.

44 at 1).

208.    Beginning in October 2002, the company bought seven "hard-to-zone" sites from Hesse

for $10,000 each in an effort to jump-start construction of more potentially lucrative

towers.  (Sanford, 10:46; Rosenfeld, 13:130; Moore, 19:70-71).  Four of those sites were

located on Nantucket, and the remaining three were located in Ipswich, Lincoln, and

Wayland, Massachusetts.  (Rosenfeld, 13:130; Moore, 19:69-70).[23]

209.    To grow, and take advantage of the available opportunities, it was clear that the company

would need additional capital funding or financing.  (Strachan, 2:145-46; *see* Moore,

---

[23] The company pursued zoning approval for each of the seven sites for several years and secured ground
and carrier leases for some of the sites.  In June 2003, AT&T put development of the Nantucket sites on hold to
investigate other means of extending cellular service to the island.  Ultimately, Eastern Towers was not able to build
towers in Ipswich, Lincoln, or Nantucket.  (Moore, 15:238-40, 255; Moore, 19:162-63, 202, 219-21, 236-27, 247;
Rosenfeld, 13:162-63).  The development of the Wayland site is discussed below.

19:65-66; *see also* Ex. 58).

210.  The four men discussed a number of financing options over the course of several months in late 2002.  The options discussed included obtaining bank financing, additional capital contribution from the members, capital contributions from non-members, and cash from asset sales.  (Strachan, 2:145-46, 3:6-8; Sanford, 10:59-60; Moore, 19:139-41).

211.  One proposal that the four men discussed to increase revenues was the acquisition of cell towers built by another company, Turning Mill.  Moore and Rosenfeld offered to invest additional capital in exchange for additional equity in order to permit Eastern Towers to acquire the Turning Mill towers.  (Strachan, 2:151-53, 4:87; Moore, 19:80-84).  Strachan did not want to further dilute his interest in the company, and Sanford did not like the terms of the deal; both rejected the proposal.  (Strachan, 2:152-53, 4:86-89; Sanford, 10:63-64).[24]

212.  By November 2002, the four men had become concerned about the cash flow of the business.  (Strachan, 2:145; Ex. 56).  After reviewing the LLC's financials, Strachan concluded that the funds from the initial $500,000 capital contribution commitment would run out in February 2003.  (Ex. 58).  Because the business would need cash to start building towers, Strachan concluded that additional financing was necessary.  (Strachan, 2:145).

213.  Strachan and Sanford relied entirely on Moore and Rosenfeld to explore financing options and obtain additional financing.  Neither Strachan nor Sanford had significant

---

[24] Strachan and Sanford also rejected a proposed joint venture between Eastern Towers, LLC and Turning Mill under which their interests in Eastern Towers would remain unchanged, and Moore and Rosenfeld would have owned half of the new business.  (Sanford, 10:69-70, Moore 19:85-87).

51

contacts with possible financing sources or substantial experience in obtaining financing.

### J.   Efforts to Obtain Bank Financing

214.   Moore contacted two banks—Brookline Savings Bank and TD Banknorth—with which
       he had done business in the past. (Fenn, 7:30-31; Rosenfeld, 13:138-39; Ex. 61, 610
       (admitted but not for truth)).

215.   Brookline Savings was not receptive, so Moore pursued financing with TD Banknorth.
       Moore was the company's primary contact with the bank. (Moore, 19:133-34; Fenn,
       7:30; *see also* Strachan, 4:77).

216.   Moore had an extensive lending relationship with TD Banknorth arising out of his other
       business activities. As of February 14, 2003, the bank had more than $15 million in loan
       exposure for entities controlled by Moore. (Fenn, 7:12-14; Ex. 801).

217.   Sanford, Moore, and Rosenfeld met with Peter Fenn from TD Banknorth on November
       25, 2002. (Rosenfeld, 13:144-45; Ex. 60, 61). Fenn had known Moore since 2000.
       (Fenn, 7:7-8, 15). Strachan missed the meeting to be with his wife, who was having a
       baby. (Moore, 19:117; Rosenfeld, 13:145; Ex. 60).

218.   Rosenfeld sent Fenn a proposed term sheet on December 1, 2002. (Moore, 19:119-20).
       He shared it with Moore, but not with Strachan or Sanford. (Strachan, 4:72-73). In it, he
       requested two lines of credit for Eastern Towers LLC: a revolving construction line for
       $1.5 million and a so-called "guidance" line for $4 million, providing long-term financing
       for constructed towers. (Ex. 61). To help secure the loans, Moore and Rosenfeld
       proposed a $500,000 personal guarantee, split between the two of them ($300,000 for

Moore and $200,000 for Rosenfeld) on the revolving line. (Moore, 19:120; Ex. 61).[25]

219.    Fenn responded with a term sheet with different terms, including a requirement that

        Moore and Rosenfeld personally guarantee up to $1 million, limited to $500,000 each to

        cover "all loans to Eastern Towers LLC . . . ." (Ex. 62 at 2; Rosenfeld, 12:36-37; Moore,

        19:124-26).[26] At the time, Fenn thought, based on his experience, that such an

        arrangememt would be approved by the bank. (Fenn, 7:116).

220.    Strachan, Sanford, Moore, and Rosenfeld had several discussions about the bank's

        proposal. (Moore, 19:126-28; Rosenfeld, 13:148-49). Moore and Rosenfeld asked that

        Strachan and Sanford join in giving their personal guarantees for the TD Banknorth loans

        proportionate to their interest in Eastern Towers. Strachan and Sanford agreed to do so.

        (Strachan, 2:147-48; Rosenfeld, 12:40, 13:148-49; Moore, 19:127-28, 130).

221.    Throughout January 2003, Moore and Rosenfeld continued to provide additional

        information to Fenn concerning Eastern Towers. (Fenn, 7:31-35; Rosenfeld, 12:45-46;

        Moore, 19:132;  Exs. 72, 75, 76, 77).

222.    The bank's credit department did not support Fenn's loan recommendation, as they

        viewed it as a relatively high-risk loan to a start-up company. (Fenn, 7:118-19).

        Nonetheless, the bank "had a very good relationship with Mr. Moore" and "wanted to

        find a way to do the deal." (Fenn, 7:119).

223.    On February 14, 2003, the TD Banknorth Management Loan Committee approved

---

[25] Fenn had indicated that the bank would probably require personal loan guarantees. (Moore, 19:119).

[26] Fenn's term sheet also provided that the $1.5 million construction line would cover up to 80% of the total
project cost for individual towers if (1) the tower to be built was "subject to at least one acceptable carrier lease,"
and (2) the projected net operating income for the tower would "be sufficient to provide debt coverage of 1X for end
loan financing." (Ex. 62 at 2; Moore, 19:125).

financing for Eastern Towers, LLC, but on different terms than those in Fenn's

recommendation. (Fenn, 7:49, 53-54; Exs. 801, 801.2). The approved terms included,

among other things, (1) a $1.5 million construction line and a $4 million guidance line,

(2) an unlimited personal guarantee from all four men for the full amount of both loans,

and (3) a number of restrictive covenants. (Ex. 801; Rosenfeld, 13:152; Moore,

19:135).[27] The bank also noted that "[a]n additional $500[,000] capital contribution will

be required prior to the end of the first year in order to cover the projected shortfall in

cash flow." (Ex. 801 at 9; *cf.* Fenn, 7:127-29, 132).

224.    Moore provided all four men with a copy of the February 14 bank term sheet. The four

      men discussed it at a meeting in February 2003. (Strachan, 3:5-6; Moore, 19:139-40;

      Rosenfeld, 13:150).

225.    On February 25, 2003, the Board Risk Committee of TD Banknorth approved the

      financing arrangement. (Fenn, 6:62-65; Exs. 90, 801.4).

226.    Moore told Strachan and Sanford that the financing arrangement had been approved.

      (Strachan, 2:148).

227.    Moore also advised Strachan and Sanford, in substance, that the financing as approved

      was not acceptable. (Strachan, 2:148-50; 3:8-9).

228.    Moore told Strachan and Sanford that the construction loan was problematic because it

      would not fund "burn"—that is, the salaries and other overhead expenses of the business.

---

[27] For example, (1) the construction revolving line would require Eastern Towers, LLC to post 20% of the cost of each tower and had a debt service coverage ratio of 1.0 for the construction line and 1.25 for the guidance line (Ex. 801 at 2-3); (2) the guidance line could only be used for groups of three completed towers with an average of two carriers on each (at the time Eastern Towers did not have three such completed towers) (Ex. 801 at 2; Strachan, 4:81; Rosenfeld, 13:151); and (3) the total loan availability was capped at five times EBITDA (Eastern Towers did not have a positive EBITDA at the time) (Ex. 801 at 3; Strachan, 4:81; Rosenfeld, 13:152).

(Strachan, 2:149-50, 3:5-6, 9; Sanford, 10:60-61).

229.   Moore and Rosenfeld testified that they did not want to provide guarantees for the entire
       amount of the loans.  Moore testified that such a guarantee was a "non-starter" and "just
       not something [he] was willing to do."  (Moore, 19:139-40).  Rosenfeld testified that he
       had serious concerns about such a guarantee, although he was willing to consider it if
       Strachan and Sanford would accept further dilution of their equity interests.  (Rosenfeld,
       12:59-61, 13:150-51).  Moore and Rosenfeld did not, however, voice those concerns to
       Strachan and Sanford at the time.

230.   At that point, only the Beverly tower was producing revenue.  Building permits had been
       issued for the Franklin Church, Franklin Industrial, and Weare towers, but they were not
       yet operational.  (Exs. 83, 801).  Other towers, particularly in Webster, Carver, Pembroke,
       and Loudon, were in various stages of development.  (Exs. 83, 801, 614).

### K.      The Proposed New Entity and Restructuring of the Bank Loan

231.   Moore did not attempt to go back to TD Banknorth to seek more favorable terms, and did
       not attempt to obtain financing from any other source.  (Moore, 20:60-62).

232.   Instead, Moore proposed an alternative plan.  (Moore, 19:142-43).  He first outlined his
       plan in February 2003 and provided additional details in March 2003.  (Strachan, 3:5-8;
       Sanford, 6:11-12; Rosenfeld, 13:154).

233.   Moore proposed that a new company would be established that would buy any towers
       built by Eastern Towers. He and Rosenfeld would own the company.  (Moore, 19:146).

234.   Under Moore's proposal, Eastern Towers, LLC would sell all of its completed towers to
       the new company. Eastern Towers would continue to build and obtain tenants for the

towers and manage the properties. It would also have the right to repurchase the towers from the new company at a specified multiple of the original sale price.[28] If the towers were profitable, the new company would receive a percentage and any additional profit would go to Eastern Towers. (Strachan, 3:7-8; Moore, 19:145-49; Ex. 85).

235.   Moore told Strachan and Sanford that he would fund the new company with proceeds from the sale of a building he owned. Moore also told them that he would be able to take advantage of certain tax benefits from "bonus depreciation" on the towers after they were purchased. (Strachan, 3:6, 11-12; Sanford, 10:91-92; Ex. 801.4; *see* Moore, 19:158; Fenn, 7:57).

236.   Strachan understood, based on his conversations with Moore and Rosenfeld, that Moore's plan was the "only option" for the company in light of the fact that the financing as approved by the bank would not fund "burn." (Strachan, 3:8).

237.   At some point in late February 2003, Moore approached TD Banknorth about obtaining financing on different terms. Specifically, he sought to ascertain whether the bank would consider advancing credit to a new entity that would be newly capitalized and wholly owned by Moore and Rosenfeld. (Moore, 19:157-58; *see* Fenn, 7:54-56, 60-61; Exs. 313, 801.4). Moore informed the bank that he and Rosenfeld would fund the new entity's acquisition of the first four towers with $850,000 of their own capital. (Fenn, 7:59-60, 135-36; Ex. 801.4).

238.   Fenn testified that the proposed $850,000 additional capital investment was a positive

---

[28] In a proposed term sheet sent to Rosenfeld on March 9, 2003, Moore suggested buying the towers at a multiple of 7.5 times net operating income. (Ex. 85). In the final version, that number had been lowered to 7.0.

factor in considering the terms of the loan. (*See* Fenn, 7:136).

239. The internal memorandum to the loan committee prepared by Fenn on March 19, 2003, concerning the restructured loan stated that "the proposed changes will facilitate much larger equity contributions from Edward Moore and Larry Rosenfeld" and that "[t]he additional equity will immediately improve Eastern Towers' cash flow and strengthen the Bank's collateral security on the guidance line." (Ex. 801.4). The bank's approval was based in part on the representation that Moore and Rosenfeld would make "much larger" equity contributions to the business. (Fenn, 7:59; Ex. 801.4).

240. In fact, however, and as described below, Moore and Rosenfeld withdrew $520,000 in capital from Eastern Towers, Inc. the day the deal closed. Moore and Rosenfeld did not inform the bank at any point during the financing application process of their intention to withdraw the capital. Indeed, they represented the opposite: that the restructuring of the organization would enable them to make larger capital contributions. (Ex. 801.4).

241. Moore also proposed to the bank that the $4 million guidance line that had originally been approved for Eastern Towers, LLC be transferred to the new entity to buy the towers and that the construction line for Eastern Towers, LLC be reduced from $1.5 million to $1 million. (Ex. 801.4; Fenn, 7:60-61).

242. Moore did not disclose to Strachan or Sanford that he had proposed diverting part of the bank financing to the new entity that would be wholly owned by Moore and Rosenfeld. (Strachan, 3:9; Sanford, 6:13).

243. As noted, Moore had told Strachan and Sanford that the original financing proposal from TD Banknorth would not work because the loans would not fund "burn." Moore and

Rosenfeld testified at the trial that the proposal would not work because of the guarantees.

244.   Moore told Fenn at TD Banknorth, however, that the reason for the new proposal was to allow Moore and Rosenfeld to (1) take advantage of new tax legislation that allowed owners of certain assets built after September 11, 2002 to take bonus depreciation, and (2) recognize a return on their cash investment separate from Eastern Towers. (Fenn, 7:56-57; Ex. 801.4).

245.   The March 19, 2003 memorandum prepared by Fenn did not state that Moore and Rosenfeld were reluctant to provide personal guarantees, or that such a reluctance played any role in their decision to modify their loan requests. (Ex. 801.4). Even after TD Banknorth agreed to transfer the $4 million guidance line to the new entity owned by Moore and Rosenfeld, Moore still had to provide an unlimited personal guarantee for that loan facility. (Ex. 801.3). While TD Banknorth did agree to limit Rosenfeld's personal guarantee for the guidance line to $800,000, Fenn acknowledged that Moore's financial strength and personal guarantee were clearly a factor in that decision. (Fenn, 7:66). The construction line continued to be supported by unlimited guarantees from Moore, Rosenfeld, Strachan and Sanford. (Ex. 89).

246.   The construction loan agreement that was ultimately executed with TD Banknorth specifically provided that the bank would fund up to 80% of the total direct and indirect costs of each tower site, including overhead and administrative costs. (Fenn, 7:146-49; Ex. 801.8).

247.   On March 19, 2003, the Management Loan Committee of TD Banknorth approved the

restructured financing arrangement proposed by Moore. (Ex. 89).  At some point, a
closing was set for June 2, 2003.  (Ex. 801.5).

248.    On April 24, 2003, the four men discussed financing at their weekly meeting.  (Ex.
614.1).  Strachan and Sanford had not been told at that point, more than a month later,
that the bank had approved the restructured financing.  (Strachan, 3:12; Sanford, 6:13).
Strachan understood only that the company had not been able to obtain bank financing.
(Strachan, 3:8-9).

### L.      The Proposed Withdrawal of Capital and Tower Purchase Agreement

249.    During a meeting on May 1, 2003, Moore and Rosenfeld told Strachan and Sanford that
they were considering taking back their original capital investment of $520,000 when the
transaction closed.  (Strachan, 3:12, 14; Sanford, 6:14-16; Exs. 91, 614.2).[29]

250.    Strachan and Sanford opposed the idea, given the company's need for capital at a critical
time in its development.  (Strachan, 3:13-14).  Sanford suggested that Moore and
Rosenfeld take back their capital in stages over the sale of the first ten to fifteen towers
under the agreement.  (Sanford, 6:15-16).[30]

---

[29] The actual total of the contributions appears to have been $522,000.  (Ex. 695).

[30] Later that day, Sanford sent an e-mail to Moore and Rosenfeld in which he further objected to the proposal:

After having the rest of the day to think about what was discussed during this morning[']s meeting[,] I wanted to raise a couple of issues for us all to think about.

The first is that this morning was the first time that either John or I have heard about the plan to payback [sic] the $500,00[0].00 investment in the next month.  While we may not have a say in it, as partners (if we truly are partners) it would be nice to be included in these conversations in the future.

The second issue is in regards to why now?  We are at a very critical time with our capital. With 3 Towers being constructed and another 4 starting in the next couple of months we are going to need

251.   Moore and Rosenfeld assured Strachan and Sanford that they "were just thinking about
       it" and that it was not a "concrete" plan. (Strachan, 3:13). They did not respond to
       Sanford's suggestion that the repayments be staggered over time. (Sanford, 6:17).

252.   On May 22, 2003, Moore and Rosenfeld presented Strachan and Sanford with a draft
       "Agreement for Purchase of Transmission Towers" between Eastern Towers, LLC and a
       new company, to be called Eastern Properties, LLC. (Ex. 93; Rosenfeld, 13:154-55;
       Strachan, 3:14-15; *see also* Ex. 100 (final agreement)). It was the first time that Strachan
       and Sanford had seen a draft of the agreement. (Strachan, 3:14).

253.   The draft Tower Purchase Agreement provided, among other things, (1) that Eastern
       Properties, LLC would purchase towers from Eastern Towers, LLC at a multiple of 7
       times net operating income; (2) that Eastern Towers, LLC would have an option to
       repurchase the towers, but only in chronological order, and that the repurchase option
       would expire after fifteen years; and (3) that Eastern Towers, LLC would receive a
       commission "equal to the cumulative NOI" of the purchased towers, above 14.29% of the
       cumulative purchase price of all towers and closing costs multiplied by 1.03 each year
       after a tower's purchase. (Ex. 93).[31] The agreement also provided that, in the event the
       towers were sold during the fifteen years after the sale, the profits would go to Eastern

---

capital. If we re[-]pay the original capital now we are not going to have much, if any, capital left.
I guess it is not clear to me why we can[']t stagger the re[-]payment say over the first 10 to 15
towers that we sell. I welcome the explanation as to why the capital must be re[-]paid in full
before we can close with Bank North . . . .

(Ex. 91; *see* Sanford, 6:14-18). There is no evidence of a reply to that e-mail. (*See* Sanford, 6:17).

   [31] Several of those terms differed from Moore's March 9 term sheet. For example, the March 9 term sheet
had proposed a multiple of 7.5 times annualized net operating income and that Eastern Towers receive a commission
for all money earned "in excess of 3% per year in NOI above that amount of NOI used to determine the purchase
price." (Ex. 85).

Towers, LLC. (Ex. 93).

254.    At the May 22 meeting, Moore discussed the proposal and addressed the purchase of the

first four towers that would be constructed if the Eastern Properties proposal was

executed.  At that point, the Beverly, Franklin Church, and Franklin Industrial towers

were complete or essentially complete, and the Weare tower was 90% complete.

255.    Strachan and Sanford both expressed the view that the fixed multiple was too low.

(Sanford, 6:21, 10:70-71; Rosenfeld, 13:156-57; Ex. 614.4; *see also* Strachan, 3:16).

256.    Moore and Rosenfeld did not advise Strachan and Sanford at the May 22 meeting that

they had decided to go ahead with their proposal to withdraw their $520,000 capital

contribution.

257.    Following the May 22 meeting, the four men had further discussions concerning the

provisions of the draft agreement. (Strachan, 3:15-17, 4:131; Sanford, 6:21-23;

Rosenfeld, 13:155-58; Moore, 19:147-52, 182-83).

258.    Strachan and Sanford objected to the concept of selling the towers and to what they

believed was an unfairly low price. (Strachan, 3:8, 15, 4:139-40; Sanford, 10:77-80, 82;

Moore, 19:151-52).  Nonetheless, Moore and Rosenfeld proceeded with the plan.[32]

259.    There was no formal vote of the members of Eastern Towers, LLC to approve the Tower

Purchase Agreement. (Strachan, 3:16-17).

260.    There was no discussion of obtaining a fairness opinion from an investment bank or other

qualified expert as to whether the terms of the transaction were fair to the company or

---

[32] Strachan and Sanford consulted others in the market concerning the sale of towers, but ultimately did not
have the relationships or expertise to develop an alternative proposal that would finance the company.  (Strachan,
4:98-99; Sanford, 10:76-80).

Strachan and Sanford.  No such opinion was ever sought or obtained.  (*Id.*).

261.  On May 28, 2003, a new entity was created called Eastern Properties, LLC.  (Ex. 94).

262.  Moore owned a 90% interest in Eastern Properties through Redstone Realty, LLC (a company Moore owned with his wife), and Rosenfeld owned the remaining 10% interest through the Joan Rosenfeld Trust f/b/o Lawrence W. Rosenfeld.  (Moore, 15:130; Ex. 806).  The only manager of Eastern Properties, LLC was Glover Property Management, Inc., a corporation owned by Moore.  (Ex. 94).

263.  The night before the June 2 closing, Rosenfeld added another onerous provision to the Tower Purchase Agreement:  a requirement that Eastern Towers, LLC begin to make nonrefundable deposits five years before it could actually decide whether to exercise its repurchase option.  (Rosenfeld, 14:132-33; Ex. 102).  Rosenfeld e-mailed that change to Moore after midnight on the night of June 1-2.  (Ex. 102).  He did not, however, provide a copy to Strachan or Sanford.  (*Id.*).

264.  Rosenfeld claims that he added the deposit provision to ensure that Eastern Towers, LLC would have enough cash set aside to exercise the option in Year 10.  (Rosenfeld, 14:25-26).  In fact, however, the purpose of the addition was to help ensure that the option would never be exercised.

**M.    The June 2 Closing**

265.  The closing, including the execution of the Tower Purchase Agreement and the TD Banknorth financing documents, occurred on June 2, 2003.  (Strachan, 3:18, 21; Moore, 19:187; Rosenfeld, 13:11; Exs. 99, 100).

266.  The closing took place at Moore's office at 8 Doaks Lane in Marblehead.  (Strachan,

3:18).

267. On the morning of June 2, Moore told Strachan and Sanford to stay at the Eastern Towers office at 40 Tioga Way in Marblehead until he called them and told them to come down to his office. (Strachan, 3:18-20).

268. Strachan and Sanford were finally called down to Moore's office around noon, after waiting for several hours. (Strachan, 3:20-21).

269. When they arrived at the closing, Strachan and Sanford were asked to, and did, sign a variety of documents in quick succession. The entire signing process took about ten minutes. (Strachan, 3:31-32, 4:142-43).

270. There is no evidence that Strachan and Sanford were provided copies in advance of any of the documents they executed on June 2, other than the incomplete draft of the Tower Purchase Agreement that had been provided on May 22.

271. As they were going through the paperwork, Strachan and Sanford noticed checks issued from Eastern Towers, Inc. to entities owned or controlled by Moore and Rosenfeld. The checks purported to repay the $520,000 in capital that Moore and Rosenfeld had contributed to the company up to that point. (Strachan, 3:21-22; Sanford, 6:19, 32-33; Rosenfeld, 11:98-103, 12:95-96, 124-27, 14:15; Moore, 15:130; *id.*, 19:73, 178, 203; Ex. 695 (summarizing data from Ex. 206 and Ex. 309)).

272. Strachan and Sanford were "shocked" to see the two checks and protested to Rosenfeld. (Strachan, 3:21-23; Sanford, 6:19, 32-34; Rosenfeld, 12:95-96, 124). Strachan told Rosenfeld that the withdrawal of capital was "going to virtually kill our company." (Strachan, 3:22). Sanford told him that it "was going to leave the company in a bad

63

place." (Sanford, 6:33).

273.   Rosenfeld responded that he and Moore needed to take their capital out then because they
       would no longer be able to do so once the construction loan was in place.  (Strachan,
       3:22-23).

274.   Notwithstanding § 7.3(d) of the LLC Operating Agreement, the managers of the LLC
       (Moore, Rosenfeld, Strachan, and Sanford) had not made a good-faith judgment, prior to
       the withdrawal of capital, that sufficient assets remained in the LLC to satisfy its
       liabilities.  Similarly, § 7.3(c) of the LLC Operating Agreement specifically prohibited
       distribution of proceeds from the sale of capital assets if in the opinion of the managers of
       the company was likely to require such proceeds to pay company expenses.  There was no
       discussion or vote as to whether the terms of the LLC Operating Agreement had been
       satisfied.

275.   Rosenfeld told Strachan and Sanford that the closing could be delayed so that they could
       discuss the issue further.  Despite their strong opposition, Strachan and Sanford felt they
       had no choice and reluctantly agreed to proceed with the closing.  (*See* Strachan, 3:22-23;
       Sanford, 6:33-34; Rosenfeld, 12:133).

276.   Moore and Rosenfeld received, together, $520,000 in cash on the day of the closing.  One
       check was made out for $100,000 from Eastern Towers, Inc. to the Joan Rosenfeld Trust
       f/b/o Lawrence Rosenfeld, which was controlled by Rosenfeld.  One check was for
       $420,000 from Eastern Towers, Inc. to Redstone Realty, LLC, which was owned by
       Moore and his wife.  (Ex. 114; Rosenfeld, 12:126-27; Strachan, 3:25-27).

277.   There is no evidence that Moore and Rosenfeld informed the bank of their $520,000

capital withdrawal.

278.  Prior to the June 2 closing, Moore and Rosenfeld had caused their attorney, Douglas
      Hausler, to prepare a document that removed Strachan and Sanford as managers of
      Eastern Towers, LLC.  (Ex. 98).

279.  Strachan and Sanford were not informed before the June 2 closing that Moore and
      Rosenfeld intended to remove them as managers.

280.  Hausler represented Moore and Rosenfeld, and apparently Eastern Properties, LLC, at the
      transaction.  (Rosenfeld, 12:120-21).  It is unclear whether Hausler also purported to
      represent Eastern Towers, LLC or Eastern Towers, Inc.; certainly no counsel represented
      those entities independent of Moore or Rosenfeld.

281.  Strachan and Sanford executed the document removing them as managers, which was
      titled "First Amendment to Operating Agreement of Eastern Towers, LLC," at the
      closing.  (Ex. 98).

282.  Another document prepared by Hausler and executed by Strachan and Sanford on June 2
      acknowledged a resolution and vote authorizing Rosenfeld and Glover Property
      Management, Inc. (a company owned by Moore), as managers of Eastern Towers, LLC,
      to execute documents carrying out the Tower Purchase Agreement.  (Ex. 99).[33]

283.  Because the documents were couched in legal language, Strachan and Sanford did not
      realize immediately that they had executed documents replacing them as managers of
      Eastern Towers, LLC.  (Strachan, 3:33; Sanford, 6:26-27, 10:192-94).

284.  Strachan and Sanford eventually noticed, however, that they were being removed, and

---

[33] No such vote had ever taken place.  (*See* Rosenfeld, 12:115-19).

protested to Moore and Rosenfeld. Rosenfeld claimed that he did not know why Strachan
and Sanford were removed as managers. (Rosenfeld, 12:106-08).

285.  At some point that day, Moore and Rosenfeld apparently agreed to reinstate Strachan and
      Sanford as managers. Hausler created a new document that would reinstate them as
      managers effective the following day. (Rosenfeld, 12:105-07).

286.  Strachan and Sanford accordingly signed a document reinstating them as managers of
      Eastern Towers, LLC effective the following day. (Ex. 117; *see also* Strachan, 3:32-34;
      Rosenfeld, 12:116-17).

287.  In the meantime, on June 2, the Tower Purchase Agreement (embodying the arrangement
      to sell towers to Eastern Properties) and the Purchase and Sale Agreement (selling the
      Beverly, Franklin Church, Franklin Industrial, and Weare towers to Eastern Properties)
      were signed by Moore (as President and Treasurer of Glover Property Management, Inc.)
      and Rosenfeld on behalf of Eastern Towers, LLC, and by Moore on behalf of Eastern
      Properties. (Exs. 100, 900.400).

288.  Neither Strachan nor Sanford signed either the Tower Purchase Agreement or the
      Purchase and Sale Agreement.

289.  At the June 2 closing, and pursuant to those agreements, Eastern Properties purchased the
      first four towers (Beverly, Franklin Church, Franklin Industrial, and Weare) from Eastern
      Towers, LLC for $818,832. (Moore, 19:187, 193; Exs. 101, 900.400).

290.  At the June 2 closing, Eastern Towers, LLC closed on its $1 million revolving
      construction line from TD Banknorth, and Eastern Properties closed on its $4 million
      guidance line. (Exs. 801.5, 801.8).

291.    The construction line was supported by unlimited guarantees by Moore, Rosenfeld,

        Strachan, and Sanford.  (Exs. 801.9, 801.10, 801.11, 801.12).[34]  The guidance line was

        supported by an unlimited personal guarantee by Moore and a limited guarantee of

        $800,000 by Rosenfeld.  (Exs. 801.6, 801.7).

### N.    The Tower Purchase Agreement

292.    The final version of the Tower Purchase Agreement, which was executed on June 2, was

        nearly identical to the May 22 draft agreement, except for the addition of onerous terms

        concerning the payment of nonrefundable deposits.  (*Compare* Ex. 93 *with* Ex. 100).

293.    Paragraph 1 of the Tower Purchase Agreement required Eastern Towers, LLC to sell, and

        Eastern Properties to buy, groups of two or more towers that had two or more existing

        carrier leases within 30 days of the completion of the towers.  (Ex. 100 at ¶ 1).  However,

        Eastern Properties had the option to purchase the towers singly or with only one carrier

        lease in place.  (*Id.*).  Specifically, paragraph 1 provided:

        PROPERTIES hereby agrees to purchase from TOWERS and TOWERS agrees to
        sell to PROPERTIES, to be evidenced by a written purchase and sale
        agreement . . . , in groups of two (2) or more, all completed and operational
        transmission towers with two (2) or more existing Qualifying Carrier Leases
        (hereinafter defined in this Agreement) within thirty (30) days of completion by
        TOWERS.  Between the date of this Agreement and December 31, 2004,
        TOWERS shall be obligated to offer to PROPERTIES either all such transmission
        towers constructed or transmission towers with a Purchase Price, as defined in
        Section 2 below, of Four Million Dollars ($4,000,000), whichever is lesser.
        PROPERTIES shall be obligated to fund the lesser of all such purchases or Seven
        and One-Half Million Dollars ($7,500,000).  PROPERTIES may at its election,
        purchase transmission towers singly or with one carrier lease in place.

        (*Id.*).

---

[34] The Revolving Construction Loan Agreement between TD Banknorth and Eastern Towers, LLC stated that Eastern Towers, LLC had no subsidiaries.  (Ex. 801.8 § 4.2; *see* Ex. 97 at 6; Rosenfeld, 12:134-39).

294. Paragraph 2 of the Tower Purchase Agreement provided that the purchase price would be "equal to the annualized Net Operating Income of each transmission tower multiplied by seven (7)." (*Id.* at ¶ 2).

295. Paragraph 4 of the Tower Purchase Agreement provided that Eastern Towers, LLC would continue to serve as the leasing agent for all towers sold to Eastern Properties, LLC, but that Eastern Towers, LLC would not receive "any customary leasing commission" for that work. (*Id.* at ¶ 4). Instead, Eastern Properties, LLC would receive a commission only to the extent that the net operating income for all towers sold exceeded (1) a "Cost of Capital" that started at 14.29% of the cumulative purchase price of all purchased towers plus closing costs, and increased by a multiple of 1.03 annually, plus (2) the sum of all previously paid commissions. (*Id.*). Specifically, paragraph 4 of the Agreement provided as follows:

TOWERS and PROPERTIES hereby agree that TOWERS shall be the leasing agent for all transmission towers purchased by PROPERTIES from TOWERS under this Agreement. TOWERS hereby agrees to use its best efforts to obtain additional carrier leases for such transmission towers without payment by PROPERTIES to TOWERS of any customary leasing commission. Provided, however, for a period of fifteen (15) years from the date of purchase by PROPERTIES from TOWERS of a transmission tower and so long as PROPERTIES owns that transmission tower purchased from TOWERS ("Commissioned Tower" or "Commissioned Towers"), PROPERTIES shall pay to TOWERS, quarterly before the 15th day following the end of each quarter, a commission equal to the cumulative NOI of all such Commissioned Towers from the date of purchase as aforesaid until such respective quarter end,

    (i)    less the cost of capital for all such transmission towers purchased as defined below, cumulated and pro rated from the time of purchase of each Commissioned Tower to the end of such respective quarter, and

    (ii)   less the sum of all such commissions paid to date by

PROPERTIES to TOWERS on the Commissioned Tower.

The "Cost of Capital" shall be equal to the cumulative purchase price of all Commissioned Towers plus applicable closing costs paid by PROPERTIES to TOWERS times a per diem rate of return which is initially 14.29% per annum and which rate of return is multiplied by 1.03 as of the anniversary date of each such Commissioned Tower's purchase. At such time that PROPERTIES sells any Commissioned Tower, whether to a third party or to TOWERS, then the original purchase price paid by PROPERTIES to TOWERS shall be deducted from the Cost of Capital formula and shall not continue to accumulate after such sale.

(Ex. 100 at ¶ 4).[35]

296.    The 14.29% (or greater) "Cost of Capital" that had to be achieved before Eastern Towers, LLC would receive any commissions under paragraph 4 of the Tower Purchase Agreement made it highly unlikely that any such commissions would ever be paid.

297.    Paragraph 5 of the Tower Purchase Agreement included a repurchase option that, at least in theory, allowed Eastern Towers, LLC to buy towers back eventually from Eastern Properties, LLC, at prices ranging from about 22% to 56% more than the original sale price, but the option was subject to many onerous conditions. (Ex. 100 at ¶ 5).

298.    First, the repurchase option could not be exercised until more than ten years after the original sale date of each individual tower. (Ex. 100 at ¶ 5). Furthermore, Eastern Towers, LLC had to repurchase the towers "chronologically by transaction," and the failure to purchase any tower in sequence nullified the option to purchase subsequent towers. (*Id.*). Specifically, paragraph 5 of the Agreement provided as follows:

RIGHT OF REPURCHASE—Beginning in the first quarter of the 11th year following the purchase by PROPERTIES from TOWERS of any particular

---

[35] Moore claimed that the 14.29% rate of return was determined based on (1) consideration of bond yields and the cost of borrowed money at the time, (2) the rate that American Tower was paying for its debt at the time, and (3) the inverse of the multiple used to determine the towers' purchase price. (Moore, 19:147).

transmission tower under this Agreement, TOWERS shall have the option, but not the obligation, to re-purchase from PROPERTIES <u>chronologically by transaction</u>, that transmission tower ("Repurchase Option"). The re-purchase price for each transmission tower shall be computed by multiplying the original purchase price paid by PROPERTIES times the factor in Table 5 below for the years and quarters elapsed since the original purchase. The Repurchase Option shall not expire until the last day of the quarter which is 15 years after the quarter in which the original purchase of the next transmission tower to be purchased occurred. Upon the failure to repurchase any transmission tower within the time frame described above, the Repurchase Option for further transmission towers shall be null and void.

(Ex. 100 at ¶ 5) (emphasis in original).[36]

299.    Paragraph 6 of the Tower Purchase Agreement required Eastern Towers, LLC to make periodic deposits in order to preserve the repurchase option. Specifically, it was required to make annual non-refundable deposits, starting at 20% of the repurchase price in the fifth year after the original sale—that is, five years before it could actually exercise the option—with additional increments of 5%-6% due each year thereafter. (*Id.* at ¶ 6).[37]

---

[36] Table 5 provided:

| Table 5: Quarter-end Tower Repurchase Multiplier | | | | |
|---|---|---|---|---|
| <u>Year</u> | <u>Q1</u> | <u>Q2</u> | <u>Q3</u> | <u>Q4</u> |
| 10 | | | | 1.219 |
| 11 | 1.2342 | 1.2497 | 1.2653 | 1.2811 |
| 12 | 1.2971 | 1.3133 | 1.3297 | 1.3464 |
| 13 | 1.3632 | 1.3802 | 1.3975 | 1.415 |
| 14 | 1.4326 | 1.4505 | 1.4687 | 1.487 |
| 15 | 1.5056 | 1.5244 | 1.5435 | 1.5628 |

(Ex. 100 at 6).

[37] Paragraph 6 specifically required that amount of the deposit "shall equal the percentage as set forth in Table 6 below, corresponding to the respective year times the quarter-end tower repurchase multiplier as set forth in Table 5 above times the original purchase price of the respective transmission towers." (*Id.*). Table 6 provided:

The failure to repurchase a tower in chronological order would result in the total loss of any deposits previously made toward the repurchase of those towers. (*Id.* at ¶ 5).[38]

300. Paragraph 7 of the Tower Purchase Agreement required that Eastern Towers, LLC provide Eastern Properties with written notice of the towers it intended to repurchase and when the transaction would occur and to make a non-refundable deposit of 5% of the original price no fewer than 30 and no more than 60 days prior to exercising the repurchase option. (Ex. 100 at ¶ 7).

301. Eastern Towers, LLC also had to pay an annual payment of $10,000 to Eastern Properties under the Tower Purchase Agreement. (*Id.* at preamble).

302. In addition, Moore and Rosenfeld effectively owned 100% of Eastern Properties, but (depending on the vesting schedule) between 60% and 85% of Eastern Towers, LLC.

| Table 6: Percentage Deposit of Repurchase Price | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| End of Year | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 |
| Percentage | 20% | 26% | 32% | 38% | 44% | 50% | 55% | 60% | 65% | 70% | 75% |

(Ex. 100 at 7).

[38] Paragraph 6 specifically provided as follows:

For the cumulative balance of deposits made, a credit will be accrued annually to the deposit balance defined hereinafter as the "Annual Deposit Accruals." At the time of such accrual, the Annual Deposit Accruals shall become part of the cumulative balance of deposits made. The Annual Deposit Accruals shall be calculated by adding to the cumulative balance of deposits made an additional per diem credit equal to the cumulative balance of deposits made times the Incremental Borrowing Rate as defined hereinafter. The "Incremental Borrowing Rate" shall be defined as equal to the Federal Home Loan Bank (FHLB) of Boston Advance Rate on amortizing funds of five years plus 250 basis points. At the time of repurchase, the deposit shall be used pro-rata on a per transmission tower basis, but to the extent that any set of transmission towers are not repurchased as defined by the expiration of the Repurchase Option or by Notice of intent not to repurchase by TOWERS, the pro[-]rata share of deposits for that remaining set, along with the Annual Deposit Accruals for that set, shall be immediately forfeited by TOWERS in favor of PROPERTIES.

(*Id.* at ¶ 6).

71

There was little chance that Moore and Rosenfeld would cause Eastern Towers, LLC to exercise an option that would benefit the LLC at the expense of Eastern Properties. (Mallinson, 8:67-68; Marcus, 21:112-14).

303.    Under the circumstances, there was no realistic possibility that Eastern Towers, LLC would ever exercise the repurchase rights in the Tower Purchase Agreement.

304.    Moore apparently did not believe the seller's rights added any value at all to Eastern Towers, LLC, as he did not list them as an intangible asset (or any other type of asset) in a balance sheet created in May 2004. (Ex. 331; Jalbert, 21:51).[39]

305.    Because of the onerous terms and conditions outlined above, the repurchase option and the purported commission rights were for all practical purposes worthless, and had no real value to Eastern Towers, LLC. (*See* Mallinson, 8:65, 73).

**O.    The Purchase Price for the Towers**

306.    Tower values are generally calculated as a multiple of tower cash flow ("TCF") or as a multiple of EBITDA (earnings before interest, taxes, depreciation, and amortization). (Mallinson 8:29-32, 57-58; *id.*, 9:39-40; Wendt, 18:16-18). TCF is the income from the tower—that is, lease revenue from the tenants—less direct operating costs (such as ground rent, insurance, utilities, and maintenance). (Mallinson, 8:30-31; Wendt, 18:16).

---

[39] Defendants' expert Wayne Brown valued the option at a range between approximately $812,000 and $1 million. (Brown Aff. ¶ 23). However, in valuing the seller's rights, Brown used a simple discounted cash flow model that did not consider (among other things) the tremendous complexity of the option, including the 10-year time period before it could be exercised; the requirement to repurchase the towers in sequence; the requirement to make non-refundable deposits five years in advance; the risk of losing those deposits; the common ownership between the two companies; and external risk factors, such as consolidation in the industry and changes in technology. (Brown, 17:50, 55-66; Marcus, 21:112-14). Brown's valuation of the option is not credible under the circumstances.

Management expenses or overhead (such as accounting and management fees) are normally excluded from the calculation of TCF. (Mallinson, 8:31-33; Wendt, 18:16).

307. The parties in this case calculated tower values based on a multiple of net operating income ("NOI"). NOI is the same as TCF, except that NOI includes management fees (and is therefore lower than TCF). (Mallinson, 8:57-59; Wendt, 18:16, 29).

308. Typically, the factors that determine the value of a cell-tower location include the level of competition, the quality of the tenants and the leases, and the expectation of adding additional tenants to a cell tower (or "lease-up" potential). (Mallinson, 8:24-27).

309. The age of a tower can be an important factor in determining lease-up potential. (Mallinson, 8:28-29; Wendt, 18:21). For example, a newer tower with only one tenant has greater lease-up potential than a similarly situated older tower. (Mallinson, 8:28-29, 49-53; Wendt, 18:24-26). Consequently, the appropriate multiple for a brand-new tower may be significantly higher than the multiple for an older tower. (Mallinson, 8:53).

310. As noted, under the terms of the Tower Purchase Agreement, the purchase price for the towers was "equal to the annualized Net Operating Income of each transmission tower multiplied by seven (7)." (Ex. 100 at ¶ 2).

311. Plaintiffs' expert, Keith Mallinson, opined that as of June 2003, and based on market conditions, the immaturity of the towers, and other relevant circumstances, a fair price for the towers would have been equal to 14 times TCF or 15 times NOI. (Mallinson, 8:60). He also opined that the use of a multiple of seven times NOI was "very unfair" and "substantially below the fair market value." (Mallinson, 8:59-60).

312. Defendants' expert, Bruce Wendt, opined that the fair market value for towers sold in

73

June 2003 was equal to 9 to 13 times TCF. (Wendt, 18:27-28). Wendt's analysis did not, however, take into account the age of the towers that were being used as comparables, the quality of the tenants, or the specific locations of those towers. (Wendt, 18:28; Mallinson, 9:41; *see* Ex. 212). Even assuming that the towers underlying Wendt's calculation were of average age, the resulting calculation would be consistent with Mallinson's opinion. (Mallinson, 9:42-44).

313.   Defendants also attempted to demonstrate that the price paid for the towers actually reflected the equivalent of 10 or 11 times NOI. (Rosenfeld, 14:26-29; Brown, 17:23-33). That calculation, however, was based on incorrect or suspect data, including discrepancies between the purchase prices for the towers as shown on the actual purchase agreements and the prices used for the calculation, and discrepancies between the financial data submitted to TD Banknorth for loan approval purposes in November 2004 and the data used for the calculation. (*See* Brown, 17:22, 27, 31-34, 46-47).

314.   The Court credits Mallinson's opinion as to the fair market value of the towers in June 2003. The sales price based on a multiple of seven times NOI was unfair and substantially below fair market value. A fair price for the towers would have been equal to 14 times TCF or 15 times NOI.

315.   Assuming that $818,532 represented seven times NOI, the fair market value in June 2003 of the four towers was $1,753,997.

316.   Because the repurchase rights and commission rights in the Tower Purchase Agreement were essentially worthless, the towers sold by Eastern Towers, LLC to Eastern Properties

were sold for less than half their fair market value.[40]

### P.   The Financial Condition of the Business in June 2003

317.   As of May 30, 2003, immediately before the June 2 closing, Eastern Towers, Inc. had $1,830.71 in its bank account, while Eastern Towers, LLC had a balance of $1.64. (Ex. 335; Jalbert, 21:59-63).

318.   As noted, on June 2, 2003, Eastern Properties purchased the first four towers (Beverly, Franklin Church, Franklin Industrial, and Weare) from Eastern Towers, LLC for $818,832. (Moore, 19:187, 193; Exs. 101, 900.400). In theory, that provided much-needed capital for the existing business.

319.   However, because Moore and Rosenfeld immediately withdrew $520,000 from the business, the net addition of funds was only $298,832 (before other payments were made).

320.   On June 2, Eastern Towers, Inc. also made a payment of $10,000 to Eastern Properties pursuant to the Tower Purchase Agreement. (Ex. 114; Rosenfeld, 12:127-28).

321.   On June 2, Eastern Towers, Inc. also made a payment of $7,500 on June 2 to TD Banknorth for a loan origination fee owed by Eastern Towers, LLC. (Exs. 114; 801.8).

322.   The four towers were purportedly owned by Eastern Towers, LLC.  Nonetheless, the entire purchase price of $818,832 was paid to Eastern Towers, Inc. (Katz, 14:179-81; Exs. 101, 206, 900.400).

323.   As noted above, the capital contributions by Moore and Rosenfeld had been made to both

---

[40] Plaintiffs contend that the purchase price for the towers was not even sufficient to cover the expenses incurred constructing the towers.  Because plaintiffs have cited only to the general ledger in support of that contention, the Court cannot ascertain the truth of that assertion. (*See* Ex. 193).

Eastern Towers, Inc. (in the total amount of $252,000), and Eastern Towers, LLC (in the total amount of $270,000).  (Ex. 695).  However, the entire capital withdrawal, in the amount of $520,000, was made from Eastern Towers, Inc.  (Exs. 114, 206 at 25).

324.   The withdrawal of $520,000 in capital on June 2 provided no benefit of any kind to Eastern Towers, Inc., Eastern Towers, LLC, Strachan, or Sanford.

325.   Moore admitted at trial that the capital withdrawal "didn't do [the company] any good . . . ."  (Moore, 19:178).

326.   The capital withdrawal left the business in a precarious financial position.

327.   At the close of business on June 2, 2003, Eastern Towers, Inc., had approximately $459,000 in trade payables and $26,000 in monthly operating expenses, and approximately $283,000 in cash on hand.  (Ex. 694; Jalbert, 21:26-30).  Eastern Towers, Inc. and Eastern Towers, LLC as a consolidated entity had a total of about $322,258.26 in current assets.  (Marcus, 21:101-02; Ex. 694).[41]

328.   On June 4 and 5, 2003, Eastern Towers, Inc. made three payments to Timberline Construction Corporation for construction services totalling $173,594.50; a payment of $3,229.75 to Pennsummit Tubular related to tower construction; and a rental payment of $1,100 related to the Weare tower. (Ex. 114).

329.   By June 30, 2003, Eastern Towers, Inc. had only $5,203.73 in its bank account, and the account of Eastern Towers, LLC had dropped below zero to ($1.36).  (Ex. 335; Jalbert 21:62).

330.   Eastern Towers (combined) had operating expenses of approximately $24,000 in June

---

[41] This provided Eastern Towers with a working capital ratio of 0.70.  (Marcus, 21:101-02).

2003, and was projected to have operating expenses of approximately $26,000 per month

thereafter.  (Marcus, 21:104; Ex. 488).

331.   As of June 2003, the only realistic potential sources of income for the business to meet

those monthly expenses were (1) income from consulting contracts and (2) income from

new tower sales.  (Moore, 19:214; Rosenfeld, 12:131-32).

332.   As of June 2, 2003, Strachan and Sanford were negotiating with General Dynamics

Network Systems to provide future consulting work.  A Master Services Agreement was

eventually signed between Eastern Towers, LLC and General Dynamics on June 16,

2003.  (Ex. 672).  General Dynamics did not, however, commit to any specific level of

future consulting engagements.  (*Id.*)

333.   The consulting work turned out to be sporadic and limited in duration, and the income

was relatively insignificant; there were multiple months when there was no consulting

income at all.  (Jalbert, 21:39-45; Ex. 630).[42]

334.   As of June 2, 2003, it was not reasonable to believe that Eastern Towers (combined)

could have covered its monthly operating expenses, let alone the construction costs of

new towers, from tower sales.

335.   Rosenfeld testified that Eastern Towers, LLC made a profit of approximately $60,000 on

each tower it sold to Eastern Properties.  (Rosenfeld, 13:16-17).  Even accepting that

highly doubtful assumption as true, it would have had to sell a tower approximately every

two months simply to meet operating expenses.  (Marcus, 21:105).  The business could

---

[42] There may have been some additional sporadic consulting income from T-Mobile, but there was no evidence at the trial as to the amount or timing of any such income.  (*See* Jalbert, 21:39).

not have funded the construction of additional towers, or build towers fast enough, without additional sources of funds.

336.   Based upon an internal Eastern Towers tracker (an internal database created and maintained by Rosenfeld) from June 2003, plaintiffs' expert Paul Marcus projected that the consolidated companies would have a negative cash balance at the end of every month over the next year, except in December 2003.   (Ex. 488; Marcus, 21:101-04).

337.   Plaintiffs' expert Marcus testified that the capital withdrawal by Moore and Rosenfeld rendered both Eastern Towers, Inc., standing alone, and Eastern Towers, Inc. and Eastern Towers, LLC, considered as a consolidated entity, insolvent. (Marcus, 21:116-17). Marcus testified that both were insolvent from both a balance sheet perspective and a capital adequacy perspective.   (*Id.*).

338.   Defendants' expert Craig Jalbert testified that both Eastern Towers, Inc. (standing alone) and Eastern Towers (consolidated) were in fact solvent as of June 2, 2003.   (Jalbert, 20:84-85).

339.   Jalbert's conclusion is premised on a number of assumptions that are not supported by the evidence.

340.   As to Eastern Towers, Inc., Jalbert's balance sheet showed a positive net equity of approximately \$37,000.   (Ex. 694).   However, his balance sheet included an asset of approximately \$459,000 in accounts receivable from Eastern Towers, LLC (counterbalancing the \$459,000 in trade payables owed by the corporation). (*Id.*). As of June 2, Eastern Towers, LLC had cash on hand of \$4.74 and no receivables, and there was no realistic prospect that the LLC would be able to pay the corporation anything

close to $459,000 in the near term.

341.    As to Eastern Towers, Inc., and Eastern Towers, LLC considered as a consolidated entity,

Jalbert opined that the two together had a positive net equity of more than $821,000. (Ex.

694). That valuation was a positive number, rather than a negative number, principally

because of the inclusion of three assets of Eastern Towers, LLC: (1) the value of the

repurchase rights and commission rights in the Tower Purchase Agreement, which Jalbert

valued at $447,283; (2) the value of the work-in-process ("WIP") the eight hard-to-zone

tower sites, which Jalbert valued at $200,000; and (3) the net value of the remaining five

tower projects, which Jalbert valued at $307,500. (Ex. 694; Jalbert, 20:83-85, 92-93; *see

id.* 21:30-47).[43]

342.    As noted, the repurchase rights and commission rights in the Tower Purchase Agreement

were essentially worthless, and Jalbert should have assigned no material value to those

rights. (Marcus, 21:114).

343.    The WIP for a tower site includes items such as licensing applications, site plans,

environmental assessments, and construction drawings. (*See* Ex. 156).

344.    Defendants' expert Bruce Wendt concluded that the value of the WIP for the eight hard-

to-zone sites as of June 2, 2003, was between $200,000 and $280,000, or "$25,000 to

$35,000 each fully permitted." (Wendt Aff. ¶ 10). Wendt admitted that he had no

"empirical comparable transactional data [and] therefore [the] values are to be considered

somewhat speculative." (Wendt Rept. sec. VIII).

---

[43] Jalbert relied on the opinions of Wayne Brown, another defense expert, as to the value of the repurchase and commission rights in the Tower Purchase Agreement, and Bruce Wendt, another defense expert, as to the value of the remaining towers and the WIP. (Ex. 694).

345.    Among other things, Wendt's valuation did not take into account the fact that neither
        zoning approvals nor building permits had been issued for any of the eight sites, or that
        four of the sites (all in Nantucket) had been put on hold indefinitely by AT&T as of June
        1, 2003. (Marcus, 21:115-16; Moore, 15:252-55; Wendt, 18:8-12, 46-48; Jalbert,
        21:35-36; *see* Ex. 613).

346.    Approximately one year later, a balance sheet for Eastern Towers, LLC dated May 31,
        2004, sent by Rosenfeld to Moore showed a value of $2,500 for the site in Ipswich;
        $50,000 for the site in Wayland; and no value at all for the other six sites. (Ex. 331; *see
        also* Jalbert, 21:50-51).

347.    As described below, Eastern Towers, LLC either sold the WIP for seven of the sites to
        Eastern Towers II, LLC on July 23, 2004, for $50,000, or the Wayland WIP to Horizon
        Towers on August 11, 2004, for $40,000.

348.    Under the circumstances, and as he admitted, Wendt's valuation for the WIP on the June
        2, 2003 balance sheet was speculative. (Marcus, 21:115-16). At a minimum, it should
        have been substantially discounted.

349.    As to the value of the five remaining tower projects, the valuation performed by Wendt
        and used by Jalbert is likewise substantially overstated.

350.    As of June 2, 2003, zoning approval had been obtained for towers in Webster, New
        Hampshire; Pembroke, New Hampshire; Carver, Massachusetts; Goshen, Massachusetts;
        and Loudon, New Hampshire. (Strachan, 4:107-08, 111-13; *see* Ex. 613). Building
        permits had been obtained for Goshen and Loudon, and both were under construction.
        (Strachan, 4:112-13).

351. Defendants' expert Wendt estimated that each of those towers could be sold at a profit of
$61,500. Wendt thus concluded that the five sites were worth $307,500 as of June 2,
2003. (Wendt Aff. ¶ 13; Ex. 694).

352. Wendt's analysis assumed that the towers would be built, and that the profits would be
received in the future. However, he did not discount the value in any respect to reflect the
present value of the projected profits or to take into account the possibility of future
delays or other problems. (Jalbert, 21:34-35; Marcus, 21:114-15).[44]

353. Wendt's analysis also capitalized the future income (the profits from the towers) as assets
without capitalizing any future expenses as liabilities. (Marcus, 21:114-15). In order to
fund its monthly expenses, Eastern Towers, LLC would have to sell an average of one
tower every two months. (Jalbert, 20:100-01; *see also* Marcus, 21:105, 152-53).[45] Wendt
assumed that Eastern Towers, LLC would not incur additional expenses, such as those
related to developing other additional tower opportunities. (Marcus, 21:151-52).[46]

354. Plaintiff's expert Marcus testified that without inclusion of those three sets of assets, the
consolidated entity had a negative net equity of ($133,000), and was therefore insolvent.
(Marcus, 21:111; see Ex. 694).

355. The Court need not resolve the question whether Eastern Towers (combined) was

---

[44] The entire process of siting and permitting a tower could take years and was fraught with uncertainty;
even the construction process was subject to unforeseeable delays. (Wendt, 18:11-18, 54-55, 68-69; Jalbert,
21:47-50).

[45] This is based on the assumption that each tower was sold for $61,000 more than it cost to build.
(Rosenfeld, 13:16-17; Jalbert, 20:100-01).

[46] As discussed, the operating expenses of Eastern Towers, LLC were approximately $26,000 per month, or
$312,000 per year. (*See* Jalbert, 21:35; Marcus, 21:105).

insolvent after Moore and Rosenfeld withdrew their $520,000 in capital on June 2, 2003. If the enterprise was not actually insolvent at that moment, it was perilously close to insolvency. Among other things, within four weeks the business had only $5,000 in cash on hand, about enough to fund operations for four or five days.

356. Only three months after Moore and Rosenfeld withdrew $520,000 in capital, Eastern Towers had run out of funds. On September 9, 2003, Rosenfeld sent an e-mail to Strachan and Sanford demanding an additional capital contribution to Eastern Towers, LLC of $20,000 each. (Ex. 118, 120). The total required contribution was $100,000 among the four members. (*Id.*). The money would be used, among other things, to pay the salaries of Strachan and Sanford.

357. Moore and Rosenfeld agreed that Strachan and Sanford could make their contributions by December 15, 2003 (eventually extended to December 31, 2003). (Rosenfeld, 14:144-47; Ex. 120). If they could not pay the required amounts, the other members would be offered the opportunity to do so in return for a greater share of the equity. (*Id.*)

358. Strachan and Sanford could not afford to pay the additional amounts. (Ex. 134; Rosenfeld, 14:144-47). It is unclear whether Moore or Rosenfeld ever paid those amounts. (*Id.*)

### Q.     Tower Purchases between June 2003 and May 2004

359. Between June 2003 and May 2004, Eastern Properties purchased five more towers—Webster, Pembroke, Carver, Goshen, and Loudon—from Eastern Towers, LLC under the Tower Purchase Agreement. (Exs. 904.400, 905.400, 907.400, 909.400).

360. The aggregate price for the five additional towers was $1,063,000. (*See* Exs. 904.400,

82

905.400, 907.400, and 909.400).

361.   According to the purchase agreements, Eastern Properties paid $185,000 for the Webster

tower, $490,000 for the Pembroke and Carver towers, $245,000 for the Goshen tower,

and $143,000 for the Loudon tower. (Exs. 904.400, 905.400, 907.400, 909.400).[47]

362.   The purchase price for the five towers was set at seven times NOI. Assuming the NOI

figure is correct, the fair market value of the towers (at 15 times NOI) was $2,277.857.

363.   The purchase agreements for the towers in Pembroke, Carver, Goshen, and Loudon were

executed solely by Moore on behalf of both Eastern Properties, LLC and Eastern Towers,

LLC. (Exs. 905.400, 904.400, 909.400). The purchase agreement for the Webster tower

includes a signature line for Strachan to assent to the sale as President of Eastern Towers,

Inc., but he never signed it. (Ex. 904.400).

364.   Eastern Properties thus paid Eastern Towers, LLC a total of $1,881,832 for the nine

towers. (*See* Exs. 619, 693, 900.400, 904.400, 905.400, 907.400, 909.400).[48]

365.   Although Eastern Properties purchased the Webster, Pembroke, Carver, Goshen, and

Loudon towers from Eastern Towers, LLC, but the payments (or portions of them) were

paid to Eastern Towers, Inc. (Katz, 14:182-95; Exs. 205, 206, 335, 473, 474, 900.400,

905.400, 905.501, 907.400, 909.400).

### R.   The Operation of the Corporation and LLC as a Single Business

366.   Eastern Towers, Inc., and Eastern Towers, LLC, were operated from a financial and

---

[47] Plaintiffs contend, with considerable justification, that defendants have taken inconsistent positions with regard to the actual price paid for specific individual towers. *Compare, e.g.,* Exs. 904.400, 905.400, 907.400, and 909.400 with Exs. 619 and 693. The parties do not, however, dispute the aggregate total price.

[48] This amount took into account tenants that never materialized and thus ended up being greater than the multiple agreed to in the Purchase Agreement. (Rosenfeld, 14:26-29).

business perspective as a single entity. (Katz, 14:177-78).

367. As noted above, when Eastern Properties purchased towers from Eastern Towers, LLC, the proceeds of the sales were paid, in whole or in part, to Eastern Towers, Inc. (Katz, 14:179-196). Rosenfeld acknowledged that they did so as an "operational shortcut." (Rosenfeld, 14:141-42).

368. Although Eastern Towers, LLC was the owner of the towers prior to their sale, expenses for the towers (such as rents) were paid primarily (although not always) by Eastern Towers, Inc. (Katz, 14:196-98; Ex. 479).

369. Although Eastern Towers, LLC was the borrower on the construction loan with TD Banknorth and received the advances on that loan, the fees and repayments for the loan were paid by Eastern Towers, Inc. (Katz, 14:198-202; Exs. 206, 207, 801.8).

370. When one entity had a negative balance, cash was shifted from the other entity to make up the deficit. (Katz, 14:202-05; Ex. 478).

371. Income and expenses were shifted between the two companies for tax purposes, so that Eastern Towers, Inc. recorded zero income on its tax forms, while Eastern Towers, LLC recorded a loss on its tax forms. (Katz, 14:205-225; Exs. 68, 201, 307, 471; Ex. 472).

372. The treatment of income and expenses benefitted Moore and Rosenfeld personally by shifting losses to Eastern Towers, LLC, where they could use them to offset income from other sources on their individual income tax returns. (Katz, 14:214-17).

373. The financial statements for Eastern Towers, Inc. and Eastern Towers, LLC were always presented as a single combined entity. (Strachan, 2:144-45).

374. Sanford testified that he always viewed the corporation and the LLC as "the same

company," and he did not differentiate between them in their business operations. (Sanford, 6:34-36).

### S. The December 2003 Letter

375. One of the sites that Eastern Towers had acquired from Chris Hesse was located at 137 Boston Post Road in Wayland. (Rosenfeld, 13:130, 14:56; Moore, 19:222). Eastern Towers was working with AT&T to develop the site, with AT&T as a prospective tenant. (Strachan, 3:49-53).

376. In January 2003, prior to selling the site, Hesse had entered into an Option and Communications Facility Agreement (the "Wayland Ground Lease") with the landowner, Steven Keneally, for the site. (Strachan, 3:46, 48-49; Hesse, 5:25-26, 30). The Wayland Ground Lease had been transferred, as part of the sale, to Eastern Towers. (Strachan, 3:49).

377. On December 16, 2003, Keneally sent Strachan a letter purporting to terminate the Wayland Ground Lease. (Ex. 130). Keneally also sent Hesse a copy of the letter. (*Id.*).

378. The December 16 letter notified Eastern Towers that the lease was considered "null and void" for three reasons: (1) failure of consideration, because the lessee had failed to submit a $10 payment upon execution of the lease; (2) because the lessee was planning to erect the tower in a location that was different than that set forth in the lease; and (3) because the lessee was attempting to enlarge the enclosure of the tower beyond the size agreed upon in the lease. (Ex. 130; Strachan, 3:45-47).

379. Strachan received the letter on December 18, 2003. (Strachan, 3:45). Sanford was aware of the letter the day it arrived. (Strachan, 3:45; Sanford, 10:195). Strachan did not,

however, immediately tell Moore or Rosenfeld about it. (Strachan, 3:77-80; Sanford, 10:194-95). Instead, he told Sanford that he would handle the situation. (Strachan, 3:80; Sanford, 10:97, 195).

380.   Strachan arranged a meeting with Keneally for January 14, 2004. Prior to that meeting, Strachan called Hesse to ask about the claims in the letter. Hesse responded that he had sent the $10 payment to Keneally; Strachan asked him to produce a record of it. (Strachan, 3:52).[49]

381.   On January 14, Strachan met with Keneally and Keneally's lawyer. (Strachan, 3:53-54, 80). Keneally told Strachan that he sent the letter because he wanted to have a real-estate development project built on his property and he was concerned that the tower would block access to the project. (Strachan, 3:54). According to Strachan, as a result of the conversation, Keneally agreed to "move forward" with construction of the tower. (Strachan, 3:55).

382.   After the January 14 meeting, Strachan again contacted Hesse to request documentation of payment of the $10 fee. (Strachan, 3:56).

383.   Strachan did not attend the weekly meetings on January 15 or 22, 2004, because he was ill. (Strachan, 3:55; Sanford, 6:43, 10:196; Moore, 19:223).

    T.    **The Meetings on January 22 and 29, 2004**

384.   During the meeting on January 22, 2004, Sanford told Moore and Rosenfeld about the

---

[49] Strachan also notified Chris Dwight, a site acquisition specialist for AT&T, about the Keneally letter to determine whether or not Dwight believed the tower had been properly located on the Wayland site. (Strachan, 3:53). Keneally, Strachan, and Dwight had conducted a walk-through of the site in April 2003, and Keneally had approved a location for the tower at that time. (Strachan, 3:49-51; Ex. 145). Dwight confirmed that he understood that the tower was properly located on the site. (Strachan, 3:53; Moore, 20:21-22, 49-51; Ex. 145).

December 16 letter and the subsequent developments, including the meeting with Keneally. (Sanford, 10:94-95, 198; Rosenfeld, 14:45-46, 65-67; Moore, 16:74, 19:222-23).

385.   Moore and Rosenfeld expressed concern to Sanford that Strachan had withheld that information for so long. (Sanford, 10:95, 198-99; Rosenfeld, 14:46-47). They viewed the Wayland site as valuable and were aware of the investment AT&T had made in obtaining zoning approval for the site. (Sanford, 10:97; Rosenfeld, 14:46-47, 78; Moore, 19:224; *see* Orlandi, 1:91-96).

386.   Moore and Rosenfeld wanted to call Strachan immediately, but Sanford asked them to give Strachan a chance to inform them of the letter himself. (Moore, 19:224-25; Rosenfeld, 14:46, 69-70). They agreed to wait until the next weekly meeting, which was scheduled for January 29, 2004, to discuss the issue. (Rosenfeld, 14:46, 69-71; Sanford, 10:96; Moore, 19:224-25).

387.   After the January 22 meeting, Sanford contacted Strachan and urged him to tell Moore and Rosenfeld about the Keneally letter. (Sanford, 10:96). Strachan responded that he was handling it. (Strachan, 3:59-60; Sanford, 10:97).

388.   On January 23, 2004, Moore and Rosenfeld spoke on a conference call with a man named Bill Ricco concerning possible employment with the company for "operational assistance." (Rosenfeld, 14:96-100; Ex. 139). Strachan and Sanford did not participate and were not informed of the call. (*Id.*; Strachan, 3:68).[50]

---

[50] Rosenfeld had been introduced to Ricco in October or November 2003 and had communicated with him in November or December 2003. (Rosenfeld, 14:95-96, 99-100).

389.  On January 26, 2004, Ricco sent a copy of his resume by e-mail to Moore and Rosenfeld. (Ex. 139).

390.  On January 28, 2004, Hesse sent an e-mail to Keneally with a copy to Strachan. The e-mail attached a copy of a letter to Keneally. In the letter, Hesse claimed that he had sent a check for $10 on January 31, 2003, that had never been cashed, and sent what purported to be a copy of that check and the accompanying letter. (Ex. 303 at 1-2). Hesse also advised Keneally that he had mailed a replacement payment. (Hesse, 5:35-36; Ex. 303 at 1-2).

391.  Strachan attended the weekly meeting on January 29, along with Moore and Sanford. At the time, he had not yet read the January 28 e-mail from Hess. (Strachan, 3:59).[51] Strachan gave an update on the Wayland site, but only reported that the lease situation was fine; he did not mention the December 16 letter. (Rosenfeld, 16:77; Moore, 19:228). Strachan told Sanford and Moore that his "gut" told him that Keneally wanted to construct an affordable housing development on the site, but that "on the surface" the Wayland lease was "fine." (Strachan, 3:59, 80-81; Moore, 16:77, 19:225-27; Ex. 688; *see* Hesse, 5:30).

392.  Neither Moore nor Sanford asked Strachan about the letter during the meeting. (Moore, 16:77-78).

393.  After the January 29 meeting, Moore called Sanford and expressed his disbelief that Strachan had not mentioned the letter. (Moore, 19:228). Sanford was disappointed that he had not done so, and said he would call Strachan to discuss the matter. (Sanford,

---

[51] Rosenfeld was traveling at the time and did not attend the meeting. (Rosenfeld, 14:77; Moore, 19:225).

10:98-99; Moore, 19:228; *see* Rosenfeld, 14:89).

394.   A few minutes later, Strachan called Moore and told him about the letter. (Strachan, 3:60; Moore, 16:78, 19:228-29). Strachan had just read Hesse's January 28 e-mail and said that he was concerned that Hesse may not have sent the $10 check to Keneally in January 2003. (Strachan, 3:59-61; Moore, 19:229).

395.   Moore then called Rosenfeld and informed him about the January 29 meeting and his subsequent conversation with Strachan. (Moore, 19:229-30, 235; Rosenfeld, 14:48-49, 90-92). Rosenfeld testified that he told Moore that he questioned Strachan's integrity and that he did not want to work with him anymore. (Rosenfeld, 14:49-50).[52]

### U.   Strachan's Termination

396.   As a result of his January 29 conversation with Moore, Strachan called Hesse again to confirm that Hesse had sent the first $10 check. (*See* Ex. 686). Hesse followed up with an e-mail to Moore and Strachan, in which he acknowledged that he did not mail Keneally any payment during January or February 2003. (*Id.*).[53]

397.   Strachan also contacted Attorney Kenneth Spigle, who was representing Eastern Towers in the zoning proceedings for the Wayland site. Strachan asked Spigle to give him advice as to the sufficiency of the December 16 letter as notice under the lease. (Strachan, 3:63-65). Spigle responded by e-mail on February 5, 2004, advising, among other things, that the notice appeared to be defective. (Ex. 304). Strachan then copied and pasted the

---

[52] Moore and Rosenfeld also questioned the authenticity of the January 2003 letter and check. (Rosenfeld, 14:76-77, 91; Moore, 19:230).

[53] Moore also checked the cure provisions of the lease and mailed Keneally a second $10 check by registered and certified mail to cover year two of the option. (Moore, 19:234-35).

substance of the response in an e-mail he sent to Moore on February 6. (Strachan, 3:64-65, 83-84).[54]

398. At Moore's request, Strachan also asked Chris Dwight of AT&T to confirm in writing his account of the Wayland site visit. (Strachan, 3:67-68; Moore, 20:21-22; *see* Ex. 145). On February 11, 2004, Dwight e-mailed Strachan with a description of the Wayland site visit, including the agreed-upon tower location. (Ex. 145). Eventually, the issue was resolved, and the lease was not voided.

399. Moore and Rosenfeld told Sanford "at some point" that Strachan had lied to them by not telling them about the December 16 letter and thought that he should be fired. (Sanford, 10:101; Rosenfeld, 14:50, 83-84; Moore, 19:235-36).

400. Rosenfeld testified that it did not "matter" to him whether the notice given by Keneally may have been defective, and therefore that the issue may not have been consequential to the lease. (Rosenfeld, 14:85-86).

401. Sanford agreed that Strachan's employment should be terminated. (Sanford, 10:101).

402. The termination of Strachan as president and director of Eastern Towers, Inc., was never put to a formal corporate vote. (Strachan, 6:44-45).

403. There does not appear to have been any discussion prior to Strachan's termination as to the impact on the vesting of his equity interests in Eastern Towers, LLC or whether there were other reasonable alternatives to termination.

---

[54] Strachan testified that he did not want to reveal attorney Spigle's role to the other men. (Strachan, 3:83-84). Neither Sanford nor Moore ever responded to Strachan's February 6 e-mail. (Strachan, 3:67). Rosenfeld testified that he saw this e-mail as an attempt by Strachan to justify his actions and that he had "no interest" in Strachan's analysis regardless of its merit. (Rosenfeld, 14:82-84).

404. The Executive Employment Agreement, which Strachan had executed in April 2002,
     provided that he could be terminated for cause for various listed reasons, including "any
     single act or series of acts by the Executive to the material detriment of the Company"
     and "commission of an act of dishonesty or moral turpitude." (Ex. 44 at 2). It also
     provided that he could be terminated without cause, although he would then be entitled to
     a severance payment. (*Id.*).

405. Sanford called Strachan and told him he would be fired at the next weekly meeting.
     (Strachan, 3:70-71).

406. On February 6, 2004, Moore and Rosenfeld met with Ricco for the first time and
     discussed his potential hiring. (Rosenfeld, 14:93; Ex. 143).

407. On February 10, 2004, Rosenfeld informed Sanford that he and Moore had decided to
     hire Ricco to replace Strachan. (Ex. 143).

408. On February 10, 2004, Moore told Rosenfeld in an e-mail that they should "make
     [Strachan's] stock give back [sic] a part of" his employment termination. (Ex. 143;
     Rosenfeld, 14:95).

409. As of February 10, 2004, Moore and Rosenfeld knew and understood that Strachan was a
     shareholder in Eastern Towers, Inc., and a member of Eastern Towers, LLC.

410. Strachan was informed of his termination at the meeting on February 13, 2004.
     (Strachan, 3:71-73; *see* Ex. 149).

411. Rosenfeld testified that on February 13 he offered Strachan $50,000 in severance pay in
     return for a release. (Rosenfeld, 12:146). The $50,000 offer comprised a $29,900
     severance payment and an agreement not to oppose approximately $20,000 in

91

unemployment benefits if Strachan applied for those benefits. (Strachan, 3:71-72).

412.  On February 19, 2004, Rosenfeld sent Strachan a proposed severance agreement (drafted

by attorney Hausler) that offered Strachan a $29,900 severance payment. (Rosenfeld,

12:147-50; Ex. 148).[55]

413.  No severance agreement was ever executed.

414.  On February 26, 2004, Rosenfeld sent a letter to Strachan formally advising him of the

termination, "for cause effective immediately." (Ex. 149). The letter was signed by

Rosenfeld as treasurer of Eastern Towers, Inc. (*Id.*).

415.  By terminating Strachan for cause, Moore and Rosenfeld avoided paying any severance to

him.

416.  The termination letter did not address Strachan's positions as director and stockholder of

Eastern Towers, Inc.

417.  On February 13, 2004, Eastern Towers, Inc., filed a Certificate of Change of Directors or

Officers of Domestic Business Corporations with the Secretary of the Commonwealth.

(Ex. 146). The certificate indicated that Strachan had been removed as president, and

replaced by Moore. (*Id.*). It also indicated that Strachan was no longer a director.

418.  Strachan never gave up his stock ownership in Eastern Towers, Inc.

---

[55] The proposed severance agreement also stated:

Strachan agrees and acknowledges that he shall voluntarily resign any and all offices and positions
with the Corporation including, without limitation, as President of the Corporation, and as
Manager of the Company. Strachan further hereby assigns, sells, conveys, and transfers all of his
right, title and interest in and to shares of the Corporation to the Corporation, and his membership
interest in the Company to the Company.

(Ex. 148 at 6). On February 26, 2004, Rosenfeld sent Strachan a document titled "Notice of Termination of
Employment for Cause." (Ex. 150).

419.   As of the date of his termination, Strachan's equity interest in Eastern Towers, Inc., was 2,500 shares, or 25% of the outstanding equity.

420.   The termination letter did not address Strachan's position as a member and owner of Eastern Towers, LLC.

421.   The LLC Operating Agreement included procedures for redemption of Strachan's membership interest at a price set by a formula in the agreement, at the discretion of "the Company." (Ex. 45 at Sch. B). Moore and Rosenfeld did not cause the LLC to redeem Strachan's interest. There is no evidence they considered doing so.

422.   Strachan was never removed as a member of Eastern Towers, LLC, and never gave up his equity interest.

423.   As of the date of his termination, Strachan's equity interest in Eastern Towers, LLC was 10.36%. That percentage is calculated as follows, pursuant to the vesting schedule in Schedule B to the Operating Agreement:

| vesting date | percentage of equity interest |
|---|---|
| April 9, 2002: | 0% |
| October 9, 2002: | 5% (25% of 20%) |
| January 9, 2003: | 6.072% (adding 1.072%, or 5.36% of 20%) |
| April 9, 2003: | 7.144% (adding 1.072%, or 5.36% of 20%) |
| July 9, 2003: | 8.126% (adding 1.072%, or 5.36% of 20%) |
| October 9, 2003: | 9.288% (adding 1.072%, or 5.36% of 20%) |
| January 9, 2004: | 10.36% (adding 1.072%, or 5.36% of 20%) |

(*See* Ex. 45).

424.    Had Strachan remained employed until the end of the two-year term of the Executive

Employment Agreement (that is, until April 9, 2004), his equity interest in Eastern

Towers, LLC would have been 11.432% (adding 1.072%, or 5.36% of 20%). (*See* Exs.

44, 45).

425.    Had Strachan remained employed by Eastern Towers, Inc., for four years, his equity

interest in Eastern Towers, LLC would have become fully vested at 20% on April 9,

2006.

426.    After he was terminated from Eastern Towers, Inc., Strachan sought unemployment

benefits.  Eastern Towers, Inc., opposed Strachan's request.  (Sanford, 6:90; Rosenfeld,

12:155; Moore, 20:7-8).  Two hearings were held before the Massachusetts Division of

Unemployment Assistance on July 21 and August 4, 2004.  Moore and Sanford both

testified in opposition to Strachan's claim for unemployment benefits.  (Rosenfeld,

12:155; Moore, 16:76, 85, 20:8; Sanford, 6:90).  The DUA Hearing Officer found,

however, that Strachan was entitled to benefits.  (Ex. 411).

427.    Rosenfeld made or obtained a tape of a telephone conversation between Strachan and

Sanford that took place on July 22 or 23, 2004, a day or two after the first hearing.

(Rosenfeld, 12:153-57; Moore, 16:87).  The circumstances of its creation are unclear.[56]

428.    After that first day of testimony at the unemployment hearing, Moore and Rosenfeld

listened to the recording.  (Ex. 406).  Rosenfeld also created a typed transcript of the

conversation.  (Rosenfeld, 153-55; Ex. 406).

---

[56] Neither Moore nor Rosenfeld claimed to be able to recall how the recording was made; Rosenfeld
testified that he discovered it on his answering machine or voice-mail.  (Rosenfeld, 12:154-55; Moore, 16:86-87).
Neither man's testimony is credible in that respect.

429.    At some point, apparently soon after Strachan was terminated, Ricco was hired to replace

him. (Moore, 19:233).

430.    In November 2005, and as discussed below, Moore approached TD Banknorth about

adding a new entity (one that he and Rosenfeld controlled) as a co-borrower on the

guidance line. (Ex. 421). At the time, Moore advised Peter Fenn at the bank that

Strachan was terminated because "Moore and Rosenfeld felt that Strachan was not

'pulling his weight' and that he intentionally misled the other principals to cover up a

mistake he had made." (Ex. 421).

431.    The principal reason that Moore and Rosenfeld terminated Strachan was to freeze him out

of the business, in order to remove a troublesome minority shareholder and permit them

to assert greater control over the affairs of the business and reap a greater share of its

rewards.

### V.    Additional Tower Acquisitions in June and July 2004

432.    Chris Tracy was an Eastern Towers, Inc. employee who had been hired by Matt Sanford

in 2003 to do tower site acquisition work. (Sanford, 6:40-41; Moore, 15:157). Tracy

reported directly to Sanford or Strachan. (Strachan, 3:35-36; Moore, 15:157-58). In

addition to locating potential ground lease sites, Tracy's job included identifying existing

towers as possible purchase opportunities for Eastern Towers. (Strachan, 3:38-39).

433.    In the fall of 2003, Tracy located a potential ground lease site on Springfield Road in

Grantham, New Hampshire, owned by a company called Channel Builders. (Strachan,

3:37-38; Moore, 15:161-62, 16:70-72). He also located an existing tower owned by a

company called ETS, which owned other towers in the area. (Rosenfeld, 12:142). Tracy

reported the news to Strachan, and provided him contact information for the sites, which Strachan forwarded to Moore and Rosenfeld. (Strachan, 3:38-39). The Eastern Towers principals discussed the information during a weekly meeting in 2003. Moore and Rosenfeld said they would contact the owners to explore the opportunity, and asked Strachan to continue working with the carriers. (Strachan, 3:38-39).

434.    Eastern Towers, Inc. had not purchased any of those New Hampshire properties by the time Strachan was terminated in February 2004. However, Moore and Rosenfeld continued to explore the opportunity, apparently independently of Eastern Towers. (Moore, 15:162-64, 16:66).

435.    On June 1, 2004, Eastern Properties acquired four towers in New Hampshire from ETS. (Ex. 908.400; Moore, 15:162-64, 16:65-66). Eastern Properties paid a total of $1,030,000 for the four towers, which were located in Hopkinton, Gilmanton, Grantham (Yankee Barn Road), and North Loudon, New Hampshire. (Ex. 908.400 at 1-3; *see* Moore, 15:65).

436.    All four of those tower opportunities had come to the attention of Moore and Rosenfeld as a result of the efforts of Tracy while he was an employee of Eastern Towers, Inc.

437.    Moore testified that he presented those opportunities to Eastern Towers, LLC through Sanford, and that Eastern Towers was not willing or able to exploit the opportunity. At the time, Sanford was a manager of Eastern Towers, LLC, and did not have an interest in Eastern Properties. (Moore, 15:165, 167-68). Strachan was not consulted about the opportunity.

438.    If Eastern Towers, LLC was unable to exploit the opportunity to acquire the New

.

Hampshire towers in June 2004, it was principally because it did not have sufficient financial resources to do so.

439.    Eastern Properties acquired four additional towers from Minnesota Towers, Inc. on July 9, 2004. The towers were located in Esko, Minnesota; Ivan, Arkansas; Bergland, Michigan; and Manitowish, Wisconsin. (Exs. 189, 913.404, 915.405, 916.404, 916.405; Moore, 15:168-69, 174-77). None of those towers were offered to Eastern Towers, Inc., or Eastern Towers, LLC as a corporate opportunity. (Moore, 15:171-72).

###    W.    The Creation of Eastern Towers II/Horizon Towers

440.    Once it became clear that Strachan was likely to sue Eastern Towers, LLC, Moore and Rosenfeld decided, and advised Sanford, that they were no longer willing to invest money in the company. (Sanford, 6:70-75; Rosenfeld, 14:53, 56-58; Ex. 412 at 58).

441.    Moore and Rosenfeld were also concerned that Strachan might make a claim against Eastern Properties. (Ex. 421). As of July 1, 2004, Eastern Properties owned the nine towers that had been sold to it by Eastern Towers, LLC.

442.    On July 2, 2004, Moore and Rosenfeld formed a new company, called Eastern Towers II, LLC. (Ex. 154). The manager of Eastern Properties, II, LLC was Glover Property Management, Inc., a company owned by Moore. (*Id.*).

443.    The purpose of the new entity was to permit Moore and Rosenfeld to continue the cell-tower business without the participation of Strachan or Sanford.

444.    Sanford consented to the use of the name "Eastern Towers" for the new entity. (Sanford, 10:106-07; Ex. 155; *see* Ex. 412 at 58-59). At the time, he thought he would be given an ownership interest in the new company. (Ex. 412). Strachan was not asked, and did not

97

consent, to the use of the name. (Ex. 155).

445. Eastern Towers II, LLC was renamed "Horizon Towers, LLC" on August 20, 2004. (Ex.
168; *see* Moore, 19:238). For the sake of convenience, this opinion will refer to the entity
as "Horizon Towers."

446. Moore and Rosenfeld provided Horizon Towers with capital contributions of $180,000
and $120,000, respectively. (Ex. 436 at 2; *see* Rosenfeld, 14:57-58).

447. Horizon Towers provided Eastern Towers, Inc., with capital to fund its payroll on
multiple occasions. (*See, e.g.*, Ex. 193 at 35; Ex. 436 at 3; *see also* Ex. 412 at 36-42, 57).

## X.    The Sale of the Wayland WIP

448. By July 2004, Eastern Towers, LLC had obtained the ground lease rights to all seven
"hard-to-zone" Massachusetts sites purchased from Hesse. The sites included individual
sites in Wayland, Lincoln, and Ipswich, and four sites in Nantucket. Some of the sites
already had a carrier lease in place, including the site in Wayland. (Moore, 15:238-39;
Ex. 412 at 25, 40, 67, 69).

449. On July 23, 2004, Eastern Towers, LLC sold the work-in-process for all seven of the
former Hesse sites to Horizon Towers for $50,000. (Ex. 156).[57] Moore alone signed the
documents for both companies. (*Id.*). The payment check, however, was made payable
to Eastern Towers, Inc. (*Id.*).

450. Moore executed the purchase and sale of the WIP without consulting either Sanford or
Strachan. (Sanford, 6:63, 74-75).

---

[57] A May 31, 2004 balance sheet valued the Wayland WIP at $50,000 and the Ipswich WIP at $2,500. It
valued the remaining five sites at zero. (Ex. 331).

451.    It is unknown whether any funds were actually transferred as a result of the July 23 sale.

452.    The Wayland zoning board officially denied approval for the tower at 137 Boston Post
        Road on July 30, 2004. (Ex. 323A; Rosenfeld, 14:51). From that point, Eastern Towers,
        LLC (if it still owned the rights to the site) had twenty days in which to appeal the
        decision to the United States District Court. (Sanford, 6:70-74; Rosenfeld, 14:51-53; Ex.
        323).

453.    Notwithstanding the vote of the Wayland zoning board, there was a very substantial
        probability that the decision would be overturned by the federal courts or that the town
        would negotiate a settlement favor to the tower developer.[58]  Because the town had not
        approved any tower at any location, the developers had a substantial argument that the
        zoning decision violated federal law.

454.    On August 5, 2004, attorney Hausler sent a formal notice to Strachan, Sanford, Moore,
        and Rosenfeld, as members of Eastern Towers, LLC, that a special meeting of the
        members was to be held on August 11. (Ex. 323). The issues identified to be discussed
        at the meeting were (1) appeal of the Wayland zoning decision, (2) renewal or
        restructuring of the line of credit with TD Banknorth, and (3) "the sale of existing work in
        process (in whole or in part) . . . ." (Ex. 323). The notice did not disclose that the WIP
        supposedly had already been sold. (Id.).

455.    On August 9, 2004, the sale of the WIP to Horizon Towers was apparently

---

[58] As noted, the Telecommunications Act of 1996 prohibits communities from making zoning decisions that
would effectively prohibit the provision of wireless communications services.  47 U.S.C. § 332(c)(7)(B)(i)(II).  The
Act requires that any decision to deny a request to construct personal wireless service facilities be in writing and
supported by substantial evidence.  47 U.S.C. § 332(c)(7)(B)(iii).

recharacterized. The transaction register for Eastern Towers, LLC lists two payments from Horizon Towers to Eastern Towers, LLC on August 9 totaling $50,000. The "notes" portion of the register labels the two payments as "part[] repayment of loan" and "balance of loan repayment." (Ex. 207 at 4). Both entries appear to be false, as there is no record of a loan between the two entities during the relevant period. (*See* Exs. 208, 436).

456.    The reason for the change has not been explained. However, it is a reasonable inference that Moore and Rosenfeld were advised, or realized, that the transaction as executed on July 23 involved self-dealing and could create substantial problems if not reversed, and that the false entries were made by them or at their direction.

457.    The special meeting of the members of Eastern Towers, LLC was held on August 11, 2004, at Hausler's law office. (Sanford, 6:61, 63; Ex. 323). Moore, Sanford, and attorney Hausler were physically present; Rosenfeld attended by telephone. (Sanford, 6:61-62, 65; Rosenfeld, 14:52; Moore, 15:261-62).[59] A stenographer was present at the meeting; no prior meeting of the LLC had ever been recorded. (Sanford, 6:61-62, 65-66; Ex. 412).

458.    A substantial part of the discussion at the August 11 meeting involved whether, and at what price, Eastern Towers should sell some or all of the WIP, and in particular, the Wayland WIP, to Horizon Towers. (*See e.g.*, Ex. 412 at 40-42, 66-70). Much of the discussion was tense. (*See* Sanford, 6:79, 82-86).

459.    There was no mention at the meeting of the fact that the sale of the WIP that had

---

[59] Strachan did not attend. (Moore, 19:241; Ex. 323).

supposedly occurred on July 23. (See Ex. 412).

460.    Sanford was upset when he found out that Horizon Towers was wholly owned by Moore

      and Rosenfeld. He had been under the impression that the new company would retain the

      same ownership structure as the old one, and that he would have an ownership interest.

      (Ex. 412 at 58-61).

461.    Sanford was also upset to learn that Horizon Towers had been paying part of the salaries

      of other Eastern Towers employees. (Ex. 412 at 57-59).[60]

462.    Moore and Rosenfeld did not disclose that by August 11 they had already made

      substantial capital contributions to Horizon Towers. (*See* Ex. 412 at 11-12, 57-58; Ex.

      436).

463.    At the August 11 meeting, Moore told Sanford that he would not invest any more money

      in Eastern Towers because Strachan was a member, and that he intended to pursue tower

      opportunities in a separate entity without Strachan. (Ex. 412 at 26).[61]

---

[60] According to the transcript of the meeting, Sanford told Moore:

> I'll tell you, you know, the fact that Horizon Towers exists and I don't even know about it and
> it's paying Chris Tracy and Bill Ricco's salary is appalling. I have never been involved with an
> individual that would ever do that, that in the days leading up to this, called himself a partner
> when it was convenient to him. I have never, ever dealt with anybody like that. To call me a
> partner in one breath and then to go off and start another tower company that is going to
> compete against the tower company that I'm a partner with you, Ted, you know that's wrong.

(Ex. 412 at 57-58).

[61] Specifically, Moore said the following:

> . . . you know, we have a company that has more obligations than it has assets; it has an
> unhappy shareholder, as we discovered today, and I'm certainly not willing to invest more
> money in a company that has a disgruntled member. I'm not willing to invest any more of my
> money in that.
>
> In fact, I'm interested in pursuing other business interests and other tower opportunities that
> doesn't involve that person -- in an entity that doesn't involve that person as a member, so I'm

464.    Moore also complained to Sanford that Strachan "thinks he owns a piece of the
        company." (Ex. 412 at 36).[62]  At the time, Strachan in fact owned more than 10% of
        Eastern Towers, LLC.

465.    Sanford strongly disagreed with Moore and Rosenfeld's valuation of the Wayland WIP.
        Moore proposed that Horizon Towers purchase the Wayland WIP for $40,000.
        Rosenfeld stated that some people he had consulted with thought that the site was worth
        "zero." (Ex. 412 at 30, 70).[63]

466.    Sanford thought that the price was much too low, and did not represent a fair value; he
        thought the site was worth at least $100,000. (Ex. 412 at 47-48, 55, 65-66; Sanford, 6:87-
        88; Rosenfeld, 14:54; Moore, 19:243).  The Wayland site represented an opportunity to
        build a virtual-monopoly tower with coverage of some of metropolitan Boston's
        wealthiest suburbs.  Among other things, Sanford felt that "it had been clear from day one
        that if and when Wayland was built" that it would be "the jewel in the company's crown,"
        and "one of the best towers in Massachusetts because it was one of the hardest towers to
        zone, and all the carriers wanted to go there." (Sanford, 6:68-69; *See* Ex. 412 at 27).  He

---

not willing to fund -- I'm not willing to further fund this entity with an unhappy member in
existence.

(Ex. 412 at 26-27).

[62] In Moore's words:

    . . . I'm not going to invest any more money in Eastern Towers, LLC when I have someone I
    don't see, I don't work with, who lies to me, who thinks he owns a piece of the company.  I'm
    just not going to do that.  I don't have an obligation to and I'm not going to do it.

(Ex. 412 at 36).

[63] Moore initially suggested that Horizon purchase all seven of the sites for $50,000 before they focused on
selling the Wayland WIP.  (Ex. 412 at 41-42, 67).

also testified that "it had never been discussed prior to this meeting that it wasn't a good

tower." ( Sanford, 6:69).

467.   Sanford was also upset about how the decisions about the future of the business were

being made.  He asked Hausler several times whether his vote mattered; Hausler did not

answer the question, but eventually commented only that Moore and Rosenfeld could

overrule his vote.  (Ex. 412 at 56-57; Sanford, 6:80-81).  Hausler did not provide any

advice or information about the duties of shareholders or members of closely held

corporations or LLCs.

468.   Sanford also asked Hausler whether there was "some sort of conflict" of interest because

Moore and Rosenfeld owned Horizon, which was the company buying the WIP.  (Ex. 412

at 57).  Although Hausler purportedly represented Eastern Towers, LLC, he did not

answer the question.  Among other things, Hausler did not advise that Moore and

Rosenfeld should recuse themselves from a vote on a self-interested transaction.  The

only person who responded to Sanford's question was Moore, who said, "Matt, we have

always tried to make these decisions by consensus."  (Ex. 412 at 57; *see* Sanford, 6:68).

469.   Following the discussion about sale of the Wayland WIP, the members went off the

record for Moore, Rosenfeld, and Sanford to have an "informal discussion."  (Ex. 412 at

64-65; Sanford 6:79).  The discussion during the break was not recorded by the

stenographer.  (Ex. 412 at 64-65; Sanford, 6:79).

470.   Sanford testified that during the break, Hausler threatened Sanford that Moore and

Rosenfeld had "something on [him] that wasn't good" and that he should "cut the shit and

agree with them . . . or else."  (Sanford, 6:82-83).  Moore was present during that

conversation.[64]  Sanford testified that he eventually came to believe that Hausler was

probably referring to the recorded telephone conversation between Strachan and Sanford.

(Sanford, 6:94-95).

471.    Following the break, and after further discussion, Moore proposed selling the Wayland

WIP to Horizon Towers for $40,000. (Ex 412 at 69-70).  The parties then agreed to the

sale. (Ex. 412 at 74-76; *see also* Ex. 167 (the final WIP purchase agreement)).

472.    Moore and Rosenfeld did not recuse themselves from the vote.

473.    Sanford voted for the sale.[65]  However, his vote was obtained under circumstances that

were coercive and unfair—including, among other things, the implicit suggestion that his

vote did not matter and the explicit threat that Moore and Rosenfeld "had something on

him."

474.    No independent opinion as to the fairness of the transaction was obtained prior to the sale

of the Wayland WIP to Horizon Towers.

475.    The fair market value of the Wayland WIP is unclear, but it appears to have been well in

excess of $40,000.  As noted, Sanford believed that the asset was worth more than

$100,000. (Ex. 412 at 47-48).  Rosenfeld himself had valued it at $50,000 on May 31,

2004. (Ex. 331).  As noted, defendants' expert Bruce Wendt testified that the total value

of the eight hard-to-zone sites on June 2, 2003, more than one year earlier, had been

---

[64] Moore testified that he did not "believe" he was present when Hausler made the threat.  (Moore, 16:44). Rosenfeld testified that he could not remember whether he had stayed on the phone or not.  (Rosenfeld, 12:158-59). Even if that testimony is credited, it is a reasonable inference that Hausler was acting with the knowledge of Moore and Rosenfeld and at their direction.  Hausler did not testify at the trial.

[65] Sanford testified that after being threatened he "checked out" and felt "the writing was on the wall." (Sanford, 6:86).

between $200,000 and $280,000. (Wendt Aff. ¶ 10). Four of those sites, in Nantucket, had been put on hold, and therefore had little or no value. (Exs. 613, 694; Wendt, 18:8-10, 46-48).

476. Moore and Rosenfeld also agreed to give Sanford thirty days to find a better offer for the Wayland WIP. (Ex. 412 at 71, 74-76; Sanford, 6:88; Rosenfeld, 14:54; Moore, 16:54-55, 19:243-44).[66]

477. Among other things, the sale provided Horizon Towers standing to appeal the Wayland zoning board's denial of a permit for the 137 Boston Post Road site within the prescribed period. (Rosenfeld, 14:54-55; Ex. 167).

478. The agreement between Eastern Towers, LLC and Horizon Towers was executed on August 20, 2004. Moore signed the agreement for both companies. (Ex. 167).

479. Sanford solicited several potential buyers for the Wayland WIP but ultimately reported, in September 2004, that he was unable to obtain a better offer. (Sanford, 10:107-10; Ex. 691). Neither Moore nor Rosenfeld attempted to find another buyer.

480. Horizon Towers spent approximately one year litigating the appeal. At some point, it reached a settlement with the town that allowed it to build a tower at a different location. (Moore, 15:126-27). It eventually constructed the Wayland tower on that site in 2006.

Y.   **Subsequent TD Banknorth Financing**

481. In October 2004, Horizon Towers requested, and TD Banknorth approved, a renewal of the $1 million construction line that had originally been approved for Eastern Towers,

---

[66] In the final agreement, that thirty-day period was extended to September 17, 2004, and Horizon was given the right to match any higher price offered. (Rosenfeld, 14:54-55; Moore, 16:55; id., 19:243-44; Ex. 167 ¶ 16).

Inc. (Ex. 806; Fenn, 7:87-88, 90-91, 96-98).

482.    The internal TD Banknorth loan approval document stated that "[t]he development entity,
        Eastern Towers has ceased daily operations and Horizon Towers now locates and
        develops the communications towers. This change was necessitated by a law suit filed by
        a former employee and owner of Eastern Tower [sic], John Strachan." (Ex. 806 at 9).
        That information was provided to the bank by Moore or Rosenfeld or someone acting
        under their direction.

483.    At the same time, Eastern Properties, LLC requested, and TD Banknorth approved, the
        renewal of the $4 million guidance line in addition to $1.23 million in existing term loans
        that had been provided to Eastern Properties, LLC. (Ex. 806; Fenn, 7:92-97).

484.    The collateral for the loans included thirteen towers owned by Eastern Properties—the
        nine towers acquired from Eastern Towers, LLC and the four additional towers in New
        Hampshire. (Ex. 806 at 10-11). As described below, the four additional towers first
        came to the attention of Moore and Rosenfeld through the efforts of Chris Tracy in the
        fall of 2003 when he was working for Eastern Towers, Inc. (Strachan, 3:36-39; Sanford,
        6:40-41; Rosenfeld, 12:139-45; Moore, 15:157, 161-62).

485.    In December 2004, Moore and Rosenfeld formed 5G Investment Trust. (Moore, 15:185-
        86; Exs. 177, 421).

486.    5G Investment Trust was created by Moore and Rosenfeld in order to take title to new
        towers in a new and different entity, in order to try to insulate those holdings against
        claims by Strachan. (Moore, 15:185-86; Ex. 421).

487.    In November 2005, Eastern Properties (through Moore) requested the addition of 5G

Investment Trust as a co-borrower on the existing Eastern Properties loans from TD

Banknorth. (Ex. 421; Fenn, 7:98-100). According to an internal TD Banknorth

document, Moore and Rosenfeld "wish[ed] to avail themselves to term loans under the

$4MM Guidance Line to Eastern Properties." (Ex. 421).

488. The same internal TD Banknorth document stated that "Eastern Towers, LLC, an affiliate

of Eastern Properties is involved in a law suit with a former employee/principal for

wrongful termination. The principals of Eastern Properties are concerned this individual

may make a claim against Eastern Properties. Recently, they began taking title to new

towers in a different entity, 5G Investment Trust, which has the same ownership structure

as Eastern Properties." (Ex. 421).

489. The bank approved the requested modification. (Ex. 421).

490. In July 2006, Eastern Properties and 5G Investment Trust renewed the guidance line

(reduced to $2.5 million) and a term loan in the amount of $3 million. (Exs. 810, 810.1;

Fenn, 7:100-02, 104-06). TD Banknorth subsequently increased the amount of the term

loan from $3 million to $3.1 million at Moore's request. (Ex. 810.2; Fenn, 7:106-08).

## Z.    Further Tower Acquisitions

491. At various points between December 2004 and November 2005, 5G Investment Trust

acquired eleven towers from Minnesota Towers. The towers were located in Antigo,

Wisconsin (Exs. 189, 917.404); Hawley, Pennsylvania (Exs. 189, 917.406); Heritage

Hills (York), Pennsylvania (Ex. 189, 917.406); Grand Rapids, Minnesota (Exs. 189,

920.404); Trego, Wisconsin (Exs. 189, 921.404); Wakefield, Pennsylvania (Exs. 189,

917.404); Washington Borough, Pennsylvania (Ex. 189, 917.406); Orwigsburg,

107

Pennsylvania (Exs. 189, 920.404); West Fergus Falls, Minnesota (Exs. 189, 925.404);

Oakland, Maryland (Ex. 189); and Lake Nebagamon, Wisconsin (Exs. 189, 927.404).

492.    The eleven towers purchased from Minnesota Towers between December 2004 and

November 2005 were purchased for $2.487 million, "funded with equity from [Moore

and Rosenfeld]." (Ex. 421). Those towers were later used as collateral when TD

Banknorth added 5G Investment Trust as a co-borrower on the guidance line. (Ex. 421).

None of those towers was offered to Eastern Towers, Inc., or Eastern Towers, LLC, as a

corporate opportunity. (Moore, 15:195).

493.    The eleven towers acquired by 5G Investment Trust eventually became the property of 5G

Investment Trust, LLC, another entity owned and controlled by Moore and Rosenfeld.

(Exs. 190, 191).

494.    In 2006, Glover Property Management, Inc., as Trustee for 5G Investment Trust, acquired

two towers from Kelly Communications Services, LLC and Cardinals Communications,

LLC. (Ex. 928.404). The towers were located in Americus and Tennille, Georgia. (Exs.

189, 928.404; Moore, 15:205-07). Neither of those towers were offered to Eastern

Towers, Inc. or Eastern Towers, LLC as a corporate opportunity. (Moore, 15:206-07).

495.    In 2007, 5G Investment Trust, LLC developed a tower in Newburyport, Massachusetts.

(Moore, 15:207-13, 16:61-62, 19:270; Exs. 931.200, 931.301).[67] The opportunity to

acquire and develop the Newburyport site was not presented to Eastern Towers, Inc. or

Eastern Towers, LLC as a corporate opportunity. (Moore, 16:62).

---

[67] 5G transferred the rights to the Newburyport site to Tower Acquisition Trust—another company formed by Moore—which developed a tower on the site. (Ex. 931.301; *see* Moore, 15:135-38).

496.    On December 23, 2008, Tower Acquisition Trust acquired an additional completed cell

        tower on Springfield Road in South Grantham, New Hampshire. (Moore, 16:63, 70,

        19:270-71; Ex. 932.204).  Chris Tracy had located the Springfield Road site in 2003

        while working for Eastern Towers, before the site had been developed. (Moore, 16:70-

        72).

497.    There is no evidence that the South Grantham opportunity was disclosed to Strachan and

        Sanford, or that they assented to its exploitation by Tower Acquisition Trust.

498.    As of 2008, various entities owned and/or controlled by Moore and Rosenfeld had

        acquired 33 towers:  17 by Eastern Properties (nine of which had been transferred from

        Eastern Towers); one by Horizon Towers; 13 by 5G Investment Trust; one by 5G

        Investment Trust, LLC; and one by Tower Acquisition Trust.

        ### AA.    The Timberline Construction Invoices

499.    Timberline Construction Corporation is a construction contractor.  Its president is Steven

        Kelly. (Strachan, 4:144-45).

500.    In early 2003, Timberline agreed to construct towers for Eastern Towers and to provide

        various ancillary services, including utility and electrical connections and the placement

        of antennas. (Kelly, 9:70, 74, 77, 10:245-49).

501.    Moore and Sanford met with Steven Kelly, and agreed that Eastern Towers would

        generally pay 50% upon completion of a tower foundation, and the remainder upon

        completion of the tower. (Kelly, 9:69-70, 72; Rosenfeld, 14:32).

502.    Kelly offered a discounted rate, understanding that there was potentially a lot of work to

        be done for Eastern Towers and in hopes of establishing a long-term relationship.  (Kelly,

9:71-73; Sanford, 10:123-24; Moore, 16:98-99).

503.    From 2003 to 2004, Timberline entered into a series of contracts with Eastern Towers in the form of Notices to Proceed and Change Orders. All of the relevant documents were signed by Sanford on behalf of "Eastern Towers" or "Eastern Tower." (*See, e.g.*, Exs. 221, 223, 235, 240, 247, 248, 249, 250, 253, 254, 255, 266, 267, 268, 269, 275, 283, 287, 289; Kelly, 9:74, 77-79).

504.    The letters, facsimiles, and other documents exchanged between the parties do not use the terms "Eastern Towers, Inc.," or "Eastern Towers, LLC," but simply use the term "Eastern Towers." (*See id.*)

505.    Sanford did not differentiate between the two entities in his dealings with Timberline. (Sanford, 6:34-36, 10:12; Kelly 9:85-86).

506.    Timberline was paid for its services, when it was paid, by Eastern Towers, Inc. (*See, e.g.*, Ex. 308).

507.    Between 2003 and 2004, Timberline constructed nine towers for Eastern Towers. (Kelly, 9:69; *see* Exs. 308, 418).

508.    Moore and Rosenfeld as controlling shareholders and members, controlled the financial affairs of Eastern Towers, including whether the invoices of Timberline would be paid. (*See* Moore, 16:57, 118-19).

509.    On June 2, 2003, Eastern Towers, LLC obtained a $1 million line of credit from TD Banknorth that could be used to fund 80% of the construction price of new towers. (Exs. 801.8, 806; Rosenfeld 13:11). Moore and Rosenfeld made the decision as to whether Eastern Towers, LLC would access that line of credit and fund the construction of a

tower. (Sanford, 10:56-57; Strachan, 4:147; Moore, 16:118-19; Rosenfeld, 13:13).

510.    Under the terms of the loan agreement, Eastern Towers, LLC could access the
        construction line by providing the bank with evidence that money had been spent on the
        construction of a tower, and the bank would loan 80% of the money used for
        construction. (Moore, 19:207).

511.    Despite the $1 million line of credit, Eastern Towers, LLC only borrowed a total of
        $78,000 between July 2003 and November 2003 for tower construction. (Moore, 19:206-
        08; Rosenfeld, 13:18; Ex. 806).

512.    Over time, Timberline submitted $809,124.37 in invoices to Eastern Towers, LLC for
        various construction services. (Moore, 16:101-02; Rosenfeld, 13:32-34; Exs. 418, 419).

513.    As described above, Eastern Properties purchased the Beverly, Carver, Pembroke, and
        Goshen towers at various points in 2003 and 2004. Although Eastern Towers no longer
        even owned those properties, Eastern Towers nonetheless continued to authorize change
        orders for construction work by Timberline for those towers. (Exs. 235, 238, 239, 240,
        248, 249, 250, 251, 253, 254, 255, 268, 269, 275, 289). Eastern Towers thus incurred
        obligations to Timberline for construction costs for towers it did not even own. The total
        amount of those costs was more than $129,251. (*Id.*).

514.    Timberline made direct payments of $8,606 to NStar to supply power to the Carver tower
        and $1,130 to a third party for the Pembroke tower. Both payments were for the benefit
        of Eastern Properties, which owned the towers. (Exs. 250, 252, 254, 275).

515.    The payments made by Eastern Towers to Timberline eventually began to slow until, by
        the spring of 2004, Eastern Towers owed Timberline approximately $100,000. (Kelly,

111

9:80-81, 132).  At that time, all of the Timberline-constructed towers had been finished except the one located in Carver, Massachusetts, which was nearly complete.  (Kelly, 9:144-46).

516.   Sanford and Moore had multiple conversations with Kelly in the spring and summer of 2004, during which they both assured him that Eastern Towers intended to pay Timberline.  (Kelly, 9:132).  Sanford and Moore stated that there were several options that could enable Eastern Towers to do so, such as additional capital contributions by Moore and Rosenfeld, the use of the construction line of credit, or the sale of towers.  (Kelly, 9:132-40, 144-46; Sanford, 10:149-50).

517.   During a meeting in June 2004, Moore, Rosenfeld, and Sanford told Kelly that the dispute with Strachan was starting to impact the company.  Moore told Kelly that, given their wealth and ability to access capital, funds to pay Timberline would be made available.

518.   Moore and Rosenfeld assured Kelly during the June 2004 meeting that one way or another Timberline would be paid.  (Kelly, 9:137-39)  Without those assurances, Timberline would not have continued performing work  for Eastern Towers.  (Kelly, 9:138-39).

519.   Moore and Rosenfeld knew those promises were false, as they did not intend to make sufficient funds available to pay all of Timberline's invoices.  Moore and Rosenfeld made the promises knowing, and intending, that Timberline would rely on them to its detriment.

520.   Several discussions followed the June 2004 meeting, during which Kelly, Sanford, and

Moore discussed in more detail Eastern Towers's financial situation and what was necessary for Timberline to finish the Carver site. (Kelly, 9:140-44). Kelly stated that he wanted to be paid some of the money owed before finishing the Carver site. (Kelly, 10:257).

521. T-Mobile, one of the carriers, asked Timberline to complete the work on Carver so that T-Mobile could go on the tower. (Kelly, 10:257-58). In August 2004, Eastern Towers paid Timberline $30,000 towards its outstanding balance on Carver, and thereafter, Timberline completed its work on the Carver tower. (Kelly, 9:107-08, 10:259-60; Ex. 257).

522. In September 2004, Moore told Kelly that Eastern Towers, Inc., had no available resources and was going bankrupt, and that he and Rosenfeld were not willing to make additional capital contributions to the company. (Kelly, 9:151-52, 156; Rosenfeld, 14:57-60).[68] Moore asked Kelly if Timberline would accept a discounted payment. Kelly said no. (Kelly, 9:151-52).

523. Eastern Towers continued to authorize change orders, and thus to incur obligations to Timberline, as late as October 2004. (Ex. 240). By that point, Eastern Towers was without significant funds or sources of revenue, and Moore and Rosenfeld had long since decided to stop funding the company.

524. Several telephone conversations followed, culminating in a meeting at Kelly's office on

---

[68] As of November 21, 2004, the two Eastern Towers entities combined had approximately $15,000 in their bank accounts. (Rosenfeld, 13:64-65; Moore, 19:255; *see* Ex. 175).

December 21, 2004. (Kelly, 9:152).[69]  Kelly, Moore, and Rosenfeld attended. (Kelly, 9:152-53).  At the time, Timberline was owed about $265,000. (*See* Kelly, 9:82).

525.   At the December 21 meeting, Moore and Rosenfeld initially offered to pay Timberline 25%, and later increased the offer to 50%, of the outstanding invoices.  They eventually offered to pay Timberline $130,000 from their personal assets. (Kelly, 9:154-55).  Moore told Kelly that he should accept the lowball price because contractors "always" take discounts. (Kelly, 9:154, 10:206).

526.   Kelly insisted that Timberline be paid the entire amount because it had satisfactorily completed all of the work it agreed to do and there was no dispute as to the amount owed. (Kelly, 9:155, 10:206-09).

527.   Moore and Rosenfeld said that Eastern Towers was out of money and could declare bankruptcy, and if that occurred Timberline would end up with nothing. (Kelly, 9:156, 10:208; Moore, 19:254-55).

528.   The meeting became heated.  Moore and Rosenfeld told Kelly that they recognized that Eastern Towers owed Timberline money, but insisted that they had no legal obligation to pay Timberline anything because they had already paid Eastern Towers for the towers through Eastern Properties.  Kelly responded that he did not care about how the entities were structured—in his view, Timberline built the towers for a company that Moore and Rosenfeld owned, they own the company that owns the towers, the towers were making money, and Timberline had not been paid. (Kelly, 9:156-57, 10:206-08; Moore, 19:259).

_____

[69] During these telephone conversations, Moore and Rosenfeld continued to assure Kelly that Timberline would be paid. (Kelly, 10:235-36).

529. Eventually, Moore and Rosenfeld offered to pay $145,000 in cash (in three separate
    $35,000 payments) plus an additional $105,000 if Kelly set up meetings between Moore
    and Rosenfeld and prospective tower tenants. (Kelly, 9:157-58, 10:209-11; Moore,
    19:258-59).[70] Kelly calculated that this offer would get him all but $15,000 of the
    $265,000 that was owed with relatively minimal extra effort on his part. Consequently,
    he tentatively agreed to the proposal. (Kelly, 10:210-11).

530. This arrangement fell apart during the documentation and subsequent negotiation of the
    settlement. (Moore, 19:259-61; Kelly, 10:211; *see* Ex. 647). Specifically, the drafts
    Rosenfeld sent to Kelly decreased the possible total payment from $250,000 to $220,000
    and required Timberline to secure signed lease agreements for their towers rather than
    simply arrange meetings between Moore and Rosenfeld and potential tenants. (Kelly,
    10:211-16, 229-34; Moore, 16:140-43; Ex. 182, 183, 292, 293).

531. While negotiating the terms of the settlement, Moore and Rosenfeld began to dispute the
    amount of money owed to Timberline. (*See* Kelly 10:219-22, 254; Moore, 16:93, 19:255-
    58. *Compare* Ex. 175 (e-mail from Rosenfeld to Moore dated November 21, 2004,
    listing amount owed as $264,774.24) *with* Exs. 293, 644).[71] Those disputes were not
    asserted in good faith, but instead to try to induce Timberline to settle or to reduce or
    abandon its claims.

---

[70] Rosenfeld testified that he and Moore did not want to simply move money into Eastern Towers or pay
Timberline personally without additional consideration because they wanted to avoid providing evidence that would
enhance Strachan's theory in his lawsuit against them. (Rosenfeld, 13:29, 41-44, 50-51; *see* Moore, 19:259).

[71] Specifically, Moore and Rosenfeld claimed to dispute approximately $45,000 of the $265,000 in
outstanding invoices. (Moore, 16:111-13; *id.*, 19:255-58; Exs. 240, 242, 266). The disputes involved, among other
things, some change orders that Sanford had signed with Moore's approval. (*See* Exs. 158, 171, 240, 293, 644;
Sanford, 10:125-28; Moore 19:255-58).

532.   Moore and Rosenfeld did not offer to pay Timberline the undisputed amounts, insisting
       on a global settlement of all of Timberline's claims. (Moore, 16:136-37). Kelly did not
       agree to the modified terms of the settlement offer. (*See* Kelly, 10:211, 223-24).

533.   Timberline has not been paid for invoices totaling $264,774.24, exclusive of interest.

       **BB.    Subsequent Litigation and Bankruptcy Petition**

534.   On August 20, 2004, Strachan filed an action, individually and derivatively, against
       Moore, Rosenfeld, and various entities in the Suffolk Superior Court.

535.   On April 19, 2005, Timberline filed an action against Eastern Towers, Inc., Moore,
       Rosenfeld, and other individuals and entities in the Essex Superior Court.

536.   On November 6, 2006, Moore and Rosenfeld caused Eastern Towers, Inc., to file a
       petition with the United States Bankruptcy Court for the District of Massachusetts
       seeking relief under Chapter 7 of the Bankruptcy Code, 11 U.S.C. § 101, *et seq.*

537.   The debtor's filings listed $1.96 in a checking account as its only asset.

538.   The debtor's filings listed Strachan and Timberline as its only creditors.

539.   Two additional creditors, the Massachusetts Department of Revenue and the Internal
       Revenue Service, later filed proofs of claim, each in the amount of $400.

540.   On November 7, 2006, attorney Joseph G. Butler was appointed by the Bankruptcy Court
       as the Chapter 7 Trustee.

## IV.    CONCLUSIONS OF LAW

### A.    Jurisdiction and Nature of Proceeding

1.     This matter involves claims by three different plaintiffs. First, the Trustee has brought
       shareholder derivative claims against Moore and Rosenfeld on behalf of the debtor,

Eastern Towers, Inc., for breach of fiduciary duty.[72] The Trustee has also asserted claims

against Moore, Rosenfeld, and various entities for recovery of fraudulent conveyance or

fraudulent transfer and avoidance and recovery of constructively fraudulent transfers.[73]

Second, Strachan has brought individual claims against Moore and Rosenfeld for breach

of fiduciary duty, promissory estoppel, breach of contract, breach of the implied covenant

of good faith and fair dealing, and wrongful termination. Third, Timberline Construction

Corporation has brought claims against Moore and Rosenfeld for violations of Mass.

Gen. Laws ch. 93A.[74]

2.      This Court has jurisdiction over this dispute pursuant to 28 U.S.C. § 1334, which confers

        upon the United States District Courts original, but not exclusive, jurisdiction over "all

        civil proceedings arising under title 11, or arising in or related to cases under title 11."

3.      In this matter, the reference of the adversary proceeding, of which the "related to" claims

        were a part, was withdrawn to this Court for trial pursuant to 28 U.S.C. § 157(d) and Fed.

        R. Bankr. P. 5011.

4.      The scope of related-to jurisdiction is "quite broad." *In re Boston Reg'l Med. Ctr.*, 410

        F.3d 100, 105 (1st Cir. 2005). "[A] civil proceeding is related to bankruptcy [if] the

        outcome of that proceeding could conceivably have any effect on the [bankruptcy]

---

[72] The Trustee has also asserted claims for an accounting and imposition of a constructive trust against Moore; Rosenfeld; Eastern Towers, LLC; Eastern Properties, LLC; 5G Investment Trust, LLC; Horizon Towers, LLC; Tower Investor Trust; Glover Property Management, Inc.; Tower Acquisitions, Inc.; Tower Acquisitions, LLC; Tower Acquisitions Trust; Ground Lease Acquisitions, Inc.; Ground Lease Acquisitions, LLC; Ground Lease Acquisitions Trust; and Midwest Towers Investment, LLC.

[73] Those entities are Eastern Towers, LLC; Eastern Properties, LLC; Horizon Towers, LLC; Tower Investors Trust; Glover Property Management, Inc.; 5G Towers, LLC; and 5G Investment Trust, LLC.

[74] Matthew Sanford is neither a plaintiff nor a defendant.

estate." *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir. 1991) (internal quotations omitted), *overruled on other grounds by Connecticut Nat'l Bank v. Germain*, 503 U.S. 249 (1992). *See Pacor, Inc. v. Higgins*, 743 F.2d 984 (3d Cir. 1984), *overruled on other grounds by Things Remembered v. Petrarca*, 516 U.S. 124 (1995); *In re New England Compounding Pharmacy, Inc., Products Liability Litigation*, 496 B.R. 256, 266 (D. Mass. 2013); *TD Bank, N.A. v. Sewall*, 419 B.R. 103, 105-06 (D. Me. 2009).

5.  The existence of related-to jurisdiction depends on the existence of some nexus between the "related proceeding" and the title 11 case, such that "the outcome of the litigation potentially could have some effect on the bankruptcy estate, such as altering debtor's rights, liabilities, options, or freedom of action, or otherwise have an impact upon the handling and administration of the bankrupt estate." *In re Boston Reg'l*, 410 F.3d at 105 (internal citations and textual alterations omitted); *see Pacor*, 743 F.2d at 994.

6.  Related-to jurisdiction may exist where recovery under an action by a creditor against a third party could reduce the amount that the creditor can claim from the estate directly. *See New England Compounding Pharmacy*, 496 B.R. at 266; *TD Bank, N.A.*, 419 B.R. at 103; *In re Baptist Foundation of Arizona*, 2000 WL 35575676, at *1 (D. Ariz. June 30, 2000); *In re Curran*, 157 B.R. 500 (Bankr. D. Mass. 1993).

7.  Here, most of the claims, in substance, allege that Moore and Rosenfeld and entities controlled by them froze out Strachan, stripped the debtor, Eastern Towers, Inc., of its assets, and diverted its business opportunities. To the extent the trustee seeks to recover funds on behalf of the debtor, there is no question that the Court has jurisdiction over the dispute.

118

8.     To the extent Strachan and Timberline seek to recover funds directly from Moore,

       Rosenfeld, or entities they control, the Court likewise has "related-to" jurisdiction. If

       Strachan or Timberline were to recover against Moore and Rosenfeld or their entities,

       they could not recover for those same losses against the estate. Thus, "[t]he creditor[s']

       lawsuit[s] against the individual [defendants are] 'related to' the debtor's bankruptcy

       because, if successful, the lawsuit could reduce or eliminate the creditor[s'] existing

       claim[s] in the bankruptcy case and thus increase the amount of money available to other

       creditors participating in the bankruptcy." *TD Bank*, 419 B.R. at 103-04.

9.     Accordingly, this Court has subject-matter jurisdiction over all claims in this matter.

       **B.    Claims for Breach of Fiduciary Duty Generally**

10.    The third amended complaint alleges two types of claims for breach of fiduciary duty: (1)

       a shareholder derivative claim by the bankruptcy trustee against Moore and Rosenfeld

       (Count 1) and (2) an individual claim by Strachan against Moore and Rosenfeld (Count

       4). Both claims allege breaches of fiduciary duty owed by Moore and Rosenfeld arising

       out of their status as shareholders and directors of Eastern Towers, Inc.

11.    Plaintiffs allege that Moore and Rosenfeld breached their fiduciary duties to the enterprise

       in a variety of ways. In substance, plaintiffs contend that the following acts, separately

       and taken as a whole, constitute such a breach: (1) the formation of Eastern Towers, LLC

       and the adoption of the LLC Operating Agreement on April 9, 2002, incorporating the

       change from a 50-50 equity split to a 60-40 split; (2) the adoption of § 5.2 in the LLC

       Operating Agreement, which permitted Moore and Rosenfeld to compete with the

       enterprise; (3) the diversion of the financing opportunity with TD Banknorth to entities

119

owned by Moore and Rosenfeld; (4) the withdrawal of $520,000 in capital from the enterprise on June 2, 2003; (5) the execution of the Tower Purchase Agreement on June 2, 2003, and the subsequent sale of various towers to Eastern Properties, LLC; (6) the sale of the Wayland work-in-process; and (7) the diversion of corporate opportunities to purchase additional towers by new entities owned and controlled by Moore and Rosenfeld.  Although many of those alleged breaches overlap and all are to some extent entwined with one another, the Court will address each separately for purposes of analysis.

12.    The third amended complaint does not directly assert claims for breach of fiduciary duty against Moore and Rosenfeld arising out of their status as members or managers of Eastern Towers, LLC.  Instead, the complaint alleges that the creation of Eastern Towers, LLC, and the execution of the LLC Operating Agreement defining the rights and ownership interests of the members, was itself a breach of the fiduciary duties that Moore and Rosenfeld owed to Eastern Towers, Inc. and Strachan as shareholders and directors of the corporation. *See, e.g.,* Third Am. Cmplt. at ¶¶ 80-91.

13.    Among the initial questions presented are (1) whether Eastern Towers, Inc., qualifies as a closely held corporation under Massachusetts law; (2) if so, the scope of fiduciary duties owed by Moore and Rosenfeld to the corporation; and (3) whether the fiduciary-duty analysis is materially different for Eastern Towers, LLC.  The question of whether Strachan can assert individual, as opposed to derivative, claims for breach of fiduciary duty in addition to the claims asserted by the bankruptcy trustee will be addressed at a later point.

120

### 1.    Eastern Towers, Inc., Is a Closely Held Corporation

14.    Under Massachusetts law, shareholders in a closely held corporation have different

obligations from those in an ordinary corporation.  A closely held corporation is "typified

by:  (1) a small number of stockholders; (2) no ready market for the corporate stock; and

(3) substantial majority stockholder participation in the management, direction and

operations of the corporation."  *Donahue v. Rodd Electrotype Co. of New England, Inc.*,

367 Mass. 578, 586 (1975); *Pointer v. Castellani*, 455 Mass. 537, 549 (2009).

15.     All three of those characteristics are present here.  There were only four shareholders of

Eastern Towers, Inc.; there was no ready market for the stock; and all of the stockholders

were intimately involved in the management, direction, and operations of the corporation.

16.    Accordingly, Eastern Towers, Inc. is a closely held corporation under Massachusetts law.

### 2.    Fiduciary Duties in a Closely Held Corporation

17.    Under Massachusetts law, directors of corporations owe a fiduciary duty of loyalty and

good faith to the corporation.  *In re Cumberland Farms, Inc.*, 284 F.3d 216, 227 (1st Cir.

2002).  A director's duty of loyalty requires him or her to "be loyal to the corporation and

not promote his own interests in a manner injurious to the corporation."  *Orsi v. Sunshine*

*Art Studios, Inc.*, 874 F. Supp. 471, 475-76 (D. Mass. 1995) (citing *Johnson v. Witkowski*,

30 Mass. App. Ct. 697, 705 (1991)).

18.    A director's fiduciary duty of loyalty to the corporation is "especially exacting where the

corporation is closely-held."  *Cumberland Farms*, 284 F.3d at 227 (quoting *Cooke v.*

*Lynn Sand & Stone, Co.*, 37 Mass. App. Ct. 490, 496 (1994)).

19.    In addition, under Massachusetts law, shareholders in a closely held corporation also owe

a "duty of utmost good faith and loyalty" to the other shareholders. *Donahue*, 367 Mass. at 592-93; *Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 529 (1997). This duty is "even stricter than that required of directors and shareholders in corporations generally." *Id.*

20.     Majority shareholders cannot, "consistent with [their] strict duty to the minority, utilize their control of the corporation to obtain special advantages and disproportionate benefit from their share ownership." *Donahue,* 367 Mass. at 598. "They may not act out of avarice, expediency or self-interest in derogation of their duty of loyalty to the other stockholders and to the corporation." *Id.* at 593. This "more rigorous duty" involves "[n]ot honesty alone, but the punctilio of an honor the most sensitive." *Id.* at 594 (quoting *Meinhard v. Salmon*, 249 N.Y. 458 (1928)).[75]

21.     Majority shareholders are forbidden from taking actions that oppress or disadvantage minority stockholders, often called "freeze-outs." *Donahue*, 367 Mass. at 588. Tactics employed to effectuate a freeze-out may include, among other things, causing the corporation to sell its assets at an inadequate price to the majority shareholder or depriving the minority shareholder of offices or employment in the corporation. *Id.* at 588-89; *Pointer*, 455 Mass. at 550; *see Smith v. Atl. Props., Inc.*, 12 Mass. App. Ct. 201, 209 (1981) (by refusing to distribute dividends in order to gain personal tax advantages, shareholder breached his fiduciary duties because corporation incurred penalty taxes for

---

[75] Moore and Rosenfeld are not technically majority shareholders in Eastern Towers, Inc., as they collectively own 50% of the shares. Nor are they technically majority owners in Eastern Towers, LLC, as the majority interest is held by Tower Investors Trust, which Moore and Rosenfeld own and control. Nonetheless, they are the *de facto* majority shareholders in both the corporation and the LLC, as well as *de facto* majority owners of the combined enterprise.

failure to distribute accumulated corporate earnings and profits).

22.  Notwithstanding their fiduciary duties, "majority shareholders have certain rights to what
     has been termed selfish ownership in the corporation[,] which should be balanced against
     the concept of their fiduciary obligation to the minority[,] permitting them room to
     maneuver and a large measure of discretion in, among other things, hiring and firing
     corporate employees." *Pointer*, 455 Mass. at 550 (quoting *Wilkes v. Springside Nursing
     Home, Inc.*, 370 Mass. 842, 851 (1976)) (internal quotations omitted).  Therefore, "where
     there is an allegation of a breach of fiduciary duty, the court must allow the controlling
     group to demonstrate a legitimate business purpose for its action." *Id.* at 551.  "The
     minority shareholder is then allowed to demonstrate that the same legitimate objective
     could have been achieved through an alternative course less harmful to the minority's
     interest." *Id.*

23.  Where there is a breach of the duty of loyalty, the fiduciary will be "liable where he
     benefits directly or where profits flow instead to a third party or to another company
     under the fiduciary's control." *Demoulas*, 424 Mass. at 535.

24.  As majority shareholders and directors of a closely held corporation, Moore and
     Rosenfeld owed a fiduciary duty of utmost good faith and loyalty to the corporation
     (Eastern Towers, Inc.) and to the other shareholders (Strachan and Sanford).

     **3.    Eastern Towers, LLC Is a Closely Held LLC**

25.  Eastern Towers, LLC had a small number of members; there was no ready market for
     equity interest in the LLC; and all of the members were intimately involved in the
     management, direction, and operations of the LLC.

123

26.    Eastern Towers, LLC was a closely held limited liability company.

### 4.    Fiduciary Duties in a Closely Held LLC

27.    No court in Massachusetts appears to have clearly and explicitly held that the members of

a closely held LLC owe one another fiduciary duties analogous to the duties imposed on

the shareholders of a closely held corporation.  Nonetheless, Massachusetts courts have

implicitly done so on at least two occasions.  In both cases, the opinions applied the

principles of *Donahue* to an LLC, but erroneously referred to the LLC as a "close

corporation."  *See Pointer*, 455 Mass. at 549 (2009) ("It is uncontested that FGC [an

LLC] is a close corporation [sic] in that it has '(1) a small number of stockholders; (2) no

ready market for the corporate stock; and (3) substantial majority stockholder

participation in the management, direction and operations of the corporation.'  Because of

the fundamental resemblance . . . to [a] partnership . . . stockholders in the close

corporation owe one another substantially the same fiduciary duty in the operation of the

enterprise that partners owe to one another[, that is,] the 'utmost good faith and loyalty.'"

(internal citations omitted)); *One to One Interactive, LLC v. Landrith*, 76 Mass. App. Ct.

142, 143, 147 (2010) (finding that controlling members of an LLC had fiduciary duties to

the minority member and applying *Donahue,* but referring to the LLC as a "closely-held

corporation" and a "corporation.").  *See also In re Lee*, 472 B.R. 156, 185-86 (Bankr. D.

Mass. 2012) (remarking that "members of limited liability companies cannot act with

impunity toward fellow members" and analogizing to closely held corporations).

28.    As a matter of logic and fairness, there is no reason why the fiduciary duties of members

of a closely held LLC should be materially different from those of shareholders of a

124

closely held corporation. The policy considerations underlying the *Donahue* line of cases appear to be identical when considered in the context of LLCs. Moreover, an LLC is, practically speaking, something of a hybrid of a corporation and a partnership; it would be highly anomalous if members of a closely held LLC had lesser fiduciary duties than those of a closely held corporation or a partnership. *See Donahue*, 367 Mass. at 586 (analogizing closely held corporation to partnership).

29.    Accordingly, as members and managers of a closely held LLC, Moore and Rosenfeld owed a duty of utmost good faith and loyalty to the LLC (Eastern Towers, LLC) and to the other members (Strachan and Sanford).

### 5.    Self-Dealing Transactions

30.    The fiduciary duty of loyalty prohibits a director or majority shareholder of a closely held corporation from engaging in a self-dealing transaction with the corporation unless certain requirements are met. *Demoulas*, 424 Mass. at 530-31. In such a circumstance, "to meet a fiduciary's duty of loyalty, a director or officer who wishes to … engage in self-dealing must first disclose material details of the venture to the corporation, and then either receive the assent of disinterested directors or shareholders, or otherwise prove that the decision is fair to the corporation." *Id.* at 533; Mass. Gen. Laws ch. 156C § 7; Mass. Gen. Laws ch. 156D § 8.31.

31.    If there is "unanimous and fully informed shareholder approval in a close corporation," such approval is generally sufficient to satisfy the duty of loyalty. *In re Mi-Lor Corp.*, 348 F.3d 294, 304 (1st Cir. 2003).

32.    For the reasons stated above, the same principles apply to members of a closely held

LLC.

### 6.     The Corporate Opportunity Doctrine

33.    The fiduciary duty of loyalty encompasses, among other things, the corporate opportunity

doctrine.  That doctrine prohibits a director or shareholder in a closely held corporation

from taking, for his or her own personal benefit, an opportunity or advantage that belongs

to the corporation, unless the opportunity is fully disclosed to, and rejected by,

disinterested directors, or the fiduciary's actions are otherwise shown to be fair to the

corporation. *See Cumberland Farms*, 284 F.3d at 227-28.[76]

34.    A corporate opportunity has been defined as "[a]ny opportunity to engage in a business

activity of which a director or senior executive becomes aware, either in connection with

performing the functions of those positions, or through the use of corporate information

or property, if the resulting opportunity is one that the director or senior executive should

reasonably be expected to believe would be of interest to the corporation." *Demoulas*,

424 Mass. at 530 (quoting 1 ALI Principles of Corporate Governance:  Analysis and

Recommendations § 5.05(b)(1)); *see Cumberland Farms*, 284 F.3d at 227-28.

35.    For the reasons stated above, the same principles apply to members of a closely held

LLC.

---

[76] *See also* Mass. Gen. Laws ch. 156D § 8.31(a) (2011), which rejects the common-law rule that all self-interested transactions by directors are automatically voidable at the option of the corporation without regard to the fairness of the transaction or the manner in which it was approved by the corporation.  The statute makes the automatic rule of voidability inapplicable to transactions that fair to the corporation or that have been approved by directors or shareholders after disclosure of the material facts.

C.      **Claims for Breach of Fiduciary Duty Based on the April 2002 Agreements**

1.      **Summary of Claims**

36.    Plaintiffs contend the execution of the LLC Operating Agreement (including the new 60-40 equity split and the adoption of § 5.2) and the Executive Employment Agreement on April 9, 2002, and the subsequent formation of Eastern Towers, LLC on September 17, 2002, and were breaches of fiduciary duty on the part of Moore and Rosenfeld.

37.    Specifically, plaintiffs contend that Eastern Towers, Inc., was intended to be the principal (or only) ownership and operational entity for the enterprise, and that Eastern Towers, LLC was created merely as a vehicle to facilitate the improper actions of Moore and Rosenfeld in taking control of the enterprise, including increasing their ownership of Eastern Towers to 60% and the subsequent misappropriation of corporate assets and opportunities.  Plaintiffs further contend that the employment agreement was an unfairly one-sided arrangement that, among other things, required Strachan to observe the duty of loyalty but permitted Moore and Rosenfeld (through the operation of § 5.2) to own competing businesses.

38.    Moore and Rosenfeld contend that no fiduciary relationship between them and Strachan had yet been established at the time of the execution of the LLC Operating Agreement.

39.    Moore and Rosenfeld further contend that even if such a fiduciary relationship existed, they did not violate their fiduciary duties with regard to the formation of the LLC or the drafting and negotiation of the LLC Operating Agreement and the Executive Employment Agreement.

40.    For the reasons set forth below, the creation of the Eastern Towers, LLC and the

execution of the LLC Operating Agreement and the Executive Employment Agreement,

without more, did not breach any fiduciary duties that Moore and Rosenfeld owed to

Eastern Towers, Inc., or to Strachan as a minority shareholder.

41.     The Court will address § 5.2 of the LLC Operating Agreement separately below.

### 2.     Events Leading up to the April 9 Agreements

42.     The corporate structure of the enterprise and the equity contributions of the parties were

the subject of ongoing discussions and negotiations among the four parties beginning in

February 2002.

43.     During the first few weeks, very little had been accomplished by the fledgling Eastern

Towers, Inc., and the precise terms and structure of the business had not yet been

definitively decided.  The basic chronology is as follows:

a.     On February 25, 2002, the parties discussed, at least to some degree, the

possibility that the equity interests of Strachan and Sanford would vest over time.

b.     On February 27, 2002, the subject of vesting was again discussed, at least to some

degree.

c.     On March 1, 2002, Eastern Towers, Inc., was created.

d.     On March 11, 2002, Rosenfeld first informed Strachan that he proposed to create

a separate LLC.  Strachan and Sanford did not object to the formation of the LLC,

although they objected to other terms of the proposal.  There is no dispute that by

that point the parties were engaged in serious discussions as to whether the equity

interests of Strachan and Sanford in the LLC would vest over time.

e.     On March 26, 2002, the parties met to discuss the proposed LLC operating and

employment agreements.

f.      On March 27, 2002, Rosenfeld circulated a draft of the LLC Operating Agreement

for Eastern Towers, LLC to Strachan and Sanford.  That draft contained the

disputed provision, § 5.2, that would permit Moore and Rosenfeld to engage in

business ventures that competed with the new enterprise.  He also circulated a

draft of the Executive Employment Agreement.

g.      On April 2 or 3, 2002, Moore and Rosenfeld proposed to Strachan and Sanford for

the first time that the equity split in the new LLC should be 60-40 rather than 50-

50.

h.      On April 9, 2002, the LLC Operating and Employment Agreements were

executed.[77]

44.    At the time the additional agreements were proposed on March 26, the new enterprise had

barely begun.  As of March 26,

- Strachan and Sanford had contributed no capital (although Strachan had
worked for a short period without compensation);

- Eastern Towers, Inc., had been in business for only about four weeks;

- although Strachan had begun work for the new enterprise, he had also
taken a family vacation that was apparently one week long;

- Sanford was still employed by another company;

- although Strachan and Sanford had agreed to transfer the Beverly tower to
the new business, the transfer had not occurred, and the tower remained in

---

[77] As noted, Eastern Towers, LLC was not actually created until September 17, 2002.

the Delaware LLC owned by Strachan and Sanford;

- Moore and Rosenfeld had contributed a total of $20,000 in capital; and

- and although the corporation had signed a lease, it was for space
  effectively owned by Moore.

### 3.   Analysis

45.   Those circumstances could potentially present a difficult question as to the precise scope
of the fiduciary duties of the shareholders of the corporation during the first few weeks, as
the business was being organized and operations were beginning. On the one hand, the
parties were still to a considerable extent in the process of negotiating and finalizing the
structure of the enterprise at arm's length, and the scope and nature of their fiduciary
duties arguably should be assessed in that light. *See Industrial Gen. Corp. v. Sequoia
Pac. Sys. Corp.*, 44 F.3d 40, 44 (1st Cir. 1995) ("[I]n the commercial context . . .
Massachusetts courts have stated that [] business transactions conducted at arm's length
generally do not give rise to fiduciary relationships . . ."). Moore and Rosenfeld had
legitimate reasons to desire a structure that consisted of something other than a traditional
corporation, such as avoidance of taxes and limitation of liability.[78] On the other hand,
once a closely held corporation had been created, and operations had begun—even if only
for a few weeks—arguably the fiduciary duties imposed by *Donahue* were in full force
and effect.

46.   The Court need not address that issue, however, as the execution of the LLC Operating

---

[78] For example, the use of an LLC permits limited liability without double taxation at the organizational and
individual level. Ultimately, however, Moore and Rosenfeld did not follow through on their efforts to create a
beneficial corporate structure, and indeed did not observe corporate and tax formalities with particular care.

Agreement and the Executive Employment Agreement on April 9, 2002, did not violate

the fiduciary duties owed by Moore and Rosenfeld to Strachan, Sanford, and the

corporation, even assuming that the strict *Donahue* standard is applicable.

47.     The terms of the LLC Operating Agreement—in particular (1) the creation of a new entity

in which Moore and Rosenfeld held a 60% share and (2) the partial abrogation of the duty

of loyalty for non-employee members in § 5.2—were highly favorable to Moore and

Rosenfeld, and thus the transaction was a self-interested one.

48.     As stated above, when a director seeks to engage in a self-interested transaction, he "must

first disclose material details of the venture to the corporation, and then either receive the

assent of disinterested directors or shareholders, or otherwise prove that the decision is

fair to the corporation." *Demoulas*, 424 Mass. at 533.

49.     Here, there was adequate disclosure of the proposed changes.  The proposed changes

were disclosed in stages over a period of approximately three weeks; by April 2 or 3,

Strachan and Sanford had received draft copies of the proposed agreements,

approximately a week in advance of April 9.

50.     Strachan and Sanford had a fair opportunity to consider the new proposals, and to

comment on them and negotiate with Moore and Rosenfeld; indeed, they did engage in

such negotiations, and successfully altered some of the terms.  They also had a fair

opportunity to consult with their own counsel before executing the agreements, although

they elected not to do so.

51.     Although there was not a formal vote taken on April 9, under the circumstances it is clear

that all four shareholders approved the transaction.

52.    The circumstances of the disclosure and the April 9 approval were not unduly coercive,
       extortionate, or unfair.  Among other things, Strachan and Sanford could have refused to
       sign the agreements, and if necessary abandoned the enterprise, with relatively little harm,
       financial or otherwise.  They had contributed no assets or capital to the enterprise, other
       than the fact that Strachan had worked a few weeks without pay.

53.    The unanimous approval on April 9 of the creation of the LLC and the LLC Operating
       Agreement and Executive Employment Agreement therefore sufficed to validate what
       would otherwise be a self-interested transaction by Moore and Rosenfeld.

54.    Furthermore, and in any event, the Court cannot say that the creation of the LLC and the
       terms of the LLC Operating Agreement and Executive Employment Agreement were
       inherently unfair.  The 60-40 equity split in the LLC, and the vesting schedules for the
       equity of Strachan and Sanford, were not clearly unreasonable or oppressive, in light of
       the relative contributions and sophistication of the parties and the other facts and
       circumstances, nor did they cause any obvious harm to the business.  Likewise, the terms
       of § 5.2—as written, not as subsequently interpreted by Moore and Rosenfeld—were not
       unreasonable or unfair.  As noted, § 5.2 is addressed separately below.

55.    In summary, the creation of the LLC and the execution of the LLC Operating Agreement
       and Executive Employment Agreement on April 9, 2002, did not breach any fiduciary or
       other duty owed by Moore or Rosenfeld to Strachan, Sanford, or Eastern Towers, Inc.

       **D.     The Doctrine of Corporate Disregard**

              **1.     Introduction**

56.    Again, plaintiffs do not contend, at least directly, that Moore and Rosenfeld breached

                                          132

their fiduciary duties to the LLC. Instead, they contend that the execution of the LLC Operating Agreement and the Executive Employment Agreement were themselves a breach of the fiduciary duties to the corporation, and that the agreement and the creation of the LLC were the first steps in a scheme to freeze out Strachan and Sanford. Plaintiffs thus contend that the corporation should have been the only entity, or at least the central entity, in the enterprise. All of plaintiffs' claims for breach of fiduciary duty, as pleaded, allege breaches of duty owed to the corporation, not the LLC.

57. For the reasons set forth above, the Court has concluded that the creation of the LLC and execution of the LLC Operating Agreement, without more, was not a breach of fiduciary duty.

58. That conclusion creates some practical difficulties. To begin, the Trustee can only assert claims that the debtor (Eastern Towers, Inc.) could have brought. *See In re Healthco International, Inc.*, 208 B.R. 288, 300 (D. Mass. 1997). Normally, a breach of fiduciary duty owed to a different entity (such as Eastern Towers, LLC) or minority owners of that entity could not be addressed in an action brought by the Trustee.

59. Here, however, Moore and Rosenfeld undertook a series of actions, as set forth below, that breached their fiduciary duties to the corporation and the LLC (and Strachan and Sanford). Furthermore, Moore and Rosenfeld treated the corporation and the LLC as a single enterprise, among other things transferring funds between the entities to suit their purposes, and paying little heed to strict corporate formalities. It would be extremely difficult, if not impossible, to sort out the affairs of the two entities to determine what injury was caused to a particular entity by a particular breach of fiduciary duty.

60.     Under the circumstances, and for the reasons set forth below, the Court has concluded
        that equitable principles permit the Court to treat Eastern Towers as a single unified
        enterprise for certain purposes, including for purposes of resolving the claims for breach
        of fiduciary duty.  That approach, among other things, permits plaintiffs to assert claims
        for breach of fiduciary duty involving the entire enterprise, and to reach assets, without
        regard to whether the claims should technically be asserted on behalf of the corporation,
        the LLC, or both.

61.     As a general matter, treating the two entities as one presents few issues.  Among other
        things, and as noted, the legal standard for breach of fiduciary duty is identical whether
        the entity is a closely held corporation or a closely held LLC.  Nor is such an approach
        unfair; if the parties themselves did not strictly observe the separate identities of the
        entities, they are hardly in a position to complain when the Court does the same in order
        to achieve an equitable outcome.  There are, however, at least two complications to
        adopting that approach.

62.     First, § 5.2 is part of the LLC Operating Agreement, and therefore applies only to the
        LLC, and not the corporation.  For the reasons set forth below, that distinction makes
        little practical difference as to nearly all of the claims.  To the extent it could otherwise
        make a difference—for example, when an action was permitted under § 5.2 of the LLC
        Operating Agreement, but not permitted as to the corporation—the Court will resolve the
        ambiguity against Moore and Rosenfeld, for the reasons set forth below.

63.     Second, the parties had different equity interests in the corporation than the LLC.  For
        example, Strachan had a 25% ownership interest in the corporation, but a 20% ownership

interest (assuming full vesting) in the LLC. The difference in equity interests is likely to be consequential in only one respect. The Court is holding that the tower assets of the various entities owned and controlled by Moore and Rosenfeld properly belong to Eastern Towers, and may be reached by the trustee to satisfy the claims of the creditors of Eastern Towers, Inc.[79] It is possible that the value of those assets will exceed the claims against the estate, and therefore there may be an excess to distribute to the shareholders or members. If those contingencies come to pass, the Bankruptcy Court may need to make a decision as to how such a distribution should be properly allocated. That decision need not, however, be made by this Court, at least at this point in the proceedings.

## 2.     The Doctrine of Corporate Disregard Generally

64.     In Massachusetts, there is a presumption that separate corporations or entities should be treated separately. *See Platten v. HG Bermuda Exempted Ltd.*, 437 F.3d 118, 128 (1st Cir. 2006). That presumption may be overcome, however, under certain circumstances.

> Where there is common control of a group of separate corporations engaged in a single enterprise, failure (a) to make clear which corporation is taking action in a particular situation and the nature and extent of that action, or (b) to observe with care the formal barriers between the corporations with a proper segregation of their separate businesses records, and finances, may warrant some disregard of the separate entitles in rare particular situations in order to prevent gross inequity.

*My Bread Baking Co. v. Cumberland Farms, Inc.*, 353 Mass. 614, 618 (1968)) (citations omitted).[80] *See Pointer*, 455 Mass. at 544 n.8 (affirming the decision of the trial court to

---

[79] As noted, the only potential creditors other than Strachan and Timberline are tax authorities with relatively minimal claims.

[80] The SJC also observed in *My Bread* that disregard of the corporate form among commonly owned and managed entities may be particularly appropriate "(a) when there is active and direct participation by the representatives of one corporation, apparently exercising some form of pervasive control, in the activities of another and there is some fraudulent or injurious consequence of the intercorporate relationship, or (b) when there is a

treat two legally separate entities, both closely held LLCs controlled by the same two
individuals, as "the same entity" for the purposes of interpreting certain transactions and
agreements).

65.    A related doctrine, commonly referred to as "piercing the corporate veil," addresses the
circumstances under which the individual owners of a corporation or other entity can be
held liable for the acts of the corporation.   *See Pepsi-Cola Metro. Bottling Co.v.
Checkers, Inc.*, 754 F.2d 10, 15 (1st Cir. 1985).   The general rule is that shareholders
"may be held liable where they control the operation of the corporation and run it for their
personal benefit, and where justice requires that the separate existence of the corporation
be ignored."   *Id.*  Among the factors to be considered in making that determination are the
following:

> (1) common ownership; (2) pervasive control; (3) confused intermingling of
> business assets; (4) thin capitalization; (5) nonobservance of corporate formalities;
> (6) absence of corporate records; (7) no payment of dividends; (8) insolvency at
> the time of the litigated transaction; (9) siphoning away of corporation's funds by
> dominant shareholder; (10) non-functioning of officers and directors; (11) use of
> the corporation for transactions of the dominant shareholders; and (12) use of the
> corporation in promoting fraud.

*Platten*, 437 F.3d at 128 (citing *Attorney Gen. v. M.C.K., Inc.*, 432 Mass. 546, 555 n.19

(2000)); *Pepsi-Cola*, 754 F.2d at 14-16.

66.    Bankruptcy courts likewise have the equitable power, under appropriate circumstances, to
"substantively consolidate two or more related entities and thereby pool their assets."   *In*

---

confused intermingling of activity of two or more corporations engaged in a common enterprise with substantial
disregard of the separate nature of the corporate entities, or serious ambiguity about the manner and capacity in
which the various corporations and their respective representatives are acting." *My Bread*, 353 Mass. at 618.  It
added: "In such circumstances, in imposing liability upon one or more of a group of closely identified corporations, a
court need not consider with nicety which of them ought to be held liable for the act of one corporation for which the
plaintiff deserves payment." *Id.* (citation and internal quotation omitted).

*re Logistics Inf. Sys. Inc.*, 432 B.R. 1, 11 (D. Mass. 2010). Such substantive

consolidation involve consolidating a debtor and a non-debtor. *Id.* at 12-13.

### 3.   Whether the Doctrine of Corporate Disregard Can Be Employed by the Trustee

67.   The Trustee here is standing in the shoes of Eastern Towers, Inc. Under normal

circumstances, a corporation cannot disregard its own corporate form for its own benefit.

*See In re Ontos Inc.*, 478 F.3d 427, 432-33 (1st Cir. 2007); *Gurry v. Cumberland Farms,*

*Inc.*, 406 Mass. 615, 626 (1990) (corporations may not "assume the benefits of the

corporate form and then disavow that form when it is to their and their stockholders'

advantage."); *Berger v. H.P. Hood, Inc.*, 416 Mass. 652, 658 (1993).

68.   *Gurry, Berger* and the line of cases supporting it deal primarily with attempts by

subsidiary and parent corporations to use the doctrine of corporate disregard as a

defense—for example, to be treated as a "single employer" for the purposes of worker's

compensation litigation. Courts addressing that question have been understandably

reluctant to allow a parent and subsidiary to reap the benefits of being treated separately

(for example, for purposes of the tax laws) and, at the same time, to reap the benefits of

being combined (for example, for purposes of the worker's compensation laws).

69.   The situation presented here is markedly different and poses none of the same concerns.

Here, the issue is whether the corporate form may be disregarded in order to address

breaches of fiduciary duty by the majority and controlling shareholders, where the

structure was essentially created by those shareholders and where they operated the

entities for their own benefit. This is not a situation where a defendant entity is seeking

137

to disregard its own structure in order to avoid liability to a third party. Under the circumstances, there is no reason why the equitable doctrine of corporate disregard cannot be employed as necessary to achieve a just result.[81]

70.    Accordingly, the Court will consider whether the circumstances warrant treating Eastern Towers, Inc., and Eastern Towers, LLC as one entity for certain purposes in this litigation.

### 4.    Whether the Corporation and the LLC Should Be Treated as a Single Entity

71.    As noted above, Eastern Towers, Inc., is a Massachusetts corporation that is owned in equal (25%) shares by four persons: Moore, Rosenfeld, Strachan, and Sanford. It is not owned, in whole or in part, by Eastern Towers, LLC.

72.    As also noted, Eastern Towers, LLC is a Massachusetts limited liability company that is owned by Tower Investors Trust (an entity wholly owned and controlled by Moore and Rosenfeld), Strachan, and Sanford. It is not owned, in whole or in part, by Eastern Towers, Inc.

73.    Eastern Towers, Inc., and Eastern Towers, LLC thus have common owners, but neither owns any portion of the other. Instead, the two entities existed essentially parallel to one another during the relevant times.

74.    Eastern Towers, Inc. and Eastern Towers, LLC were effectively controlled at all relevant times by the same persons:  Moore and Rosenfeld.

---

[81] As noted, § 2.7 of the LLC Operating Agreement provides in substance that the failure of the company to observe formalities shall not be grounds for making individual members or managers responsible for the liabilities of the company. That provision, however, cannot limit the recovery of outsiders, such as Timberline, who were not parties to the agreement and had no notice of its terms. Nor can it effect the liability of members for breaches of their own fiduciary duties, which are not "liabilities of the company."

75.   Eastern Towers, Inc., and Eastern Towers, LLC were operated jointly at all relevant times
       as a single unified business enterprise.

76.   Eastern Towers, Inc., and Eastern Towers, LLC operated from the same offices at the
       same address at 40 Tioga Way in Marblehead.

77.   There was substantial and confused intermingling of the business activities, and the
       assets, liabilities, income, and expenses, of Eastern Towers, Inc. and Eastern Towers,
       LLC.  Among other things,

- the four towers that were sold on June 2, 2003, were purportedly owned by
  the LLC, but the aggregate purchase price of $818,832 was paid instead to
  the corporation;

- the five towers that were sold between June 2003 and May 2004 were
  purportedly owned by the LLC, but substantial portions of the aggregate
  purchase price of $1,881,832 were paid instead to the corporation;

- prior to June 2, 2003, Moore and Rosenfeld had invested capital in both
  the LLC ($270,000) and the corporation ($252,000), but on June 2 they
  withdrew essentially that same capital (520,000) from the corporation
  alone;

- the entity that purportedly owned the interest of Moore and Rosenfeld in
  the LLC was Tower Investors Trust, but the June 2, 2003 capital
  withdrawal payment was made to Redstone Realty and the Joan Rosenfeld
  Trust;

- Moore and Rosenfeld purportedly owned their shares of the corporation in

139

their own names, but the June 2, 2003 capital withdrawal payment was
made to Redstone Realty and the Joan Rosenfeld Trust;

- the corporation paid substantial portions of the ongoing expenses of the
towers, although they were purportedly owned by the LLC;

- although the LLC was the borrower on the TD Banknorth construction
loan, the fees and loan repayments were instead generally paid by the
corporation;

- cash was regularly shifted between the corporation and the LLC as
necessary to make up any negative balances;

- income and expenses were shifted between the corporation and the LLC in
order to ensure that the LLC shared a loss, which benefitted Moore and
Rosenfeld personally; and

- when Moore arranged the initial sale of the Wayland WIP in July 2004,
the check was made payable to the corporation, even though the LLC
purportedly owned the WIP.

78.   An expert witness for the plaintiff, Jerrold Katz, opined that the two entities were
"essentially" operated as, and functioned as, a single company. (Katz, 14:177-214).

79.   Eastern Towers, Inc., and Eastern Towers, LLC were thinly capitalized, particularly after
Moore and Rosenfeld withdrew their capital on June 2, 2003.

80.   Although the four principals of the LLC and the corporation met regularly, strict
corporate formalities were not generally observed.  Among other things, the four
principals did not hold separate meetings of the two entities (other than the August 2004

meeting of the LLC to address purchase of the Wayland WIP).

81.    Although the parties entered into the LLC Operating Agreement on April 2002, the
       parties neglected to create the LLC until September 2002, when the certificate of
       organization was filed with the Secretary of State. *See* Mass. Gen. Laws ch. 156C, §
       12(b) ("A limited liability company is formed at the time of the filing of the initial
       certificate of organization in the office of the state secretary . . . .").

82.    The LLC Operating Agreement falsely (and absurdly) stated that the LLC "was formed"
       on April 24, 2002, even though the agreement was signed on April 9, 2002.

83.    There was no apparent change to the operations of the enterprise when the LLC came into
       existence in September 2002.

84.    In September 2002, Moore signed the Tower Lease Agreement for the Beverly Tower on
       behalf of "Eastern Towers, LLC." The tower was actually owned by Eastern Towers,
       LLC (Delaware), of which Moore was not a member or manager.

85.    The LLC Operating Agreement states that the LLC and the corporation had entered into a
       "Management Services Agreement," and thereby suggests that such an agreement sets out
       the relationship between the two entities. In fact, no such agreement was ever created or
       executed.

86.    There is an absence of corporate records as to the ownership of Eastern Towers, Inc.,
       including a complete absence of any stock register or other corporate record indicating
       any transfer or formal issuance of shares.

87.    Eastern Towers, Inc., did not pay any dividends during the relevant time.

88.    Eastern Towers, Inc., was insolvent, or on the brink of insolvency, as of June 2, 2003.

89.   Moore and Rosenfeld siphoned away funds from Eastern Towers, Inc., by, among other things, withdrawing their capital on June 2, 2003; diverting bank financing away from the corporation to Eastern Properties, an entity that they controlled; and entering into and implementing the Tower Purchase Agreement.

90.   In 2004, Moore and Rosenfeld funded the payroll of Eastern Towers, Inc., from the funds of Horizon Towers, without advising Sanford (or Strachan) of that fact.

91.   Moore and Rosenfeld caused "Eastern Towers" (the actual entity is uncertain) to incur obligations to Timberline for the construction of towers even after the towers in question had been sold to Eastern Properties.

92.   The principals did not always distinguish between the corporation and the LLC when dealing with outside parties.  For example, in his dealings with Timberline, Sanford simply referred to the business as "Eastern Towers," and the change orders and other documents concerning the construction of the towers also use the same term.

93.   As set forth below, the two entities were used to promote unfair and deceptive acts and practices against Timberline Construction, Inc.

94.   Moore and Rosenfeld made contradictory statements to outside parties as to the relationship between the LLC and the corporation.  Moore told the IRS, for example, that the LLC owned the corporation.  He told TD Banknorth, however, that the LLC had no subsidiaries.

95.   Under the circumstances, and weighing the relevant factors, it is appropriate to and equitable to apply the doctrine of corporate disregard in the following respect:  Eastern Towers, Inc., and Eastern Towers, LLC will be considered as a single entity for purposes

of the claims for breach of fiduciary duty and the claim of Timberline under Chapter 93A.

### 5. Construction of Pleadings and Trial of Unpleaded Issues

96.     As noted, the third amended complaint asserts claims for breach of fiduciary duty only against the corporation, not against the LLC. That raises the issue whether the doctrine of corporate disregard may be fairly employed under the circumstances, when the theory was not pleaded in the complaint.

97.     The Federal Rules of Civil Procedure set forth relatively liberal requirements for the statement of claims. Rule 8 requires that a pleading include "a short plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). It also provides that allegations "must be simple, concise, and direct" and that "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(d)(1), (e).

98.     In at least one instance, the Massachusetts Appeals Court construed the pleadings in a corporate freeze-out claim to permit a claim of breach of fiduciary duty to be considered in its entirety. In *Horizon House-Microwave, Inc. v. Bazzy*, 21 Mass. App. Ct. 190 (1985), defendant asserted a counterclaim against the plaintiff corporation, its majority stockholder (defendant's brother), and two related corporations, contending that he had been frozen out through a variety of means including a triangular merger. The trial court read the counterclaim as asserted only against plaintiff (Horizon) and not against a related entity (Microwave) and therefore did not consider a claim against the latter entity. However, the Appeals Court "read [Bazzy's] pleading more expansively." *Id.* at 195. It found that "[a]t bottom, [Bazzy's] grievance is that he was 'cashed out' of Horizon, while his brother wound up with a larger equity in the economic unit which survived,

143

Microwave," that Bazzy's complaint "is against the end result of the triangular merger,"
and that his counterclaim was "not without shots aimed at Microwave." *Id.* The court
stated that "it does not assist analysis to focus on parts, rather than the whole of the
transaction" and that "the gravamen of [Bazzy's] action was abuse of fiduciary duty by a
majority stockholder." *Id.* at 195-96. Accordingly, the court found that Bazzy had
properly asserted a claim against Microwave. *Id.* at 196. *See also Fort Point
Commercial Co., Inc. v. Spiegel*, 2011 WL 1758950, at *5 (Mass. Super. Apr. 8, 2011)
(rejecting plaintiff's argument that counterclaim sought damages for alleged
misallocations of corporate funds and therefore should have been brought derivatively
based on the court's broad reading of the counterclaim to state individual claims on a
freeze-out theory).

99.    That liberality of construction, of course, has its limits. *See Rodriguez v. Doral Mortgage
       Corp.*, 57 F.3d 1168, 1171-72 (1st Cir. 1995) ("The bottom line is simply this: while
       courts should construe pleadings generously, paying more attention to substance than to
       form, they must always exhibit awareness of the defendant's inalienable right to know in
       advance the nature of the cause of action being asserted against him."). A defendant
       "must be afforded both adequate notice of any claims asserted against him and a
       meaningful opportunity to mount a defense." *Id.* at 1172.

100.   Furthermore, and in any event, Fed. R. Civ. P. 15(b)(2) explicitly provides that "[w]hen
       an issue not raised by the pleadings is tried by the parties' express or implied consent, it
       must be treated in all respects as if raised in the pleadings, that "[a] party may move—at
       any time, even after judgment—to amend the pleadings to conform them to the evidence

and to raise an unpleaded issue", and that "failure to amend does not affect the result of the trial of that issue." *See Yellow Freight Sys., Inc. v. Martin*, 954 F.2d 353, 358 (6th Cir. 1992) ("The general rule is when issues not raised in pleadings are raised by the express or implied consent of the parties, the court may treat the issues in all respects as if the parties had raised them in the pleadings."); *Donald v. Wilson*, 847 F.2d 1191, 1198 (6th Cir. 1988) ("[Fed. R. Civ. P. 15(b)] is designed to allow parties . . . to get to the heart of the matter and not have relevant issues obscured by pleading niceties. It was not designed to allow parties to change theories in mid-stream.").

101.    Here, the actions alleged to constitute the breach of fiduciary duty are essentially identical, whether they are asserted on behalf of the corporation, the LLC, or both.

102.    There was substantial testimony at trial, including cross-examination, on the question of whether the two entities should be treated as a single enterprise. That testimony included, among other things, expert testimony on the precise subject. (*See, e.g.,* Katz, 14:177-214) (opining, among other things, that the two entities were "essentially" operated as, and functioned as, a single company).

103.    The issues were also briefed to a considerable extent by the parties. *See, e.g.*, Docket No. 105, Plaintiffs' Post-Trial Brief Concerning Piercing the Corporate Veil for Timberline Construction Corporation's [Chapter 93A] Claim.

104.    Under the circumstances, the Court finds that defendants had sufficient notice of the claim that the corporation and LLC should be treated as a single entity; the relevant issues were joined at trial; and defendants had a fair and adequate opportunity to present evidence and otherwise respond.

105.    Accordingly, and for the foregoing reasons, the Court will treat Eastern Towers, Inc., and

        Eastern Towers, LLC as a single entity for certain purposes, including analyzing the

        claims for breach of fiduciary duty.  The Court will refer to the combined entity as

        "Eastern Towers" unless the context indicates otherwise.

        **E.      The Effect of § 5.2 of the LLC Operating Agreement**

106.    The next question is the effect, if any, of § 5.2 of the Eastern Towers, LLC Operating

        Agreement on the claims for breach of fiduciary duty.

107.    As noted, § 5.2 of the LLC Operating Agreement abrogated, at least in part, the duty of

        loyalty of Moore and Rosenfeld.  Specifically, § 5.2 permitted Moore and Rosenfeld to

        "engage or have an interest in other business ventures which are similar to or competitive

        with the business of the Company . . . ."  It further stated that neither "shall be obligated

        to present an investment opportunity to the Company even if it is similar to or consistent

        with the business of the Company, and such Member, Officer or Manager shall have a

        right to take for their own account or recommend to others any such investment

        opportunity."

108.    Also as noted, the LLC Operating Agreement was approved by Strachan and Sanford, in

        the absence of any indication of coercion, extortion, or breach of an existing fiduciary or

        other duty to the corporation or the shareholders.

109.    The questions to be determined are (1) whether § 5.2 is legally valid and enforceable;

        and, if so, (2) which, if any, of the defendants' actions were protected by § 5.2 and

        therefore permissible.

                                                146

## 1.    Effect of Articles of Organization of Eastern Towers, Inc.

110.    Plaintiffs contend that Article VI (j) the Articles of Organization of Eastern Towers, Inc.,

forbids the operation of any instrument or agreement that seeks to negate the duty of

loyalty owed by the directors of that corporation to it or its shareholders.

111.    Massachusetts law permits corporations to adopt articles of organization that place limits

on the personal liabilities of directors for breach of fiduciary duty, subject to various

exceptions.  Mass. Gen. Laws ch. 156B, § 13(b)(1½).  Among other exceptions, such

articles may not eliminate or limit the liability of a director for breach of the duty of

loyalty.  (*Id.*)

112.    Article VI (j) tracks the Massachusetts statute, and states that "this provision shall not

eliminate or limit the liability of a director (i) for any breach of the director's duty of

loyalty to the corporation or its stockholders. . . ."  (Ex. 21).

113.    Nothing in Article VI (j)—which is part of the Articles of Organization of one

corporation—prohibits the directors and shareholders from entering into *another*

agreement involving a *different* entity that does in fact limit the liability of a director for a

breach of the duty of loyalty.

114.    Furthermore, and in any event, Article VI (j) by its terms applies only to the *directors* of

the corporation.  It has no effect on the liability of the majority *shareholders* of the

corporation for breach of fiduciary duty.

115.    Accordingly, § 5.2 of the LLC Operating Agreement of Eastern Towers, LLC is not

invalid due to the operation of Article VI(j) of the Articles of Organization of Eastern

Towers, Inc.

## 2.   **Modifying Fiduciary Duties by Contract**

116.   As noted above, shareholders of a closely held corporation and members of a closely held LLC owe one another fiduciary duties of "utmost good faith and loyalty." *See Donahue*, 367 Mass. at 592-93.

117.   Mass. Gen. Laws ch. 156C, § 63(b), which governs limited liability companies, expressly permits the "duties and liabilities [of LLC members to] be expanded or restricted by provisions in the operating agreement."

118.   Massachusetts law generally permits members of an LLC to modify the fiduciary duty of loyalty by contract. *See Pointer*, 455 Mass. at 555-57 (affirming a lower court decision upholding provisions of an LLC operating agreement that modified the duty of loyalty by among other things, explicitly allowed any member the right "to conduct any other business or activity whatsoever . . . .").[82]

119.   In *Fronk v. Fowler*, 456 Mass. 317 (2010), the SJC upheld a provision in a limited partnership agreement that permitted partners to engage in "any other business or investment, including the ownership of or investment in real estate," and provided that "neither the partnership nor any of the partners thereof shall have any rights" in such businesses or investments. 456 Mass. at 320. The SJC affirmed the ruling of the Massachusetts Appeals Court that where the agreement expressly addressed the action that forms the basis of a duty of loyalty claim, "the obligations of the parties are determined by reference to contract law, and not by the fiduciary principles that would

---

[82] As noted, the entity in question was an LLC, but the SJC referred to it in its analysis as a corporation. *Compare* 455 Mass. 539 (noting that the entity, FGC, was an LLC) *with id.* at 549 ("It is uncontested that FGC is a close corporation.")

otherwise govern." *Fronk v. Fowler*, 71 Mass. App. Ct. 502, 507 (2008) (citing *Chokel v. Genzyme Corp.*, 449 Mass. 272, 278 (2007).

120.    However, and as described in further detail below, the fact that a shareholder in a closely

held entity has entered into one or more agreements with the entity or the other

shareholders "does not relieve stockholders of the high fiduciary duty owed to one

another in all their mutual dealings." *Blank v. Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404,

408 (1995).  Thus, even though a particular action by a majority shareholder may be

permitted by contract, that same action may be unlawful if the conduct of the shareholder

leading up to that point constituted a breach of fiduciary duty. *See King v. Driscoll*, 418

Mass. 576, 586 (1994).

### 3.    Scope of § 5.2

121.    As noted above, the duty of loyalty generally prohibits, among other things, a director, or

shareholder in a closely held corporation, from taking, for his or her own personal benefit,

a business or investment opportunity that "would be of interest to the corporation"

without first presenting that opportunity to the corporation. *Demoulas*, 424 Mass. at 530

(quoting ALI Principles of Corporate Governance § 5.05(b)(1)).

122.    Under the terms of § 5.2, Moore and Rosenfeld were permitted to "engage or have an

interest in other business ventures which are similar to or competitive with the business

of the Company, and the pursuit of such ventures, even if competitive, shall not be

deemed wrongful or improper or give the Company, its Managers or the other Members

any rights with respect thereto."  It further provided that Moore and Rosenfeld were not

"obligated to present an investment opportunity to the Company even if it is similar to or

149

consistent with the business of the Company," and they had the "right to take for their
own account or recommend to others any such investment opportunity." (Ex. 45).

123.    Section 5.2 has two basic provisions. First, Moore and Rosenfeld were permitted to
engage or have an interest in "other business ventures" that were "competitive." Thus,
for example, they could have purchased stock in another tower company, started a
competing tower company, or generally purchased towers for their own behalf. Second,
they were not required to "present" an investment opportunity to the company, and could
take such an opportunity for themselves. Thus, for example, if they learned from a third
party of a potential tower opportunity of which the company was not aware, they could
have exploited it for themselves.

124.    Moore and Rosenfeld contend that § 5.2 contains a broad waiver of the duty of loyalty,
and that among other things it permitted them to divert business opportunities away from
Eastern Towers and exploit those opportunities for their own personal benefit.

125.    The clear language of § 5.2 does not, however, support such a broad interpretation. It
states that Moore and Rosenfeld were not required to *"present"* investment opportunities
to the company—in other words, they were not required, when they learned of
opportunities that could benefit the company, to make the disinterested shareholders
aware of such opportunities so that the company might try to take advantage of them. It
does not, however, state that Moore and Rosenfeld could *divert* investment opportunities
that had already been presented to the company—in other words, opportunities of which
the company was already aware, or was considering or attempting to exploit. Put simply,
nothing in § 5.2 permitted Moore and Rosenfeld to take what the company already had, or

150

was aware of, for their own personal benefit.

126.   Even if § 5.2 were ambiguous, the extrinsic evidence does not support a broad
interpretation of the language.  At the time the agreement was executed, Moore and
Rosenfeld specifically represented to Strachan and Sanford that they did not intend to
compete directly with Eastern Towers and that the provision was designed to protect their
"existing interests," such as the tower owned by Moore in Marblehead, and allow them to
invest in other tower companies, such as American Tower.  However, because § 5.2 is not
ambiguous, it is not necessary to consider such evidence to interpret its terms.  *See, e.g.,
Mass. Mun. Wholesale Elec. Co. v. Danvers*, 411 Mass. 39, 48 (1991).[83]

127.   Furthermore, § 5.2 was in derogation of the heightened duty of loyalty otherwise owed by
Moore and Rosenfeld to the enterprise.  While it is true that the parties have the power to
modify that duty by contract, any such contractual language should be strictly, not
expansively, construed.  *See Werner v. Miller Technology Mgmt., L.P.*, 831 A.2d 318,
333 (Del. 2003) (requiring "clear contractual language" to preempt a fiduciary duty).

### 4.   Effect of § 5.2 on Diversion of Financing and Tower Opportunities

128.   As described below, Moore and Rosenfeld, or entities that they owned and controlled,
diverted or misappropriated business opportunities of Eastern Towers on multiple
occasions.

129.   For example, Eastern Properties acquired multiple towers from Eastern Towers, LLC:
four towers (Beverly, Franklin Church, Franklin Industrial, and Weare) on June 2, 2003;

---

[83]   In addition, because Moore and Rosenfeld drafted the provision, any ambiguities should be interpreted
against them. *See, e.g., Merrimack Valley Bank v. Baird*, 372 Mass. 721, 724 (1977).

five towers (Webster, Pembroke, Carver, Goshen, and Loudon) between June 2003 and May 2004; and four towers (Hopkinton, Gilmanton, Grantham (Yankee Barn Road), and North Loudon) on June 1, 2004.

130.   In addition, Horizon Towers acquired the Wayland WIP on August 20, 2004, and Tower Acquisition Trust acquired one tower (Grantham (Springfield Road)) on December 23, 2008.

131.   In each of those instances, the towers or towers sites were developed by Eastern Towers, identified as potential targets for acquisition or development due to the efforts of Eastern Towers, or were otherwise the product of opportunities that had been discovered or developed by Eastern Towers.

132.   In each of those instances, the diversion or misappropriation of the business opportunity by Moore and Rosenfeld was not permitted by the terms of § 5.2 of the LLC Operating Agreement.

133.   As described below, Moore and Rosenfeld also diverted an opportunity for bank financing from Eastern Towers to Eastern Properties between March and June 2003. That diversion or misappropriation of a business opportunity was not permitted by the terms of § 5.2 of the LLC Operating Agreement.

134.   The effect of § 5.2 as to the acquisition of the other 18 towers (that is, the four towers acquired from Minnesota Towers in July 2004; the eleven towers acquired from Minnesota Towers in 2005; the two towers acquired from Kelly Communications and Cardinals Communications in 2006; and the tower developed in Newburyport in 2007) is addressed below.

### 5.   Application of § 5.2 to Fiduciary Duties Owed to Eastern Towers, Inc.

135.   As noted, § 5.2 is part of the Operating Agreement of Eastern Towers, LLC.  It is not part
       of the articles of organization or by-laws of Eastern Towers, Inc.

136.   As also noted, Eastern Towers, Inc., is not a subsidiary of Eastern Towers, LLC.

137.   Moore and Rosenfeld thus effectively created the following situation:  (1) they modified
       their fiduciary duties as to the LLC; (2) they did not modify their fiduciary duties as to the
       corporation; and (3) they treated the corporation and LLC as a single unified business
       enterprise, without regard to corporate formalities.  They now seek to apply § 5.2 to both
       the LLC and the corporation.

138.   Under the circumstances, there is no reason, in equity or otherwise, to interpret the terms
       of § 5.2 broadly to cover all aspects of the business of Eastern Towers.

139.   Thus, whatever effect § 5.2 may have on the fiduciary obligations of Moore and
       Rosenfeld as members of Eastern Towers, LLC, it has no legal effect on their fiduciary
       obligations to Eastern Towers, Inc.  Moore and Rosenfeld therefore owed a fiduciary duty
       to Eastern Towers, Inc., and to Strachan and Sanford, to present business opportunities to
       the corporation, regardless of the operation of § 5.2.

### F.   Other Claims for Breach of Fiduciary Duty

140.   Plaintiffs next contend that Moore and Rosenfeld breached their fiduciary duty to Eastern
       Towers in connection with the events centering on the June 2, 2003 closing.  In particular,
       plaintiffs contend that Moore and Rosenfeld breached their fiduciary duty by (1) diverting
       the financing opportunity with TD Banknorth in February and March 2003; (2)
       withdrawing $520,000 in capital on June 2, 2003; and (3) executing the Tower Purchase

Agreement on June 2, 2003, and subsequently transferring nine towers pursuant to that agreement. The Court will address each claim in turn.

### 1.   The Diversion of Bank Financing

141.   Plaintiffs contend that the diversion by Moore and Rosenfeld of the bank-financing opportunity from Eastern Towers to other entities owned and controlled by them breached their fiduciary duties to Eastern Towers.

142.   One of the understood and agreed-upon roles of Moore and Rosenfeld in the business was to pursue and secure sources of financing that would facilitate the acquisition of sites and development of towers. Beginning in December 2002, Moore approached TD Banknorth about possible financing.

143.   On February 14, 2003, TD Banknorth approved a $5.5 million loan facility for Eastern Towers, consisting of a $1.5 million construction line and a $4 million guidance line. The approved terms included, among other things, unlimited personal guarantees from all four men.

144.   Moore and Rosenfeld told Strachan and Sanford that the construction loan as approved was not workable because it would not finance "burn"—that is, the ongoing expenses of the business.

145.   As noted, Moore and Rosenfeld contend that the original $4 million guidance line that TD Banknorth offered to Eastern Towers was unacceptable due to the personal guarantee requirements. However, Moore ultimately agreed to a full guarantee on a nearly identical loan to Eastern Properties, and Rosenfeld agreed to a guarantee of $800,000.

146.   Moore and Rosenfeld did not attempt to negotiate further with the bank concerning the

February 14 proposal, nor did they seek financing from other banks.  Instead, they

proposed diverting the guidance line to an entity that they controlled.

147.    In late February 2003, Moore proposed to TD Banknorth to transfer the $4 million

guidance line that it had originally approved for Eastern Towers to a new entity that he

planned to form with Rosenfeld, which eventually became Eastern Properties.  The bank

approved the new arrangement on March 19, 2003.

### a.    Disclosure of Transaction

148.    Strachan and Sanford were not aware that the guidance line had been diverted until the

June 2, 2003 closing.  Instead, they were told that the company's proposed financing

arrangements had been rejected and the bank's counterproposal was not workable.

149.    The proposed transfer of the financing opportunity to an entity that was wholly owned

and controlled by Moore and Rosenfeld was not adequately disclosed to Strachan and

Sanford.

### b.    Assent of Disinterested Directors, Shareholders, or Members

150.    Strachan and Sanford never explicitly approved the diversion of bank financing to

Eastern Properties.

151.    To the effect that Strachan and Sanford could be found to have implicitly approved the

diversion of bank financing, by not raising objections at the June 2, 2003 closing, any

such approval was not informed and therefore insufficient to validate the transaction.

### c.    Fairness of Transaction

152.    The $4 million guidance line was a corporate opportunity that belonged to Eastern

Towers.  The failure of Moore and Rosenfeld to disclose the transfer of the financing

155

opportunity to another entity that he and Rosenfeld controlled was a breach of fiduciary duty. *See Cumberland Farms*, 284 F.3d at 228-29 (holding that funds in related company that could be used to pay debts owed to subject corporation constituted a corporate opportunity); *Connolly v. Bain*, 484 N.W.2d 207, 212 (Iowa Ct. App. 1992) (offer of financing to closely held corporation constituted a corporate opportunity such that majority shareholders breached their fiduciary duties when they pursued the financing offer on behalf of a separate business entity).

153.  As noted above, the diversion of the financing opportunity was not authorized by § 5.2 of the LLC Operating Agreement.

154.  There was no legitimate business purpose for the diversion of the financing. Eastern Towers needed sources of capital or debt financing that would permit the company to grow. If the terms offered by TD Banknorth were not acceptable to the company, Moore and Rosenfeld should have sought to negotiate further with the bank, found an alternate source of financing, or put the matter before the four principals for a vote after full disclosure.

155.  It was not up to Moore and Rosenfeld by themselves to determine whether the diversion of the financing opportunity was the best option for Eastern Towers under the circumstances. Under Massachusetts law, a fiduciary's duty of disclosure is not limited "to those [opportunities] judged by the fiduciary to be within the corporation's legal, financial, or institutional capabilities." *Demoulas*, 424 Mass. at 532. Instead, it is up to the company, not the majority shareholders, to determine "whether any . . . obstacles" inherent in the proposal were "insurmountable." *Id.*

156.   In October 2004, Moore arranged to transfer the $1 million construction line from Eastern
       Towers to another entity that he and Rosenfeld had formed, Horizon Towers.  At that
       point, Moore and Rosenfeld had decided to wind down the operations of Eastern Towers
       and to transfer the construction line to Horizon Towers in order to try to keep assets out
       of the reach of Strachan's lawsuit.  Presumably, the construction line was then used to
       finance the development of the Wayland tower by Horizon Towers.

157.   In October 2004, Eastern Properties also renewed the $4 million guidance line that had
       originally been provided to Eastern Towers.  When added to an existing $1.23 million
       term loan, TD Banknorth was extending $5.23 million in total credit to Eastern
       Properties.  When added to the $1 million construction line to Horizon Towers, the total
       amount was $6.23 million.  The collateral for those loans consisted of 13 towers owned
       by Eastern Properties, including the nine towers acquired from Eastern Towers.

158.   In November 2005, Moore added another entity that he and Rosenfeld owned, 5G
       Investment Trust, as a co-borrower on the existing Eastern Properties lines of credit from
       TD Banknorth.  5G Investment Trust had been established as part of a strategy to shield
       assets from Strachan.

159.   In July 2006, Eastern Properties and 5G Investment Trust renewed the TD Banknorth
       guidance line at a reduced amount of $2.5 million and obtained a $3.1 million term loan,
       again using towers that they had acquired, including the original nine towers from Eastern
       Towers, as collateral.

160.   Moore and Rosenfeld used their controlling position in Eastern Towers to decide which
       entity received the benefit of the financing.

161.    The diversion of the TD Banknorth financing opportunity was not fair to Eastern Towers.

162.    The transfer of the construction line from Eastern Towers to Horizon Towers was a breach of fiduciary duty and was not permitted under § 5.2 of the LLC Operating Agreement.

163.    By taking advantage of the guidance line that had originally been granted to Eastern Towers for the benefit of 5G Investment Trust, Moore and Rosenfeld diverted corporate opportunities that rightfully belonged to Eastern Towers, in breach of their fiduciary duty.

164.    Accordingly, Moore and Rosenfeld breached their fiduciary duty to Eastern Towers when they diverted the TD Banknorth financing opportunity from Eastern Towers to Eastern Properties and ultimately for the benefit of Horizon Towers and 5G Investment Trust.

### 2.    The June 2, 2003 Capital Withdrawal

165.    Plaintiffs further contend that Moore and Rosenfeld's withdrawal of approximately $520,000 in capital from Eastern Towers at the closing amounted to a breach of their fiduciary duties.

166.    As stated above, when a director seeks to engage in a self-interested transaction, he "must first disclose material details of the venture to the corporation, and then either receive the assent of disinterested directors or shareholders, or otherwise prove that the decision is fair to the corporation." *Demoulas*, 424 Mass. at 533.

### a.    Disclosure of Transaction

167.    On May 1, 2003, Moore and Rosenfeld told Strachan and Sanford that they were considering withdrawing their capital investment. However, they assured Strachan and Sanford that they "were just thinking about it" and that it was not a "concrete" plan.

158

168. Moore and Rosenfeld knew that Strachan and Sanford were opposed to the withdrawal of capital.

169. Strachan and Sanford did not discover until the day of the closing, on June 2, 2003, that Moore and Rosenfeld had actually decided to go through with the plan. They were never directly informed about it, but in the course of the closing discovered checks payable to Redstone Realty, LLC (an entity owned by Moore and his wife) and the Joan Rosenfeld Trust f/b/o Lawrence Rosenfeld (an entity controlled by Rosenfeld).

170. Under the circumstances, Moore and Rosenfeld did not adequately disclose to Strachan and Sanford their intention to withdraw $520,000 in capital.

### b. Assent of Disinterested Directors, Shareholders, or Members

171. At the June 2, 2003 closing, Strachan and Sanford were surprised and upset upon discovering the checks written out to entities owned and controlled by Moore and Rosenfeld. They confronted Moore and Rosenfeld and were given only the illusory choice to delay the closing. Because of Eastern Towers's urgent need for funding and the controlling position of Moore and Rosenfeld as majority shareholders, Strachan and Sanford had no real choice but to permit the closing to go forward.

172. Sanford and Strachan did not make a valid assent to Moore and Rosenfeld's withdrawal of capital on June 2, 2003.

### c. Fairness of Transaction

173. The withdrawal of capital by Moore and Rosenfeld on June 2, 2003, was unfair to Eastern Towers. Only Moore and Rosenfeld received any benefit from the action, and it harmed the company to a considerable extent.

159

174.    Neither Moore nor Rosenfeld have provided any reason why the withdrawal was in the best interests of Eastern Towers.  Indeed, Moore essentially admitted that the capital withdrawal did not help the company at all.

175.    Moore and Rosenfeld caused the capital withdrawal to be paid by Eastern Towers, Inc., but in fact the withdrawal included their capital contributions of $270,000 to Eastern Towers, LLC.

176.    The withdrawal of capital also violated the express terms of the LLC Operating Agreement.

177.    Section 2.9 of the LLC Operating Agreement only permitted repayment of capital contributions if "expressly provided" by the agreement.

178.    The capital withdrawal was not made as part of a distribution of profits or upon liquidation or dissolution of the LLC.  It therefore was permitted only, if at all, under the provisions governing the distribution of proceeds from the sale of capital assets.

179.    The sale of the towers, which generated the proceeds from which the capital withdrawal was paid, was a sale of capital assets.

180.    Section 7.3(d) of the LLC Operating Agreement provided that no distribution of proceeds from the sale of capital assets could be made to "any Member" unless "all liabilities of the Company . . . have been satisfied or, in the good faith judgment of the Managers, there remain assets of the Company sufficient to satisfy such liabilities." (Ex. 45).

181.    Section 7.3(c) of the agreement also provided that such proceeds could not be distributed "to the extent that, in the opinion of the Managers, the Company is likely to require such proceeds to pay Company expenses." (Ex. 45).

182. The managers of the LLC were Moore, Rosenfeld, Strachan, and Sanford. The managers did not make a good-faith judgment, prior to the capital withdrawal, that sufficient assets remained in the LLC to satisfy its liabilities. Likewise, the managers did not consider, prior to the capital withdrawal, whether the company was likely to require the proceeds to pay expenses. In fact, and as noted, the LLC was insolvent, or nearly insolvent, after the capital withdrawal.

183. The withdrawal of capital, under the circumstances, violated sections 7.3(c) and (d) of the LLC Operating Agreement.

184. The capital withdrawal left Eastern Towers in a difficult, if not impossible, financial position, with approximately $459,000 in trade payables and $26,000 in monthly operating expenses and just $283,000 in cash on hand.

185. Within a few months, the enterprise needed additional capital. Moore and Rosenfeld demanded additional contributions from Strachan and Sanford. Strachan, unsurprisingly, was unable to meet the demand.

186. A director's repayment to himself of loans from a company in need of cash has been held to violate his duty of loyalty to the corporation. *Access Cardiosystems, Inc. v. Fincke*, 404 B.R. 593, 693 (Bankr. D. Mass. 2009) ("Because he was receiving funds directly from the corporation, the transactions constitute self-dealing, and [the defendant] bore the burden at trial to demonstrate that they were fully disclosed and ratified or were inherently fair to [the corporation]."). The court held that since the corporation was "at all times in desperate need of cash, [the defendant's] preferential repayments on his own loan account represented . . . a corporate opportunity. . . . Rather than putting the interests

161

of the company paramount in his mind . . . [the defendant] acted in self-interest and unfairly toward the corporation by siphoning off needed funds to satisfy his own debts." *Id.* Therefore, "the payments were made in violation of his fiduciary duty of loyalty to [the corporation]." *Id.*

187.   The capital withdrawal by Moore and Rosenfeld was a breach of their duty of loyalty to Eastern Towers for substantially the same reasons.

188.   In summary, Moore and Rosenfeld breached their fiduciary duty to Eastern Towers when they withdrew $520,000 in capital on June 2, 2003.

### 3.   The Tower Purchase Agreement and Resulting Tower Sales

189.   Plaintiffs further contend that the execution of the Tower Purchase Agreement, and the subsequent sale of towers to Eastern Properties, constituted a breach of fiduciary duty.

190.   The purported purpose of the Tower Purchase Agreement was to provide funding to Eastern Towers to permit it to develop additional towers and otherwise continue its operations.

191.   The effectuation of the agreement required the formation of a new company owned by Moore and Rosenfeld—Eastern Properties, LLC—that would purchase towers built by Eastern Towers, thereby providing it income.  The agreement further provided that Eastern Towers would continue to manage and obtain tenants for the towers, would purportedly have the right to repurchase the towers under specific terms, and would purportedly receive commissions from Eastern Properties under certain circumstances.

192.   Because Eastern Properties, LLC, the company obtaining the towers, was wholly owned and controlled (through intermediaries) by Moore and Rosenfeld, the transaction was a

self-interested transaction.

193.   As stated above, when a director seeks to engage in a self-interested transaction, he "must

first disclose material details of the venture to the corporation, and then either receive the

assent of disinterested directors or shareholders, or otherwise prove that the decision is

fair to the corporation." *Demoulas*, 424 Mass. at 533.

### a.   Disclosure of Transaction

194.   Moore first raised the possibility of selling towers to a new entity in February 2003.

Moore and Rosenfeld did not, however, provide a draft of the Tower Purchase Agreement

until May 22, 2003, eleven days before the June 2 closing.

195.   The Tower Purchase Agreement is a complex document that would not be readily

understood even by a reasonably sophisticated and experienced business person.

196.   Moore and Rosenfeld never obtained, or even suggested obtaining, a fairness opinion or

outside advice concerning the Tower Purchase Agreement.

197.   During the discussions concerning the Tower Purchase Agreement in late May 2003,

Moore and Rosenfeld concealed multiple material facts from Strachan and Sanford,

including, among other things, their intention to withdraw their capital and their intention

to remove Strachan and Sanford as managers at the closing.

198.   Although Rosenfeld provided Strachan with an initial draft of the Tower Purchase

Agreement on May 22, Rosenfeld continued to revise the agreement without informing

Strachan and Sanford right up until the closing on June 2, 2003.

199.   At least one of the undisclosed revisions was highly material—the addition of a

requirement that Eastern Towers begin making nonrefundable deposits five years in

163

advance to preserve its option to repurchase the towers. That change was made after midnight on the night before the closing.

200. Strachan and Sanford were not provided with drafts or copies of any other documents in connection with the June 2 closing.

201. On June 2, Strachan and Sanford signed the relevant documents removing them as managers of the LLC without having been made aware of their contents. They protested to Moore and Rosenfeld, and were reinstated effective the following day. In the meantime, however, Moore and Rosenfeld signed the Tower Purchase Agreement and the Purchase and Sale Agreement (selling the initial four towers) on behalf of Eastern Towers, LLC, as the only then-existing managers.

202. Under the circumstances, the transactions of June 2, 2003, including the Tower Purchase Agreement and the Purchase and Sale Agreement, were not fully disclosed in all material respects to Strachan and Sanford.

**b.    Assent of Disinterested Directors, Shareholders, or Members**

203. As described above, Strachan and Sanford did not actually execute either the Tower Purchase Agreement or the June 2 Purchase and Sale Agreement transferring the first four towers to Eastern Properties; they had been removed as managers of Eastern Towers, LLC as part of the same transaction. They did not therefore vote to approve either agreement.

204. To the extent that Strachan and Sanford could be deemed to have approved either the Tower Purchase Agreement or the June 2 Purchase and Sale Agreement, by having executed a variety of documents at the June 2 closing, such an "approval" was not

sufficient under the circumstances to validate the transactions. Strachan and Sanford were not given adequate time to consider the proposals, and the circumstances of the execution of the documents were coercive and unfair.

205.   Rosenfeld's offer to delay the June 2 closing was ineffectual and illusory. If Rosenfeld had seriously intended to give Strachan and Sanford a fair opportunity to consider the transactions and obtain independent advice, he would have, among other things, made adequate disclosure of the transaction well before the closing.

### c.   Fairness of Transaction

206.   The Tower Purchase Agreement, and the related agreements selling nine towers to Eastern Properties, LLC, were not fair to Eastern Towers, Strachan, or Sanford.

207.   As noted above, under the Tower Purchase Agreement, Eastern Towers was obligated to sell the towers for seven times net operating income. Using that formula, four towers were sold to Eastern Properties, LLC on June 2, 2003, for an aggregate purchase price of $818,832. Between June 2003 and May 2004, it purchased five more towers for an aggregate purchase price of $1,063,000. The total price paid for the nine towers was $1,881,832.

208.   Under the Tower Purchase Agreement, in exchange for the nine towers, Eastern Towers also received a repurchase option that gave it the right to repurchase the towers, and to obtain commissions, under certain circumstances.

209.   The value received by Eastern Towers for the nine towers thus was equal to the purchase price paid ($1,881,832) plus the value of its rights under the repurchase option.

165

### (i)    Value of the Repurchase Option

210.    As noted, under the Tower Purchase Agreement, Eastern Towers also received the right

under certain circumstances to repurchase the towers.

211.    Collectively, the provisions required Eastern Towers to complete a series of elaborate

steps in order to repurchase the towers.

212.    The repurchase option was neither fixed nor entirely fluid.  Eastern Towers could only

exercise the option between ten and fifteen years after the Agreement (that is, between

2013 and 2018).  The repurchase price was multiplied by an increasing multiplier each

quarter following the maturity of the repurchase option.

213.    Eastern Towers was required to repurchase the towers in the order in which they were

sold to Eastern Properties.  This had the effect of preventing Eastern Towers from

purchasing only the successful towers.  In contrast, Eastern Properties was only required

to purchase constructed towers if they had at least two tenants.

214.    In addition, Eastern Towers had to decide to exercise the option—and commit

funds—five years in advance.  The deposits were designed so that Eastern Towers would

pay 50% of the repurchase price by the time it could exercise the repurchase option.

Furthermore, the deposits were not refundable.

215.    If Eastern Towers failed to follow those elaborate requirements, it would forfeit both its

deposits and its repurchase rights on the other towers.

216.    Those restrictions made it virtually impossible to exercise the option effectively.  As a

result, the prospect of future profit was so distant and uncertain that the repurchase option

(for all practical purposes) was of no value to Eastern Towers.

217.    The value of the repurchase rights to Eastern Towers was zero, or effectively zero.

218.    As discussed above, the value of the commission rights under the Tower Purchase
        Agreement was also zero, or effectively zero.

### (ii)     Value of the Towers

219.    As noted, the towers were sold for cash (at a price reflecting seven times NOI) and the
        value of the repurchase option.

220.    The fair market value of the towers was an amount reflecting 15 times NOI.

221.    Because the repurchase option was worthless, the towers were sold for prices far below
        their market value—indeed, less than half their value.

222.    The Tower Purchase Agreement thus permitted Eastern Properties to acquire four towers
        from Eastern Towers in June 2003 for $818,832, when those towers had a fair market
        value of $1,753,997, and five towers between June 2003 and May 2004 for $1,063,000,
        when those towers had a fair market value of $2,277,857.

223.    One of the practical effects of the Tower Purchase Agreement was to alter dramatically
        the risks and rewards of tower development.  The majority of the risk of building towers
        (for example, the risk that zoning or permitting would not be approved, that a carrier
        would lose interest in a site) fell on Eastern Towers.  The majority of the reward went to
        Eastern Properties (and thus to Moore and Rosenfeld ).  Eastern Towers, in substance,
        had only the right to develop towers to be sold at half their fair market value; Eastern
        Properties, in substance, had the right to purchase towers at a bargain price and to keep
        the profits generated by those towers.

224.    There was no legitimate purpose for Eastern Towers to sell its most valuable assets to

167

Eastern Properties for less than half their market value.

225.    In summary, Moore and Rosenfeld breached their fiduciary duty to Eastern Towers when
they executed the Tower Purchase Agreement on June 2, 2003, and when they caused
Eastern Towers to sell nine towers to Eastern Properties pursuant to that agreement at
various points between June 2003 and May 2004.

### 4.    Sale of Wayland WIP

226.    Plaintiffs next contend that the sale of the Wayland WIP in August 2004 was a breach of
fiduciary duty to Eastern Towers.

227.    Strachan was terminated on February 13, 2004, and was not employed by Eastern Towers
when the sale of the Wayland WIP took place in July of that same year.  However,
Strachan was still a member of Eastern Towers, LLC and a shareholder of Eastern
Towers, Inc., at the time of the transaction, and, therefore, Moore and Rosenfeld
continued to owe him (and the company) a duty of utmost loyalty and good faith.

228.    Because Horizon Towers, the entity that purchased the Wayland WIP, was wholly owned
by Moore and Rosenfeld, the transaction was a self-interested transaction.

229.    As stated above, when a director seeks to engage in a self-interested transaction, he "must
first disclose material details of the venture to the corporation, and then either receive the
assent of disinterested directors or shareholders, or otherwise prove that the decision is
fair to the corporation." *Demoulas*, 424 Mass. at 533.

### a.    Disclosure of Transaction

230.    The Wayland WIP was transferred to Horizon Towers on July 23, 2004, together with
other work-in-process sites still owned by Eastern Towers.  Moore signed documents for

168

both companies to effect the transfer.

231. The transaction on June 23, 2004, was not disclosed to either Strachan and Sanford.

232. Accordingly, because no material disclosure of the transaction was made to the disinterested shareholders, the sale of the Wayland WIP on June 23, 2004—if in fact it occurred on that date—constituted a breach of Moore and Rosenfeld's duty of loyalty to Eastern Towers.

233. Moore and Rosenfeld contend, however, that the actual sale of the Wayland WIP occurred on August 20, 2004, after a meeting of the members of Eastern Towers, LLC that took place on August 11.

234. Strachan received notice of the August 11, 2004 meeting, but did not attend. Sanford attended the meeting. The terms of the sale of the Wayland WIP were disclosed to Sanford at the August 11 meeting, although he was not informed of the transfer that had taken place on June 23.

        **b.**    **Assent of Disinterested Directors, Shareholders, or Members**

235. As noted, Sanford voted to approve the sale of the Wayland WIP at the August 11, 2004 meeting. However, Sanford had vigorously opposed the sale and believed that the price was unfair.

236. Sanford voted to approve the sale under circumstances that were coercive and unfair.

237. Among other things, Sanford was effectively advised, in the presence of corporate counsel, that his vote did not matter.

238. Furthermore, Sanford's approval was obtained by a form of blackmail: the explicit threat that Moore and Rosenfeld "had something on him."

239.   Sanford's vote to approve the sale of the Wayland WIP, under the circumstances, was not effective to validate the sale.

240.   Strachan did not attend the August 11, 2004 meeting, and did not vote to approve the sale of the Wayland WIP.

### c.   Fairness of Transaction

241.   No independent opinion as to the fairness of the transaction was obtained prior to the sale of the Wayland WIP to Horizon Towers.

242.   As noted, the fair market value of the Wayland WIP is unclear, but the available evidence suggests that it was worth substantially more than $40,000.  Sanford thought that the Wayland site was worth more that $100,000, and that the sales price of $40,000 was "dramatically underpriced and not fair to Eastern Towers." (Ex. 412).  Rosenfeld himself had valued the site at $50,000 just a few weeks earlier.  Wendt, defendants' expert, testified that the total value of eight hard-to-zone sites one year earlier had been between $200,000 and $280,000; half of those were virtually worthless, suggesting that Wayland was worth at least $50,000 to $70,000.

243.   The purported opportunity given to Sanford to try to find a better price was illusory under the circumstances.  Among other things, Sanford did not have the resources necessary to conduct such a search in a meaningful way.  Furthermore, and in any event, the burden should have been on Moore and Rosenfeld to demonstrate that the price was fair, not on Sanford to prove it was unfair.

244.   Moore and Rosenfeld have not established that the sale of the Wayland WIP had any legitimate business purpose.

245.    Accordingly, Moore and Rosenfeld breached their fiduciary duty to Eastern Towers by
        transferring the Wayland WIP in August 2004 to Horizon Towers.

### 5.    The Diversion of Tower Opportunities to New Entities

246.    Plaintiffs next contend that the acquisition of 23 additional towers or tower sites acquired
        after May 2004 (that is, in addition to the transfer of the nine original towers and the
        Wayland WIP) constituted diversion of business opportunities and therefore breaches of
        fiduciary duty by Moore and Rosenfeld.

247.    As noted, Eastern Properties acquired nine towers from Eastern Towers between June
        2003 and June 2004:  four towers (Beverly, Franklin Church, Franklin Industrial, and
        Weare) on June 2, 2003; and five towers (Webster, Pembroke, Carver, Goshen, and
        Loudon) between June 2003 and May 2004.

248.    As also noted, the Wayland WIP was transferred to Horizon in August 2004.

249.    Eastern Properties acquired four towers (Hopkinton, Gilmanton, Grantham (Yankee Barn
        Road), and North Loudon) on June 1, 2004, directly from third-party sellers, rather than
        from Eastern Towers.

250.    The business opportunities represented by the sites in Hopkinton, Gilmanton, Grantham
        (Yankee Barn Road), and North Loudon were not disclosed to Strachan.  It appears that
        they were disclosed to some degree to Sanford, although the evidence is sparse.

251.    Moore testified that he told Sanford about the opportunity.  Defendants apparently
        contend that Eastern Towers was not able to take advantage of the opportunity because it
        did not have the resources to do so.

252.    If Eastern Towers was not able to take advantage of the business opportunities in late

171

2003 or early 2004, it was because Moore and Rosenfeld had crippled the finances of Eastern Towers in a variety of ways, such as withdrawing their capital on June 2, 2003; diverting the TD Banknorth financing opportunity; and causing Eastern Towers to sell nine towers for less than half their fair market value.

253.   Under the circumstances, Sanford's assent, if given, was not sufficient to validate the transaction.

254.   There is no evidence that the business opportunity at the site at the South Grantham (Springfield Road) was disclosed to Strachan or Sanford, or that either Strachan or Sanford assented to its acquisition by Tower Acquisition Trust.

255.   The acquisition of those five towers (Hopkinton, Gilmanton, Grantham (Yankee Barn Road), North Loudon, South Grantham (Springfield Road)) provided no benefit of any kind to Eastern Towers, and thus were not fair to the enterprise.

256.   Entities owned or controlled by Moore and Rosenfeld also acquired 18 other towers or tower sites:  the four towers acquired from Minnesota Towers on July 9, 2004; the eleven towers acquired from Minnesota Towers in 2005; the two towers acquired from Kelly Communications and Cardinals Communications in 2006; and the tower developed in Newburyport in 2007.

257.   There is not sufficient evidence in the record to support the conclusion that those 18 towers or tower sites had been identified as potential targets for acquisition or development due to the efforts of Eastern Towers, or that they were otherwise the product of opportunities that had been discovered or developed by Eastern Towers.

258.   However, the acquisition of those 18 towers or tower sites nonetheless constituted

diversions of corporate opportunities by Moore and Rosenfeld in violation of their fiduciary duties to Eastern Towers.

259.  As noted above, and notwithstanding the adoption of § 5.2 in the LLC Operating Agreement, Moore and Rosenfeld continued to owe a duty of loyalty to Eastern Towers, Inc., that had never been modified by agreement.  At a minimum, therefore, Moore and Rosenfeld had a duty to present any tower opportunity to Eastern Towers, Inc.—indeed, any opportunity that was "conceivably advantageous" to the company. *Cumberland Farms*, 284 F.3d at 228.

260.  The four towers acquired on July 9, 2004, from Minnesota Towers (Esko, Ivan, Bergland, and Manitowish) were acquired by Eastern Properties.

261.  The assets and creditworthiness of Eastern Properties, and indeed its very existence, were largely the result of breaches of fiduciary duty by Moore and Rosenfeld.  It is reasonable to infer that the July 9, 2004 acquisition by Eastern Properties could not have occurred but for those breaches.

262.  The July 9, 2004 acquisition of the four towers from Minnesota Towers therefore breached fiduciary duties owed by Moore and Rosenfeld to both Eastern Towers, LLC and Eastern Towers, Inc.

263.  The other 14 towers were not acquired by Eastern Properties, but by other entities owned and controlled by Moore and Rosenfeld:  5G Investment Trust; 5G Investment Trust, LLC; or Tower Acquisition Trust.

264.  The eleven towers acquired in 2005 from Minnesota Towers (Antigo, Hawley, Heritage Hills, Grand Rapids, Trego, Wakefield, Washington Borough, Orwigsburg, West Fergus

173

Falls, Oakland, and Lake Nebagamon) were purchased by 5G Investment Trust, apparently with funds supplied by Moore and Rosenfeld.

265.   In November 2005, Moore and Rosenfeld successfully sought to add 5G Investment Trust as a co-borrower to the TD Banknorth guidance line of credit, and to use the eleven newly-acquired towers as additional collateral for that line.  That guidance line was itself the result of a breach of fiduciary duty by Moore and Rosenfeld, who diverted the original financing opportunity away from Eastern Towers to Eastern Properties.

266.   There is not sufficient evidence in the record to support the conclusion that the acquisition of the two towers in 2006 (Americus and Tennille) and the development of the tower in 2007 (Newburyport) were the result of the use of the TD Banknorth loan facility, as modified in November 2005.

### a.    Disclosure of Transaction

267.   There is no evidence that any of the acquisitions of the 18 additional towers identified above were disclosed to Eastern Towers, Strachan, or Sanford.

### b.    Assent of Disinterested Directors, Shareholders, or Members

268.   There is no evidence that any of the acquisitions of the 18 additional towers identified above were approved by Eastern Towers, Strachan, or Sanford.

### c.    Fairness of Transaction

269.   The acquisitions of the other 18 additional towers identified above provided no benefit of any kind to Eastern Towers, and thus were not fair to Eastern Towers.

270.   In summary, the acquisition of all 33 towers or tower sites by entities owned and controlled by Moore and Rosenfeld constituted breaches of the fiduciary duty of loyalty

174

Case 1:10-cv-10207-FDS   Document 117   Filed 03/26/15   Page 175 of 205

owed by Moore and Rosenfeld to Eastern Towers.

G.    **Strachan's Individual Claim for Breach of Fiduciary Duty**

271.    As noted, Strachan has also asserted individual, rather than derivative, claims against

Moore and Rosenfeld for breach of fiduciary duty

272.    Moore and Rosenfeld contend that even if they owed fiduciary duties to Strachan and

Eastern Towers, the claims asserted here for breach of those duties belong to the

corporation, not Strachan as an individual.

273.    Strachan contends that he has standing as an individual to assert claims for breach of

fiduciary duty against Moore and Rosenfeld that otherwise might be considered derivative

claims.

274.    As a general matter, the right of recovery for a majority shareholder's breach of fiduciary

duty belongs to the corporation, and any claim for relief must be asserted in a derivative

action on behalf of the corporation. *Bessette v. Bessette*, 385 Mass. 806, 809-10 (1982);

*see Orsi v. Sunshine Art Studios, Inc.*, 874 F. Supp. 471, 474 (D. Mass. 1995).

275.    Under some circumstances, however, a minority shareholder may maintain an action for

breach of fiduciary duty directly against the majority shareholder. *Bessette*, 385 Mass. at

809; *Donahue*, 367 Mass. at 589 n. 14.  A claim may be asserted against the shareholder

directly, rather than derivatively, where such an action "would more justly apportion the

burden of the recovery among the wrongdoers." *Samia v. Central Oil Co. of Worcester*,

339 Mass. 101, 123 (1959); *Orsi*, 874 F. Supp. at 474.

276.    Thus, if a majority shareholder improperly removes assets from a corporation, or diverts

assets away from it, the wrong is normally inflicted on the corporation itself, and recovery

should be made on behalf of the corporation. *See, e.g., Bessette*, 385 Mass. at 809-10 and
n. 5 (distribution of excess salaries and dividends to majority shareholder is a claim of the
corporation; "plaintiffs do not allege that the defendant's conduct was an attempted
'freeze-out' of the minority stockholders by draining off 'the corporation's earnings in the
form of exorbitant salaries and bonuses.' . . . Thus, the vulnerability of minority
stockholders, which we found controlling in *Donahue*, is missing."); *Schaeffer v. Cohen,
Rosenthal, Price, Mirkin, Jennings & Berg, P.C.*, 405 Mass. 506, 513 (1989). However,
if the majority shareholder inflicts harm directly on the minority shareholder (such as
freezing him or her out of the business or terminating his or her employment) the claim
may be asserted directly. *See, e.g., Donahue*, 367 Mass. at 585-89 (alleging failure to
accord minority shareholder equal opportunity to sell shares to corporation); *Zimmerman
v. Bogoff*, 402 Mass. 650, 658 (1988) (holding that a shareholder was entitled to relief on
his direct breach of fiduciary duty claim against another shareholder who confiscated
their jointly owned company's tools, good will, and other assets for the use of his own
secretly created corporation). Indeed, under such circumstances, the minority
shareholders would be hard pressed to prove any breach of duty to the corporation itself.
*Donahue*, 367 Mass. at 589 n.14.

277.   Here, the claims for breach of fiduciary duty against Moore and Rosenfeld based on the
withdrawal of capital and the transfer or diversion of bank financing and tower assets are
claims that must be brought as derivative claims on behalf of the corporation and LLC.
However, Strachan's claims concerning his termination and freeze-out are properly
asserted as individual claims of a minority shareholder for breach of fiduciary duty.

278.   Whether Strachan can recover on his individual claim for breach of fiduciary duty
       depends to a considerable degree on the interplay between the Executive Employment
       Agreement (which permitted Strachan's termination with or without cause) and the duty
       of the majority shareholders under *Donahue* to act with utmost good faith and loyalty
       (which would prohibit his termination as part of an unlawful freeze-out).

279.   The two principal cases on which the answer to that question depends are *King v.
       Driscoll*, 418 Mass. 576 (1994), and *Blank v. Chelmsford Ob/Gyn, P.C.*, 420 Mass. 404
       (1995).

280.   *King v. Driscoll* involved a close corporation in which an internal power struggle for
       control had occurred between different factions. The plaintiff, a vice-president and
       minority shareholder, was an at-will employee. He had been terminated in retaliation for
       his participation in a shareholder derivative action against one of the factions. Before the
       events in question, the plaintiff had entered into a stock repurchase agreement that
       applied to departing employees. 418 Mass. at 578-80.

281.   Defendants in *King* pointed to language in *Evangelista v. Holland*, 27 Mass. App. Ct.
       244, 248-49 (1989), in which the Massachusetts Appeals Court noted that "[q]uestions of
       good faith and loyalty do not arise when all the stockholders in advance enter into an
       agreement for the purchase of stock of a withdrawing or deceased stockholder." 418
       Mass. at 586. The SJC, however, distinguished *Evangelista*:

              *Evangelista* does not stand for the proposition that the existence of a buy back
              agreement completely relieves shareholders of the high duty owed to one another
              in all dealings among them.

              In this case, contrary to the facts of *Donahue* [*v. Rodd Electrotype*] and

                                          177

*Evangelista*, the allegations of breach of the duty of utmost good faith and loyalty arose from the conduct of fellow shareholders Driscoll and Marchant during the whole series of events leading up to and including the termination of the plaintiff. The plaintiff did not aver that the terms of the repurchase constituted a breach of the duty, but in essence argued that the conduct of the defendants which caused him to be terminated and, as a result, caused his stock to be repurchased constituted a breach of that duty. The judge agreed.

418 Mass. at 586. The court then affirmed the judgment as to that issue. *See also*

*Wartski v. Bedford*, 926 F.2d 11, 20 (1st Cir. 1991) (holding that a partnership agreement

cannot nullify the fiduciary duty owed by the partner to the partnership: "The fiduciary

duty of partners is an integral part of the partnership agreement whether or not expressly

set forth therein. It cannot be negated by the words of the partnership agreement.").

282.    *Blank v. Chelmsford Ob/Gyn P.C.* involved a dispute in a close corporation with three

shareholders. 420 Mass. at 404. Two of the shareholders had terminated the employment

of the plaintiff, the third shareholder, pursuant to an employment agreement. *Id.* at 404-

05. The employment agreement permitted the termination of plaintiff on six months'

written notice, without cause. A separate stock purchase agreement provided that his

stock would be repurchased at book value. *Id.* at 405-06.

283.    The SJC in *Blank* first noted three "generally accepted principles" of law: (1) that "there

is an implied covenant of good faith and fair dealing between parties to a contract"; (2)

that "the relationship among stockholders in a close corporation must be one of trust,

confidence, and absolute loyalty if the enterprise is to succeed"; and (3) that "the fact that

a stockholder has entered into an employment agreement or the fact that stockholders

execute a valid stock purchase agreement does not relieve stockholders of the high

fiduciary duty owed to one another in all their mutual dealings" (citing *King v. Driscoll*).

420 Mass. at 407-08. It then distinguished *King* on the ground that, unlike in that case,

"there was an employment contract that permitted employment to be terminated by either

party on six-months' notice, and there is no allegation that the defendants are denying the

plaintiff his contractual rights or future compensation for past services." *Id.* at 408.

> The *Blank* court concluded:
>
> Because there is a stock purchase agreement, the method of determining
> the value of the plaintiff's shares on proper termination is not subject to
> question. A duty of good faith and fair dealing exists during the course of
> events leading up to and including termination, but that duty is to be
> evaluated in light of an agreement that permits termination by either party
> without cause on notice.
>
> Thus, we are faced with a termination without cause on proper notice, in
> accordance with the plaintiff's employment contract freely and mutually
> agreed to at the outset of his employment. The plaintiff received all that he
> had bargained for, *i.e.*, the book value of his stock and six-months' notice
> of his termination.

*Id.* at 408. *See also Chokel v. Genzyme Corp.*, 449 Mass. 272, 278 (2007) (ruling, in case

not involving a close corporation, that "[w]hen a director's contested action falls *entirely*

within the scope of a contract between the director and the shareholders, it is not subject

to question under fiduciary duty principles" (citing *Blank*) (emphasis added); *Fronk v.

Fowler*, 71 Mass. App. Ct. 502, 507 (2008) (ruling that where a partnership agreement

expressly authorized a general partner's actions, the obligations of the parties are

determined by reference to contract law, not by the fiduciary principles that would

otherwise govern)

284.   From that line of cases, it is clear that the terms of the Executive Employment Agreement

did not give Moore and Rosenfeld a free license to breach their fiduciary duties and

freeze Strachan out of the business. That is true even though the agreement permitted Strachan's termination with or without cause. If the termination was itself the culmination of a series of events constituting a breach of fiduciary duty, Strachan has a viable claim. *See King*, 418 Mass. at 586; *Blank*, 420 Mass. at 408.

285. On the other hand, it is also clear that the fiduciary duties of Moore and Rosenfeld must be evaluated in light of the employment agreement. *See Blank*, 420 Mass. at 408. Among other things, the agreement must be taken into account when evaluating Strachan's reasonable expectations as to his role and future in the enterprise, and in fashioning any remedy.

286. In this case, Strachan's employment contract provided, among other things, that he could be terminated at any time by "the Company" (that is, Eastern Towers, Inc.) without cause, and that he would receive only a modest severance upon such a termination. In that respect, he had only marginally greater rights than an at-will employee.

287. Strachan's termination would also cause his membership interest in the LLC to stop vesting, and make his interest subject to redemption under the LLC Operating Agreement. Any such redemption was at the company's option; his equity interest could not be transferred without the company's approval; and there was no market in any event for his equity interest.

288. The consequences to Strachan of being terminated were therefore substantial: the loss of his employment, the loss of the opportunity for further vesting of his equity interest, and the effective loss of all, or nearly all, the value of his investment.

289. Here, the termination of Strachan was intended by Moore and Rosenfeld as a critical step

in freezing him out of the business and usurping and diverting business opportunities for
their own benefit.

290. By early 2004, Moore and Rosenfeld had diverted a substantial bank-financing
opportunity to Eastern Properties, a company they owned and controlled; stripped Eastern
Towers of a substantial portion of its capital; and forced Eastern Towers to sell all of its
completed towers to Eastern Properties for less than half their fair market value. Eastern
Towers was starved of capital and had little prospect for growth. Not surprisingly, the
relationship between the principals were strained. Strachan and Sanford, in particular,
had ample reason to distrust Moore and Rosenfeld.

291. At least on paper and in theory, Strachan was the president of Eastern Towers, Inc., and
therefore should have enjoyed some degree of latitude in managing the affairs of the
corporation.

292. Nonetheless, when he received the Keneally letter, Strachan should have brought it to the
attention of Moore and Rosenfeld. His failure to do so was a serious lapse in judgment.
Strachan's actions were no doubt motivated in part, if not entirely, by the fear that Moore
and Rosenfeld would use the incident as a basis to force him out of the company.

293. It would hardly be surprising if Strachan was disaffected and lacked enthusiasm for his
work, and did not trust Moore and Rosenfeld. If Strachan found it difficult to be open
and forthright with Moore and Rosenfeld about a potential issue, surely Moore and
Rosenfeld bear a large portion of the blame for creating an atmosphere of animosity and
mistrust. *Cf. Blank*, 420 Mass. at 408 ("the relationship among stockholders in a close
corporation must be one of trust, confidence, and absolute loyalty if the enterprise is to

181

succeed.").

294.   It is particularly ironic that Moore and Rosenfeld claimed afterward that they were
       unwilling to work with a person who they felt had been dishonest with them. As detailed
       at considerable length, Moore and Rosenfeld had engaged in an extensive pattern of
       deceit, concealment, and manipulation for most of the short existence of Eastern Towers.

295.   In any event, Strachan was not forthright with his handling of the Keneally letter, and
       concealed the existence of the letter from Moore and Rosenfeld for a period of several
       weeks. Under different circumstances, that act might be sufficient cause to terminate the
       relationship without legal consequence.

296.   Strachan's termination must, however, be interpreted in light of the developments that
       had occurred up to that point. It is reasonable to infer that Strachan knew that Moore and
       Rosenfeld wanted him out of the company, and that they were looking for an opportunity
       to do so.

297.   Furthermore, even if there was a legitimate business purpose for the actions of Moore and
       Rosenfeld, that purpose could have been achieved through an alternative course (such as
       a reprimand) that would have been far less harmful to Strachan's interests.

298.   It is noteworthy that the letter turned out to be essentially meaningless:  the notice was
       clearly defective under the lease arrangement, and the default was easy to cure. No harm
       of any kind befell Eastern Towers as a result.

299.   It is likewise noteworthy that Moore and Rosenfeld had no interest (once they learned of
       the letter) in having an open and honest conversation with Strachan. Instead of asking
       about the issue immediately, they elected to try to trap Strachan into making further

182

blunders to strengthen their case for termination.  They also immediately developed an interest in hiring Bill Ricco to replace Strachan, and indeed hired him immediately after the termination.

300.   It is also true that Sanford "agreed" that Strachan should be terminated.  (Sanford, 10:101).  If Strachan's termination violated fiduciary duties owed to the company, that approval might weigh heavily in the balance.[84]  But that assent was not sufficient to validate a termination that Moore and Rosenfeld intended as part of a freeze-out in violation of their fiduciary duties to Strachan.  Indeed, as to Sanford, the assent was self-interested, as his equity interest in Eastern Towers increased pro rata upon Strachan's termination.

301.   After Strachan was terminated, Moore and Rosenfeld stopped funding the company, stripped it of its remaining assets (such as the Wayland WIP), stopped paying Timberline invoices, and diverted other tower opportunities away from the company.  The effect of those actions was to render Strachan's investment in Eastern Towers essentially worthless.

302.   It is difficult to attempt to construct a "but for" world in which Strachan had not been terminated and Moore and Rosenfeld had acted in good faith from the outset. Nonetheless, equity requires the fashioning of a remedy, and the Court must attempt to do so.

303.   Strachan's employment contract was for a two-year term, ending on April 9, 2004.  He

---

[84] That assumes that Sanford assented (there was no formal vote) and that his assent was informed.  There is substantial reason, however, to doubt that Moore and Rosenfeld were forthright with Sanford about their purpose in terminating Strachan, and their intentions for the future of the business.

was terminated on February 26, 2004. The LLC Operating Agreement provided that his equity interest would not fully vest until four years out, or on April 9, 2006. Strachan had also worked without pay for six months and had contributed his interest in the Beverly tower.

304.   It is certainly true that the Executive Employment Agreement provided that Strachan could be terminated with or without cause. It is also true that Strachan was not entitled to lifetime employment, regardless of his performance or behavior.

305.   Again, it was Moore and Rosenfeld who had effectively crippled Eastern Towers and diverted its assets for their own benefit, and who had taken a series of actions that undermined the likelihood of a proper working relationship among the principals. Under the circumstances, the Court will give a considerable benefit of the doubt to Strachan.

306.   Accordingly, the Court finds that the termination of Strachan on February 26, 2004, which caused both the loss of his employment and the cessation of his vesting rights, was a breach of the fiduciary duty owed to him by Moore and Rosenfeld as majority shareholders of Eastern Towers.

307.   But for that breach of the fiduciary duty to Strachan, and the breaches of fiduciary duties owed to Eastern Towers, it is more probable than not that Strachan would have been employed by Eastern Towers for a reasonable period of additional time.

308.   Under the circumstances, the Court has concluded that a reasonable period of time would have been at least four years, or until April 9, 2006. At that point, the equity interest of Strachan in Eastern Towers, LLC would have fully vested at 20%.

309.   Strachan will therefore be awarded the value of his lost pay from February 26, 2004, to

April 9, 2006. Furthermore, his equity interest in Eastern Towers, LLC will be deemed to be 20%.

### H.    Strachan's Contract and Tort Claims

#### 1.    Breach of Oral Contract

310.   Strachan contends that Moore and Rosenfeld breached an oral contract with him when, among other things, they altered the proposed division of equity between Eastern Towers shareholders.

311.   It is a well-established rule of contract law that when a subsequent written contract contains an integration clause, any preexisting oral agreements are superseded. *See Vaks v. Ryan*, 2012 Mass. App. Div. 17, at *3, 2012 WL 194398, at *3 (Mass. App. Div. Jan. 18, 2012) (if plaintiff "freely and voluntarily entered into a written contract with [defendants], [he] is now precluded, as a matter of law, from attempting either to alter or amend its terms or to enforce an alleged prior or contemporaneous verbal agreement."); *see also* Farnsworth on Contracts § 7.3 (3d ed. 2004) (explaining that the parol evidence rule bars the admission of evidence concerning prior oral negotiations when a written contract is "completely integrated").

312.   The LLC Operating Agreement contained an integration clause stating that the agreement superseded any prior oral agreements.

313.   Accordingly, any evidence of an alleged oral agreement regarding the ownership structure or duties and obligations of Moore and Rosenfeld cannot be considered, and any such purported agreement will not be enforced.

## 2.    **Promissory Estoppel**

314.    Strachan further contends that Moore and Rosenfeld are prohibited from claiming a 60%

equity interest in Eastern Towers, LLC under the doctrine of promissory estoppel.

315.    As a general matter, "courts typically invoke the doctrine of promissory estoppel when

the formal requirements of contract formation are absent and when enforcing the promise

would serve the interests of justice." *Steinke v. Sungard Fin. Sys.*, 121 F.3d 763, 776 (1st

Cir. 1997); *see also Rhode Island Hosp. Trust Nat'l Bank v. Varadian*, 419 Mass. 841,

850 (1995) ("[A promissory estoppel] action based on reliance is equivalent to a contract

action, and the party bringing such an action must prove all the necessary elements of a

contract other than consideration.").[85]

316.    Here, Moore and Rosenfeld made no separate promise to Strachan that was not subsumed

by either the LLC Operating Agreement or the Executive Employment Agreement.

Because those contracts governed the terms of Strachan's equity ownership and

employment, the promissory estoppel claim cannot be asserted in this context.

317.    Any reliance by Strachan on oral promises or assurances was unreasonable as a matter of

law. "Where a written statement conflicts with a prior oral representation, reliance on the

oral representation is generally held to be unreasonable." *Coll v. PB Diagnostic Sys.*, 50

F.3d 1115, 1124 (1st Cir. 1995) (agreeing with the district court that plaintiff "could not

have reasonably relied on [pre-hire discussions]" and affirming summary judgment on

---

[85] "An offspring of the intermarriage of tort and contract, this doctrine [of promissory estoppel] holds that a promise given without consideration is binding when the promissor should reasonably expect to induce action or forbearance if injustice can be avoided only by enforcement of the promise." *Trifiro v. New York Life Ins. Co.*, 845 F.2d 30, 31 (1st Cir. 1988).

186

promissory estoppel and misrepresentation).

### 3.    Breach of Implied Covenant of Good Faith and Fair Dealing

318.    Strachan has also asserted a claim against Moore and Rosenfeld for breach of the implied

covenant of good faith and fair dealing implied by law in every contract. *See Anthony's*

*Pier Four, Inc. v. HBC Associates*, 411 Mass. 451, 471-72 (1991).

319.    That claim is based on the alleged oral contract described above. Because that alleged

contract, even if it were made, would not be valid or enforceable, the claim for breach of

the implied covenant fails as well.

### 4.    Wrongful Termination

320.    Finally, Strachan has asserted a claim for wrongful termination. It appears that Strachan

is claiming that the termination of his employment was wrongful because it was premised

on a false ground—that he had made a material misrepresentation. It is not a claim for

breach of the Executive Employment Agreement.

321.    Massachusetts law recognizes that even at-will employees may not be terminated for

reasons that violate public policy, such as "asserting a legally guaranteed right," "doing

what the law requires," or "refusing to do what the law forbids." *See, e.g., Falcon v.*

*Leger*, 62 Mass. App. Ct. 352, 363-64 (Mass. App. Ct. 2004). That doctrine does not,

however, apply here, as there is no relevant public policy that prohibited the termination,

and therefore the claim for wrongful termination must fail. *See King v. Driscoll*, 418

Mass. at 581-85.

### I.    Claims Asserted by Timberline

322.    Timberline contends that Moore and Rosenfeld engaged in unfair and deceptive practices

in violation of Mass. Gen. Laws ch. 93A when they diverted assets away from Eastern Towers in order to keep the company undercapitalized and underfunded, refused to pay the amount concededly owed to Timberline for work on cell towers, and attempted to extract a settlement by improper means.

323.    Chapter 93A prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2(a); *Commercial Union Ins. Co. v. Seven Provinces Ins. Co.*, 217 F.3d 33, 40 (1st Cir. 2000). For a claim brought by a business plaintiff, § 11 authorizes private suit only where the plaintiff suffers "any loss of money or property, real or personal" as a result. Mass. Gen. Laws ch. 93A, § 11.

324.    An individual officer or director, such as Moore or Rosenfeld, is "not immunized as an officer and director of a corporation for the acts he is alleged to have committed personally." *Nader v. Citron*, 372 Mass. 96, 102 (1977). Corporate officers can be held liable for themselves engaging in unfair and deceptive practices. *Id.* at 103. *See George Hyman Const. Co. v. Gateman*, 16 F. Supp. 2d 129, 161 (D. Mass. 1998) ("a claim under c. 93A, § 11, which extends broadly to persons acting in a business context, may be asserted directly against [individuals] without the benefit of a veil-piercing").

325.    As a threshold matter, the parties do not dispute that the dealings at issue occurred in the conduct of trade or commerce. The transactions at issue in this case center around the transfer of construction services and property. *See* Mass. Gen. Laws ch. 93A, § 1(b).

326.    Whether conduct is unfair or deceptive is a question of fact that focuses on "the nature of challenged conduct and on the purpose and effect of that conduct as the crucial factors."

*Commercial Union Ins.*, 217 F.3d at 40.

327.    A mere breach of contract, without more, is not sufficient to create liability under Chapter
        93A. *See, e.g., Madan v. Royal Indemnity Co.*, 26 Mass. App. Ct. 756, 762 (1989).
        However, a party who breaches a contract in deliberate attempt to obtain a benefit to
        which it is not entitled may commit an unfair or deceptive act under Chapter 93A. *See,*
        *e.g., Commercial Union Ins.*, 217 F.3d at 40-41 (violation where reinsurer's "pattern of
        evasiveness and obstructionism" to avoid its contractual obligations included deliberately
        avoiding coming to a decision on whether to pay; constantly shifting its defenses and
        objections to payment; and allowing almost two and one-half years to elapse from receipt
        of proof of the reinsurance until trial); *Arthur D. Little, Inc. v. Dooyang Corp.*, 147 F.3d
        47, 55-56 (1st Cir. 1998) (violation where party to a contract acted with the "wrongful
        purpose" of "extracting a favorable settlement . . . for less than the [undisputed]
        amount . . . owed by repeatedly promising to pay, not doing so, stringing out the process,
        and forcing [the other party] to sue"); *Anthony's Pier Four*, 411 Mass. at 475 (violation
        where owner withheld approval of development plan in an attempt to force developer to
        increase compensation to owner beyond what contract required).

328.    The use of the breach of contract as a lever or wedge to enhance one party's bargaining
        power or exact control over another party violates Chapter 93A. *See Pepsi-Cola*
        *Metropolitan Bottling Co. v. Checkers, Inc.*, 754 F.2d 10, 18 (1st Cir. 1985). Put another
        way, such cases involve "commercial extortion or a similar degree of culpable conduct."
        *Commercial Union Ins.*, 217 F.3d at 40 (citing *Anthony's Pier Four*, 411 Mass. at 474-
        75).

329.   Moore and Rosenfeld, as controlling shareholders and members, controlled the financial affairs of Eastern Towers, including whether its financial obligations would be paid.

330.   Beginning on June 2, 2003, Moore and Rosenfeld systematically transferred money and assets out of Eastern Towers to other entities they controlled, which left Eastern Towers chronically underfunded.  They did so deliberately, knowing that Eastern Towers had entered, and would continue to enter, into a series of contractual obligations with Timberline for the construction of towers.

331.   Those contractual obligations to Timberline totaled more than $800,000.

332.   Eastern Towers continued to enter into contractual obligations with Timberline as late as October 2004.

333.   Timberline was by far the most significant creditor of Eastern Towers.  By deliberately stripping Eastern Towers of its assets, Moore and Rosenfeld deliberately increased the likelihood that Timberline's invoices would not be paid.

334.   Moore and Rosenfeld knew that Eastern Towers had a $1 million line of credit with TD Banknorth that could be used to pay the invoices of Timberline.  Indeed, the very purpose of the line of credit was to finance the construction of towers, and Timberline was for all practical purposes the only construction contractor.  Nonetheless, Moore and Rosenfeld refused to use the credit facility to pay the invoices of Timberline in full.

335.   Although Moore and Rosenfeld had stripped Eastern Towers of cash and other assets, they did not return funds to Eastern Towers to make good on its obligations to Timberline.

336.   Moore and Rosenfeld used the claimed that Eastern Towers lacked funds to avoid paying

Timberline, and to try to obtain leverage to attempt to force Timberline to accept a much lower payment for services already rendered.

337.   Moore and Rosenfeld contend that because a mere failure to pay amounts owed due to financial distress is not actionable under 93A, their refusals to pay Timberline and subsequent negotiations to settle for a lesser amount were not actionable unfair or deceptive practices. *See Ahern,* 85 F.3d at 798; *The Boston Pilots v. The Motor Vessel Midnight Gambler*, 357 F.3d 129, 133 (1st Cir. 2004) (finding no chapter 93A violation where non-payment of debt was due to inability to pay).

338.   However, the inability of Eastern Towers to pay the invoices of Timberline was a direct consequence of the actions of Moore and Rosenfeld—in particular, stripping the company of its capital and assets, while continuing to induce Timberline to perform construction services.  If Moore had not done so, Eastern Towers would have been able to pay Timberline's invoices as they became due.

339.   The work performed by Timberline was performed acceptably, and pursuant to work authorizations and change orders specifically authorized by Eastern Towers.  Moore and Rosenfeld did not have a good faith basis to dispute the fact that Eastern Towers owed Timberline $264,774.24 in unpaid invoices.  Nonetheless, they began to dispute that amount during their discussion with Timberline to try to induce the company to settle or reduce or abandon its claims.

340.   Moore and Rosenfeld attempted to extort a favorable settlement from Timberline by proposing an arrangement where Timberline would receive $250,000 if Kelly introduced Moore and Rosenfeld to prospective tower tenants.  However, after Kelly tentatively

agreed to the proposal, Moore and Rosenfeld changed the terms; they lowered the amount

to $225,000 and demanded Kelly secure signed lease agreements for their towers.

341.    The foregoing conduct of Moore and Rosenfeld occurred primarily and substantially in

Massachusetts.

342.    The foregoing conduct of Moore and Rosenfeld, taken as a whole, constituted an unfair

and deceptive act or practice within the meaning of Mass. Gen. Laws ch. 93A, § 11.

343.    The violation of Mass. Gen. Laws ch. 93A, § 11 by Moore and Rosenfeld caused actual

injury to Timberline in the amount of $264,774.24, exclusive of interest, costs, and

reasonable attorneys' fees.

344.    The violation of Mass. Gen. Laws ch. 93A, § 11 by Moore and Rosenfeld was knowing

and willful.

345.    Timberline is therefore entitled to recover its actual damages in the amount of

$264,774.24; multiple damages, also in the amount of $264,774.24; prejudgment interest;

costs; and reasonable attorneys' fees, all arising out of the violation of Mass. Gen. Laws

ch. 93A, § 11.

### J.    Fraudulent Transfer

346.    The Trustee, on behalf of Timberline, contends that three transfers of property were

actually or constructively fraudulent: (1) the June 2, 2003 capital withdrawal by Moore

and Rosenfeld; (2) the various transfers of towers from Eastern Towers to Eastern

Properties; and (3) the 2004 sale of the Wayland WIP.

### 1.    Fraudulent Transfers Generally

347.    The Bankruptcy Code, 11 U.S.C. § 544(b), permits a trustee to avoid any transfer of a

debtor's property that is voidable by an unsecured creditor under "applicable state law," including state fraudulent-conveyance statutes.

348.    The Massachusetts Uniform Fraudulent Transfer Act ("MUFTA"), Mass Gen. Laws ch. 109A, provides that to establish a fraudulent-transfer claim, the Trustee must show that:

> the debtor made the transfer or incurred the obligation:
>
> (1)     with actual intent to hinder, delay, or defraud any creditor of the debtor; or
>
> (2)     without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor:
>
>> (i)     was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
>>
>> (ii)     intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due.

Mass. Gen. Laws ch. 109A, § 5(a).

349.    The MUFTA sets forth eleven factors a court may consider "among other factors" in determining whether the requisite "actual intent" to hinder or defraud a creditor is present. The factors are:

> (1) the transfer or obligation was to an insider;
>
> (2) the debtor retained possession or control of the property transferred after the transfer;
>
> (3) the transfer or obligation was disclosed or concealed;
>
> (4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
>
> (5) the transfer was of substantially all the debtor's assets;

(6) the debtor absconded;

(7) the debtor removed or concealed assets;

(8) the value of the consideration received by the debtor was reasonably equivalent to the value of the asset transferred or the amount of the obligation incurred;

(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;

(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and

(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.

Mass. Gen. Laws ch. 109A, § 5(b).

350.   There is no requirement that each of the eleven factors be present in order for a court to

determine a fraudulent transfer was made. *See Hasbro, Inc. v. Serafino*, 37 F. Supp. 2d

94, 98 (D. Mass. 1999).

351.   "Proof of an 'actual intent' to defraud must be made by clear and convincing evidence."

*See Hoult v. Hoult*, 2002 WL 1009378, at *6 (D. Mass. May 13, 2002) (citing *In re the

O'Day Corp.*, 126 B.R. 370, 410 (Bankr. D. Mass. 1991)); *see also Frank Sawyer Trust

of May 1992 v. C.I.R.*, 2011 WL 6781014, at*12 (U.S. Tax Ct. Dec. 27, 2011) ("[T]he

U.S. Bankruptcy Court for the District of Massachusetts (the bankruptcy court), in

applying MUFTA, has found that actual fraud must be proven by clear and convincing

evidence . . . and constructive fraud must be proven by a preponderance of the evidence.")

(internal citations omitted).

352.   Massachusetts law also provides a cause of action for constructively fraudulent transfer

when the Trustee can show that "the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation." Mass. Gen. Laws ch. 109A, § 6.

353.    On June 2, Eastern Towers received cash in the amount of \$818,832 as consideration for transfer of the first four towers.  The same day, assets totaling \$2,273,997 were transferred out of Eastern Towers:  cash in the amount of \$520,000 (the capital withdrawal) and assets worth \$1,753,997 (the four towers).  The consideration for those transfers was inadequate.

354.    The June 2 transactions rendered Eastern Towers insolvent, or nearly insolvent; by June 30, it had only enough cash on hand to fund about five days of operations, with substantial ongoing and future obligations to Timberline and other creditors.

355.    The June 2 transactions involved the transfer of a substantial portion of the assets of Eastern Towers.  Other than the cash received on June 2, which was quickly dissipated, the only other significant asset of Eastern Towers was the work-in-process of towers that had not yet been completed.

356.    Moore and Rosenfeld concealed the June 2 capital withdrawal from TD Banknorth, and falsely represented to the bank that the restructuring of the business would permit them to make large, additional capital contributions.

357.    Moore and Rosenfeld concealed the true nature of the June 2 transactions from Strachan and Sanford, and disguised the economics of the transfer of the towers through the elaborate provisions of the Tower Purchase Agreement.

358.  As of June 2, 2003, and thereafter, Moore and Rosenfeld intended to keep Eastern Towers undercapitalized and underfunded in order to benefit their personal holdings, such as Eastern Properties.

359.  Between June 2003 and May 2004, Eastern Towers transferred five additional towers to Eastern Properties for a sales price of $1,063,000.  Those towers had a fair market value of $2,277,857.  The consideration for those transfers was inadequate.

360.  On August 11, 2004, Eastern Towers transferred the Wayland WIP to Horizon Towers for $40,000 (assuming it had not been transferred on July 23).  The consideration for that transfer was inadequate.

361.  The transfer of the five additional towers, as a whole, and the transfer of the Wayland WIP in July or August 2004, involved the transfer of nearly all of the assets of Eastern Towers.  With each transfer, the business was rendered insolvent or nearly insolvent.

362.  Moore and Rosenfeld continued to conceal the true nature of those transactions from Strachan and Sanford, and to disguise the economics of the transfer of the towers.

363.  During the period between May 2003 and August 2004, among other things, Eastern Towers had an ongoing business relationship with Timberline Construction Corporation. Timberline constructed a series of telecommunications towers and related structures for Eastern Towers, for which it issued invoices for payment on a regular basis.

364.  Moore and Rosenfeld knew as of June 2, 2003, and through at least August 11, 2004, that Eastern Towers had an ongoing relationship with Timberline Construction, and that Timberline was performing work and would continue to perform work for Eastern Towers and that Eastern Towers had outstanding obligations and would continue to incur

196

new obligations to Timberline.

365.    The Court finds, by clear and convincing evidence, that the June 2, 2003 withdrawal of

capital by Moore and Rosenfeld; the transfer of nine towers from Eastern Towers to

Eastern Properties in 2003 and 2004; and the transfer of the Wayland WIP were transfers

of property of Eastern Towers that were made with actual intent to hinder, delay, or

defraud the creditors of Eastern Towers, specifically Timberline Construction

Corporation, within the meaning of Mass. Gen. Laws ch. 109A, § 5(a).

366.    The foregoing transactions were transfers that were made without Eastern Towers

receiving a reasonably equivalent value in exchange for the transfers.

367.    As of June 2, 2003, and thereafter, Eastern Towers was engaged or about to engage in

business transactions, specifically the construction of towers by Timberline, for which the

remaining assets of Eastern Towers were unreasonably small in relation to the business or

transaction.

368.    As of June 2, 2003, and thereafter, the principals of Eastern Towers intended to incur, or

believed, or reasonably should have believed, that Eastern Towers would incur, debts

beyond the ability of Eastern Towers to pay as they became due.

369.    The Court finds, by a preponderance of the evidence, that the June 2, 2003 capital

withdrawal by Moore and Rosenfeld; the transfer of the nine towers from Eastern Towers

to Eastern Properties in 2003 and 2004; and the transfer of the Wayland WIP in August

2004 were constructively fraudulent within the meaning of Mass. Gen. Laws ch. 109A, §

6.

370.    Those transfers therefore constituted an actual and constructive fraudulent transfers or

197

conveyances within the meaning of Mass. Gen. Laws ch. 109A that can be avoided by the trustee pursuant to 11 U.S.C. § 544(b).

**K.**    **Accounting**

371.    The Trustee further seeks an equitable accounting from all defendants. An equitable accounting is appropriate where a fiduciary relationship exists, or where the accounts are so complicated that an action at law would not be an adequate remedy. *See Porter v. Reid*, 79 F. Supp. 898, 907 (D. Mass. 1948); *Chedd-Angier Production Co., Inc. v. Omni Publications Int'l, Ltd*, 756 F.2d 930, 937 (1st Cir. 1985) ("Under Massachusetts law, an equitable accounting is available only if there exists a fiduciary or trust relationship between the parties"); *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 478 (1962) (in order to maintain a suit for equitable accounting, "the plaintiff must be able to show that the 'accounts between the parties' are of such a 'complicated nature' that only a court of equity can satisfactorily unravel them" and thus no adequate remedy at law exists) (quoting *Kirby v. Lake Shore & Michigan Southern R. Co.*, 120 U.S. 130, 134 (1887)).

372.    Moore and Rosenfeld owed fiduciary duties to Eastern Towers, Inc.; Eastern Towers, LLC; Strachan; and Sanford.

373.    Moore and Rosenfeld, or entities that they owned and/or controlled, owned and/or controlled Eastern Properties, LLC, Horizon Towers, LLC; Tower Investors Trust; Glover Property Management, Inc.; 5G Towers, LLC; and 5G Investment Trust, LLC. Those entities were used by Moore and Rosenfeld to usurp and divert business opportunities and transfer and hold assets in violation of the fiduciary duties of Moore and Rosenfeld owed to Eastern Towers, Inc.; Eastern Towers, LLC; Strachan; and Sanford.

374.    As discussed above, Moore and Rosenfeld have engaged in a pattern of transferring funds

and other assets between entities without regard for corporate formalities and maintaining

appropriate business and financial records.

375.    The accounts of the parties are sufficiently complicated that an action at law would not be

an adequate remedy.

376.    Accordingly, the trustee is entitled to equitable accounting from all defendants in order to

ascertain what funds and other assets were transferred between the various entities, and

otherwise to identify what assets properly belong to the debtor, Eastern Towers.

### L.    Constructive Trust

377.    The Trustee further seeks to establish a constructive trust for the benefit of plaintiffs.

378.    In Massachusetts, "a constructive trust is a flexible tool of equity . . . [that] [t]he court

may impose . . . where one acquires an interest in property in breach of a legal duty to one

who has granted that interest." *Maffei v. Roman Catholic Archbishop*, 449 Mass. 235,

247 (2007).

379.    "A constructive trust 'is not [to be] imposed where a recipient has given value or had no

notice of the violation of duty.'" *Id.* at 248 (quoting *Demoulas*, 424 Mass. at 544).

380.    A constructive trust is a remedy, not a cause of action. *See In re Handy*, 624 F.3d 19, 22

(1st Cir. 2010) ("Constructive trusts are not substantive rights that confer a cause of

action; they are remedial devices employed by courts once liability is found and where

equity requires").

381.    For the reasons stated above, the defendants Eastern Properties, LLC, Horizon Towers,

LLC; Tower Investors Trust; 5G Towers, LLC; and 5G Investment Trust, LLC acquired

interests in various towers and related property as a result of breaches of fiduciary duty by
Moore and Rosenfeld.

382. Under the circumstances presented here, equity requires importation of a constructive
trust in the towers and related property of those defendants for the benefit of the trustee
and Strachan.

## V.   CONCLUSION

### A.   Findings of Liability

For the foregoing reasons, the Court makes the following findings as to liability:

1. As to Count 1, asserting a claim for breach of fiduciary duty, the Court finds for plaintiff
Joseph G. Butler, as Chapter 7 Trustee, against defendants Edward T. Moore and
Lawrence W. Rosenfeld.

2. As to Count 2, asserting a claim for an accounting, the Court finds for plaintiff Joseph G.
Butler, as Chapter 7 Trustee, against defendants Edward T. Moore and Lawrence W.
Rosenfeld.

3. As to Count 3, asserting a claim for imposition of a constructive trust, the Court finds for
plaintiff Joseph G. Butler, as Chapter 7 Trustee, against defendants Edward T. Moore and
Lawrence W. Rosenfeld.

4. As to Count 4, asserting a claim for breach of fiduciary duty, the Court finds for plaintiff
John W. Strachan against defendants Edward T. Moore and Lawrence W. Rosenfeld.

5. As to Count 5, asserting a claim for promissory estoppel, the Court finds for defendants
Edward T. Moore and Lawrence W. Rosenfeld.

6. As to Count 6, asserting a claim for breach of contract, the Court finds for defendants

Edward T. Moore and Lawrence W. Rosenfeld.

7.   As to Count 7, asserting a claim for breach of the implied covenant of good faith and fair dealing, the Court finds for defendants Edward T. Moore and Lawrence W. Rosenfeld.

8.   As to Count 8, asserting a claim for wrongful termination, the Court finds for defendants Edward T. Moore and Lawrence W. Rosenfeld.

9.   As to Count 9, asserting a claim for fraudulent conveyance, the Court finds for plaintiff Joseph G. Butler, as Chapter 7 Trustee, against defendants Edward T. Moore; Lawrence W. Rosenfeld; Eastern Towers, LLC; Eastern Properties, LLC; Horizon Towers, LLC; Tower Investor Trust; 5G Towers, LLC; 5G Investment Trust; and Glover Property Management, Inc.

10.   As to Count 10, asserting a claim for fraudulent conveyance, the Court finds for plaintiff Joseph G. Butler, as Chapter 7 Trustee, against defendants Edward T. Moore; Lawrence W. Rosenfeld; Eastern Towers, LLC; Eastern Properties, LLC; Horizon Towers, LLC; Tower Investor Trust; 5G Towers, LLC; 5G Investment Trust; and Glover Property Management, Inc.

11.   As to Count 11, asserting a claim for unfair and deceptive acts and practices in violation of Mass. Gen. Laws. ch. 93A, the Court finds in favor of plaintiff Timberline Construction Corporation against defendants Edward T. Moore and Lawrence W. Rosenfeld.

**B.   Relief**

The Court orders the following relief:

1.   The Court declares that the ownership interests and rights of the following defendants:

201

Eastern Properties, LLC;

Horizon Towers, LLC;

Tower Investor Trust;

5G Towers, LLC;

5G Investment Trust, LLC; and

Glover Property Management, Inc.,

(the "Tower Defendants") in the following properties:

Beverly, Massachusetts (Eastern Properties, LLC);

Franklin, New Hampshire ("Church") (Eastern Properties, LLC);

Franklin, New Hampshire ("Industrial") (Eastern Properties, LLC);

Weare, New Hampshire (Eastern Properties, LLC);

Webster, New Hampshire (Eastern Properties, LLC);

Pembroke, New Hampshire (Eastern Properties, LLC);

Carver, Massachusetts (Eastern Properties, LLC);

Goshen, Massachusetts (Eastern Properties, LLC);

Loudon, New Hampshire (Eastern Properties, LLC);

Hopkinton, New Hampshire (Eastern Properties, LLC);

Gilmanton, New Hampshire  (Eastern Properties, LLC);

Grantham, New Hampshire ("Yankee Barn Road") (Eastern Properties, LLC);

North Loudon, New Hampshire (Eastern Properties, LLC);

Wayland, Massachusetts (Horizon Towers, LLC);

Esko, Minnesota (Eastern Properties, LLC);

202

Ivan, Arkansas (Eastern Properties, LLC);

Bergland, Michigan (Eastern Properties, LLC);

Manitowish, Wisconsin (Eastern Properties, LLC);

Antigo, Wisconsin (5G Investment Trust, LLC);

Hawley, Pennsylvania (5G Investment Trust, LLC);

Heritage Hills (York), Pennsylvania (5G Investment Trust, LLC);

Grand Rapids, Minnesota (5G Investment Trust, LLC);

Trego, Wisconsin (5G Investment Trust, LLC);

Wakefield, Pennsylvania (5G Investment Trust, LLC);

Washington Borough, Pennsylvania (5G Investment Trust, LLC);

Orwigsburg, Pennsylvania (5G Investment Trust, LLC);

West Fergus Falls, Minnesota (5G Investment Trust, LLC);

Oakland, Maryland (5G Investment Trust, LLC);

Lake Nebagamon, Wisconsin (5G Investment Trust, LLC);

Americus, Georgia (Glover Property Management, Inc., as Trustee for 5G
        Investment Trust, LLC);

Tennille, Georgia (Glover Property Management, Inc., as Trustee for 5G
        Investment Trust, LLC): and

Newburyport, Massachusetts (5G Investment Trust, LLC),

including any telecommunication towers and related facilities and any related real

property, leasehold interests, rents, profits, bank accounts, and intangible property (the

"Tower Assets"), were improperly acquired, by fraudulent conveyance or transfer,

wrongful diversion or usurpation of corporate or business opportunities, or both, from Eastern Towers, Inc., and Eastern Towers, LLC by Edward T. Moore, Lawrence W. Rosenfeld, and the Tower Defendants.

2.      Any ownership interests and rights of the Tower Defendants, Edward T. Moore, or Lawrence W. Rosenfeld in the Tower Assets shall be transferred and conveyed and made available as reasonably necessary to plaintiff Joseph G. Butler, as Chapter 7 Trustee for debtor Eastern Towers, Inc., to be liquidated and distributed or otherwise used to satisfy the creditors of debtor Eastern Towers, Inc.

3.      Any ownership interests or rights of Eastern Towers, LLC in the Tower Assets, shall be transferred and conveyed and made available as reasonably necessary to plaintiff Joseph G. Butler, as Chapter 7 Trustee for debtor Eastern Towers, Inc., to be liquidated and distributed or otherwise used to satisfy the creditors of debtor Eastern Towers, Inc.

4.      The Court declares that plaintiff John W. Strachan has a 25% equity interest in debtor Eastern Towers, Inc., and a 20% equity interest in Eastern Towers, LLC.

5.      A constructive trust shall be imposed against Edward T. Moore, Lawrence W. Rosenfeld, and the Tower Defendants as to the Tower Assets and for the benefit of debtor Eastern Towers, Inc.

6.      Edward T. Moore, Lawrence W. Rosenfeld, and the Tower Defendants shall, within ninety days of the date of this Order, make a full and complete accounting to plaintiff Joseph G. Butler, as Chapter 7 Trustee for debtor Eastern Towers, Inc., of all of the assets and opportunities, including a detailed accounting of all payments, conveyances, transfers, and assignments of any money, real property, leasehold interests, intangible

property, and other property relating to the business of debtor Eastern Towers, Inc., by Moore, Rosenfeld, or any person or entity acting under their direction or control, to or from any of the Tower Defendants and/or any third parties.

7.      Edward T. Moore and Lawrence W. Rosenfeld shall pay $520,000 to plaintiff Joseph G. Butler, as Chapter 7 Trustee for debtor Eastern Towers, Inc., as damages for the wrongful withdrawal of $270,000 in capital of Eastern Towers, Inc., and $250,000 in capital of Eastern Towers, LLC on June 2, 2003, in violation of their fiduciary duties.

8.      Plaintiff John W. Strachan is hereby awarded compensatory damages in the amount of $141,346.13, for loss of his salary from Eastern Towers, Inc., from February 26, 2004, to April 9, 2006, at a rate of $75,000 per year.

9.      Plaintiff Timberline Construction Corporation is hereby awarded damages from defendants Edward T. Moore and Lawrence W. Rosenfeld in the following amounts: (a) compensatory damages of $264,774.24, (b) additional damages in the amount of $264,774.24 for a willful violation of Mass. Gen. Laws ch. 93A, for a total of $529,548.48, and (c) reasonable attorneys' fees and costs.

10.     Plaintiffs John W. Strachan and Timberline Construction Corporation are hereby awarded prejudgment interest on their damages awards at the statutory rate.

**So Ordered.**

F. Dennis Saylor IV
United States District Judge

Dated: March 26, 2015

205