## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                        )
**JOSEPH G. BUTLER, as Chapter 7 Trustee,**  )
**and JOHN W. STRACHAN,**               )
                                        )
         **Plaintiffs,**                )
                                        )        **Civil Action No.**
         **v.**                         )        **10-10207-FDS**
                                        )
**EDWARD T. MOORE,**                    )
**LAWRENCE W. ROSENFELD,**              )
**EASTERN TOWERS, LLC,**                )
**EASTERN PROPERTIES, LLC,**            )
**HORIZON TOWERS, LLC,**                )
**TOWER INVESTORS TRUST,**              )
**GLOVER PROPERTY MANAGEMENT, INC.,**   )
**5G TOWERS, LLC,**                     )
**5G INVESTMENT TRUST, LLC,**           )
**TOWER ACQUISITIONS, INC.,**           )
**TOWER ACQUISITIONS, LLC,**            )
**TOWER ACQUISITION TRUST,**            )
**GROUND LEASE ACQUISITIONS, INC.,**    )
**GROUND LEASE ACQUISITIONS, LLC,**     )
**GROUND LEASE ACQUISITION TRUST, and** )
**MIDWEST TOWERS INVESTMENT, LLC,**     )
                                        )
         **Defendants.**                )
_____)


## MEMORANDUM AND ORDER ON
## CROSS-MOTIONS FOR SUMMARY JUDGMENT AS TO REMEDY

**SAYLOR, J.**

This action arises out of a dispute concerning a closely held business that developed

towers for the cellular telephone industry.  The principal dispute involves a series of transactions

in which the majority owners of the business froze out the minority owners and appropriated

assets and business opportunities for their own benefit.  The Court previously issued a decision

on liability, and the proceeding is now at the remedy stage.  Familiarity with the Court's

previously-issued Findings of Fact and Conclusions of Law is presumed.

## I.      Procedural Background

In November 2006, defendants Edward Moore and Lawrence Rosenfeld caused Eastern Towers, Inc., to file a voluntary petition under Chapter 7 of the Bankruptcy Code.  With two very minor exceptions, plaintiff Strachan is the only remaining creditor.[1]  The reference to the Bankruptcy Court was withdrawn in 2010, and the matter was then tried to the Court without a jury.

On January 27, 2012, the Court ordered the case bifurcated into liability and remedy phases.  After a bench trial as to liability, the Court issued Findings of Fact and Conclusions of Law on March 26, 2015.  Following the issuance of the judgment, the Court granted defendants' motion for a new trial as to remedy on the grounds that the conclusions of law inappropriately included findings that should have been reserved for the remedy phase.  Defendants have now moved for summary judgment as to the proper remedy, and plaintiffs have cross-moved for partial summary judgment as to the same issue.

## II.      Additional Factual Background

Except as noted, the following facts are either based on those Findings of Fact or are not disputed by the parties.

### A.      2010 Sale of Thirteen Towers

1.      The Court's Findings of Fact identified 33 towers that had been acquired and developed in violation of the fiduciary duties of Moore and Rosenfeld to Eastern Towers.  (COL ¶ 270).

---

[1] Defendants have settled the claims brought by Timberline Construction subsequent to the Court's decision in March 2015.

2.      Of those 33 towers, 13 were sold on September 1, 2010, to SBA Towers III, LLC, an unrelated third party.  (Exs. 913.400, 913.401, 913.403).[2]

3.      The 13 towers that were sold were as follows:

      a.      Four towers that were formerly owned by Eastern Properties, LLC (Esko, Ivan, Manitowish, and Bergland);

      b.      One tower that was formerly owned by Tower Acquisition Trust or Tower Acquisitions, Inc. (South Grantham);

      c.      Eight towers that were formerly owned by 5G Investment Trust, LLC (Antigo, Trego, Lake Nebagamon, West Fergus Falls, Grand Rapids, Americus, Tennille, and Oakland).

(*Id.*).

4.      The seller of the 13 towers on September 1, 2010, was Midwest Towers Investment, LLC, a Delaware limited liability company owned and controlled by Moore and/or Rosenfeld.  (*Id.*).[3]  Midwest Towers Investment, LLC is a single member LLC owned by 5G Investment Trust.  (Phillips Rpt. at 2 n. 4).

5.      Midwest Towers Investment, LLC had apparently acquired the 13 towers by means of an asset purchase agreement dated July 14, 2010.  (Ex. 913.402).  The sellers of the towers under that July 14, 2010 agreement were 5G Investment Trust, LLC; Eastern Properties,

---

[2] The sale of the towers appears to have taken the form of an asset sale, rather than the sale of an ongoing business, and appears to have principally involved the sale of property (the towers themselves, and any appurtenant structures and equipment) and the assignment of leases, both as lessee (ground leases for the property on which the towers were constructed) and lessor (the leases with telecommunications companies that were tenants on the towers).  (*See, e.g.,* Exs. 913.400, 913.403).

[3] The purchase and sale agreement and related documents indicate that Marblehead Office, LLC, which is apparently a limited liability company owned and controlled by Moore and/or Rosenfeld, was also a seller of the towers. (*See* Exs. 913.400, 913.403).  It is unclear what ownership interest Marblehead Office, LLC, held in the 13 towers, or how that interest was acquired.  It is unclear whether any proceeds of the sale went to Marblehead Office, LLC.

LLC; and Tower Acquisition Trust.  (*Id.*).

6.      The sales price for that transaction, as reflected on the closing statement dated September 1, 2010, was $15,464,924.30.  (Ex. 913.401).  That amount included the Marblehead tower (which is not subject to the Court's remedy) and may have included other towers, but did not include the Oakland tower (which is).  The Oakland tower was sold separately for a stated price of $813,135.  (See SOF ¶ 50; Floyd Rpt., Ex. 6-H).

7.      Of that approximately $15.4 million purchase price, $171,719.39 was paid to Media Capital Advisors, Inc., as a broker fee.  (*Id.*).

8.      Another $2,068,377.70 of the purchase price was paid to TB Bank in three separate wires to pay off loans that had been incurred by Eastern Properties, LLC.  (*Id.*).  That debt had been used to finance the acquisition of the towers, and involved the same loan facility that had been originally intended to be used by Eastern Towers.

9.      The remaining proceeds from the sale of the towers, after adjustments for items such as taxes and rent, totaled $13,126,691.19.  (Ex. 913.401).  That amount was paid by wire transfer on or about September 1, 2010, to the IOLTA Client Account of Lampert, Hausler & Rodman, P.C., a law firm that represents Moore and Rosenfeld.  (*Id.*).[4]

10.     The approximately $13.1 million in proceeds from the sale of the towers were then distributed by the law firm to Moore and Rosenfeld directly or indirectly (through entities owned or controlled by them).  (*Id.*).

11.     None of the proceeds of the sale were paid directly to Midwest Towers Investment, LLC.  (*Id.*).

12.     Apparently because the July 10, 2010 sale included at least some other assets,

---

[4] Attorney Douglas Hausler represented Moore, Rosenfeld, and/or their business entities in certain of the transactions involving Eastern Towers.  (*See, e.g*., FOF ¶¶ 278, 457).

plaintiffs contend, and defendants admit, that the sales price for the 13 relevant towers was

$8,433,949.  (Def. Counter-Statement of Material Facts, Dkt. No. 211, No. 46 at 14).

      13.      The plaintiffs contend, and defendants admit, that the sales prices assigned to the

13 towers were as follows:

          a.      $482,386 for Esko;

          b.      $313,214 for Ivan;

          c.      $568,778 for Manitowish;

          d.      $431,580 for Bergland;

          e.      $475,000 for South Grantham;

          f.      $2,701,533 for Antigo, Trego, and Lake Nebagamon;

          g.      $977,899 for West Fergus Falls and Grand Rapids;

          h.      $1,670,424 for Americus and Tennille; and

          i.      $813,135 for Oakland.

(*Id.*, No. 48-50 at 14-15; Floyd Rpt., Ex. 6-H).

      14.      Of the 33 towers described above, 20 have not been sold.  Those towers are as

follows:

          a.      Towers owned by Eastern Properties, LLC:

            1.      Beverly

            2.      Franklin Church

            4.      Franklin Industrial

            5.      Weare

            6.      Webster

             7.      Pembroke

8.      Carver

9.      Goshen

10.     Loudon

11.     Hopkinton

12.     Gilmanton

13.     Grantham (Yankee Barn Road)

14.     North Loudon

b.      Towers owned by 5G Investment Trust, LLC:

1.      Hawley

2.      Heritage Hills

3.      Wakefield

4.      Washington Borough

5.      Orwigsburg

c.      Tower owned by Tower Acquisition Trust or Tower Acquisition, Inc.:

1.      Newburyport

d.      Tower owned by Horizon Towers, LLC:

1.      Wayland

**B.      Acquisition of Ground Leases between 2008 and 2013**

1.      Between 2008 and 2013, Moore and Rosenfeld acquired ground lease rights, or purchased real property, for the tower sites for the Beverly, Loudon, South Grantham, Pembroke, and Hopkinton towers.  The acquisitions were conducted through a new entity called Ground Lease Acquisitions, Inc.  (Def. Counter-Statement of Material Facts, Dkt. No. 211, No. 36 at

12).[5]

2.       In 2008, Ground Lease Acquisitions, Inc., acquired the ground lease for the Beverly and Loudon tower sites.  (*Id.*, No. 37 at 12).

3.       In 2008, Ground Lease Acquisitions, Inc., purchased the land on which the Loudon tower sits.  (*Id.*, No. 39 at 13).

4.       In 2009, Ground Lease Acquisitions, Inc., acquired the ground lease for the Pembroke tower site.  (*Id.*, No. 40 at 13).

5.       In 2009, Ground Lease Acquisitions, Inc., purchased the land on which the South Grantham tower sits.  (*Id.*).

6.       In 2013, Ground Lease Acquisitions, Inc., acquired the ground lease for the Hopkinton tower site.  (*Id.*, No. 44 at 14).

## C.    Acquisition of Interest in 4G Towers, LLC in 2004

1.       In 2004 and 2005, 5G Investment Trust purchased and sold a majority ownership in 4G Towers, LLC, a Massachusetts limited liability company that owned towers in Minnesota, Oregon, Wisconsin, and Washington.  (*Id.*, No. 32 at 10).

2.       At least $103,222 of the payment made by 5G Investment Trust for its interest in 4G Towers, LLC came from Eastern Properties, LLC.  (*Id.*, No. 33 at 11-12).

---

[5] Although defendants contend that Ground Lease Acquisitions, Inc., is the relevant entity in each instance, the evidence suggests that the reality may be more complicated.  The South Grantham tower site is illustrative.  A Site Lease Agreement "dated for identification only as of November 1, 2008" was executed between an individual named Paul Kneeland and Tower Acquisition Trust.  (Ex. 932.204).  Under that agreement, Kneeland (who represented that he owned the property) leased the land on which the South Grantham tower is located to Tower Acquisition Trust.  (*Id.*).  Next, a Site Lease Agreement "dated for identification only as of January 1, 2009" was executed between Tower Acquisition Trust and Ground Lease Acquisition Trust.  (Ex. 932.203).  Under that agreement, Tower Acquisition Trust (which represented that it owned the property) leased the property to Ground Lease Acquisition Trust.  (*Id.*).  Next, on July 24, 2010, Tower Acquisition Trust executed a document purporting to assign the lease to Midwest Towers Investment, LLC.  (Ex. 932.200).  That was apparently a mistake, because a "Ratification and Confirmation of Lease" dated August 24, 2010, was executed between Ground Lease Acquisition Trust and Midwest Towers Investment, LLC.  (*Id.*).  That document essentially acknowledged the error and assigned the lease to Midwest Towers.  (*Id.*).  It then appears that Midwest Towers assigned the lease as part of the sale of 13 towers to SBA Towers III, LLC.

3.      In 2004 and 2005, 5G Investment Trust received $3,955,009 in distributions from 4G Towers, LLC and recorded a profit of $1,189,384 from its investment.  (*Id.*, No. 34 at 11; Floyd Rpt., Ex. K).

**D.      Distributions to Moore and Rosenfeld and/or Related Entities**

1.      Between 2003 and 2004, Moore and Rosenfeld received at least $571,700 in distributions from Eastern Towers, LLC and/or Eastern Towers, Inc.  (Floyd Rpt., Ex. I).

2.      Between 2003 and 2014, Moore and Rosenfeld received at least $7,630,546 in distributions from Eastern Properties, LLC.  (*Id.*, Exs. I, J).

3.      Between 2004 and 2014, Moore and Rosenfeld received at least $285,000 in distributions from Horizon Towers, LLC.  (*Id.*, Ex. I).

4.      Between 2005 and 2014, Moore and Rosenfeld received at least $7,126,909 in distributions from 5G Investment Trust.  (*Id.*).

5.      Between 2009 and 2014, Moore and Rosenfeld received at least $507,428 in distributions from Tower Acquisitions Trust and/or Tower Acquisitions Inc.  (*Id.*, Ex. 10-A).

6.      As noted, in 2005, Moore and Rosenfeld received an additional $3,955,009 in distributions from 5G Investment Trust as part of the liquidation of their investment in 4G Towers.

7.      Those amounts total $20,076,592.

**E.      Payment of Litigation Fees and Expenses**

1.      As of December 31, 2014, the Tower Entities had paid at least the following amounts for professional services rendered on behalf of Moore, Rosenfeld, and other defendants in connection with this litigation:

a.      Jones Day was paid $2,071,005;

      b.      Murphy & King, P.C. was paid $627,261;

      c.      Verdolino & Lowey, P.C. was paid $129,022;

      d.      Baker Tilly Virchow Krause, LLP was paid $71,882;

      e.      Lampert, Hausler & Rodman, P.C. was paid $59,403;

      f.      Steel Tree Partners, LLC was paid $50,783; and

      g.      Carlton, Healy & Fredrick LLP was paid $3,358.

(Floyd Rpt., Ex. 8-A).

    2.      Those amounts total $3,102,714.  (*Id.*).

## III.   <u>Standard of Review</u>

The role of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (internal quotation marks omitted).  Summary judgment is appropriate when the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Essentially, Rule 56[ ] mandates the entry of summary judgment 'against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'"  *Coll v. PB Diagnostic Sys.*, 50 F.3d 1115, 1121 (1st Cir. 1995) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).  In making that determination, the court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).  When "a properly supported motion for summary judgment is made, the adverse party 'must set forth specific facts showing that there is a genuine issue for trial.'" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quoting Fed. R. Civ. P. 56(e)).  The non-moving party

may not simply "rest upon mere allegation or denials of his pleading," but instead must "present affirmative evidence." *Id.* at 256-57.

## IV.   Analysis

### A.   Overview

"Courts have broad equitable powers to fashion remedies for breaches of fiduciary duty in a close corporation." *Brodie v. Jordan*, 447 Mass. 866, 871 (2006) (citing *Zimmerman v. Bogoff*, 402 Mass. 650, 661 (1988)).  In doing so, courts should be guided by the principle of preventing unjust enrichment. *See Demoulas v. Demoulas Super Markets, Inc.*, 424 Mass. 501, 556 (1997).  "The objective in addressing unjust enrichment is to recover simply the amount derived from the wrongdoing." *Id.* at 558 (citing *USM Corp. v. Marson Fastener Corp.*, 392 Mass. 334, 338-39 (1984)).

The parties dispute what form of remedy is most appropriate, given the Court's findings in the liability phase.  As a general matter, plaintiffs seek a constructive trust over all tower assets, along with the return of any distributions received by defendants (including any proceeds received from tower sales), all amounts paid by the entities for professional fees, and prejudgment interest.  Defendants, however, contend that plaintiffs' proposed remedy amounts to an unfair windfall, and that the more appropriate remedy is the return of (some) distributions received in combination with equitable liens imposed on (some) tower assets in favor of the individual minority shareholders.

For the reasons set forth below, the Court concludes that the imposition of constructive trusts and disgorgement are the appropriate remedies, in order to provide the most effective and equitable manner of recovering defendants' gains derived from their fiduciary breaches. However, as also set forth below, defendants may be entitled to a credit or offset for certain

contributions made to those entities, including any additional capital invested or taxes paid.

There is a further question, which the Court does not resolve now, as to the percentage of equity

interest in Eastern Towers attributable to Strachan, which will become important if the

liquidation of the business produces surplus equity that must be distributed to the owners.

### B.    The Nature of the Remedy

There are two claims of breach of fiduciary duty in this case:  one by Eastern Towers

(brought as a derivative action) and one by Strachan (brought as a minority shareholder).

To the extent that Moore and Rosenfeld breached their fiduciary duties to Eastern

Towers, the appropriate remedy is restitution of the improper gains, to put the *entity* in the

position that it would have been in but for the breach.  *See Demoulas*, 424 Mass. at 556 ("Where

a corporate fiduciary obtains a gain or advantage through a violation of his duty of loyalty, a

court may properly order restitution of the gain, so as to deny any profit to the wrongdoer and

prevent his unjust enrichment.") (citations omitted).  In this case, as set forth below, that means

the imposition of a remedy that returns assets to Eastern Towers, whether by means of a

constructive trust over the new entities created by defendants, disgorgement of distributions, or

otherwise.

To the extent that Moore and Rosenfeld breached their fiduciary duties to Strachan, the

appropriate remedy is to restore the benefits that *he* reasonably expected due to his ownership of

a minority interest in the enterprise.  *See Brodie*, 447 Mass. at 870-71 ("Because the wrongdoing

in a freeze-out is the denial by the majority of the minority's reasonable expectations of benefit,

it follows that the remedy should, to the extent possible, restore to the minority shareholder those

benefits which she reasonably expected, but has not received because of the fiduciary breach.").

In this case, that means the imposition of a remedy that addresses Strachan's reasonable

expectations of continued employment and sharing in the company's profits.

Thus, the first question is what assets should be returned to Eastern Towers.  For the reasons set forth below, it is appropriate to impose a constructive trust over five different entities that own tower assets, as well as to require disgorgement of various distributions made to Moore and Rosenfeld or to entities they own or control.  The remedy will also include the restitution of legal fees paid by Eastern Towers on behalf of Moore and Rosenfeld.

The second question is what amounts should be awarded to Strachan for his loss of employment opportunity.  That issue was addressed in the Court's Finding of Facts and Conclusions of Law, in which it concluded that Strachan was entitled to the value of his lost pay from February 26, 2004, to April 9, 2006.  *See* COL ¶ 309.

The third—and more difficult—question is how to award Strachan his reasonable expectations of sharing in the company's profits.  That question turns on the amount of equity interest attributable to Strachan, which is addressed below.

Defendants contend that a "reasonable expectations" analysis should apply to all of the claims—that is, that plaintiffs should receive only the benefits that they reasonably expected but did not receive because of the breach of fiduciary duty—and that those expected benefits are substantially less than the amounts sought by the plaintiffs.  Defendants reason that Eastern Towers was essentially unharmed by many of the breaches, because the company was insolvent or otherwise incapable of taking advantage of the business opportunities usurped and that it had no reasonable expectation of profiting from those opportunities.  Defendants further contend that Strachan was unwilling or unable to invest additional capital into the business, and that at the very least his equity interest would have been substantially diluted over time as Moore and Rosenfeld contributed additional capital.

Defendants, however, ignore the fact that it was their own conduct that led to the financial difficulties that they claim would have prevented Eastern Towers from capitalizing on the opportunities. *See* COL ¶ 252 ("If Eastern Towers was not able to take advantage of the business opportunities in late 2003 or early 2004, it was because Moore and Rosenfeld had crippled the finances of Eastern Towers in a variety of ways . . . .").

Furthermore, and in any event, a "reasonable expectations" analysis is not appropriate as to the corporation's claims. When the benefits of a corporate opportunity have been denied to a corporation through a breach of fiduciary duty, the law is well-settled that the corporation's alleged inability to exploit an opportunity does not excuse the conduct of those who took the opportunity for themselves without offering it to the corporation. *See Demoulas*, 424 Mass. at 532; *see also Durfee v. Durfee & Canning, Inc.*, 323 Mass. 187, 202 (1948) (corporation's alleged credit weakness did not allow director to take opportunity that should have been disclosed); *Energy Resources Corp. v. Porter*, 14 Mass. App. Ct. 296, 302 (1982) (fiduciary who secretly acquires corporate opportunity barred from asserting that corporation would have been unable to exploit opportunity). That is because it is for the corporation to decide "whether and how to address obstacles" standing in the path of taking advantage of the opportunity. *Demoulas*, 424 Mass. at 532. Whether Eastern Towers might not have been able to exploit those opportunities, or indeed might not have survived, is not the relevant inquiry.

In short, a corporation's ability to execute an opportunity is not the controlling factor in the remedy phase, where the objective generally is to prevent the unjust enrichment of the defendants by transferring the benefits unfairly received by the defendants back to the corporation. *See id.* at 535-36 (upholding trial court's decision to return usurped assets to corporation despite argument that it would have been unable to take advantage of the

opportunity, stating "[W]e do not need to address whether [the corporation] could have feasibly pursued these opportunities."). Accordingly, and as in *Demoulas*, the Court need not undertake an analysis as to whether Eastern Towers would have been able to successfully pursue the opportunities defendants took for themselves, and, if so, to what extent it would have been successful.

The Court will also reject defendants' request that it essentially bypass the bankruptcy trustee and the bankruptcy process by awarding equitable liens directly to Strachan and Sanford. In substance, defendants contend that potential inefficiencies in the bankruptcy process— including the possibility that the trustee could sell some assets at less than fair market value— mitigate in favor of simply imposing equitable liens in favor of the individual minority shareholders.

The remedy, however, must be awarded to the party that suffered the loss. Here, the corporate opportunities that were usurped rightfully belonged to Eastern Towers; the claim itself was brought (and the right to relief established) by the trustee acting on behalf of the entity, and it is therefore the entity that is entitled to relief. *Cf. Bessette v. Bessette*, 385 Mass. 806, 809-810 (1982) (claim for diverted assets belongs to the corporation); COL ¶ 277 ("[T]he claims for breach of fiduciary duty against Moore and Rosenfeld based on the withdrawal of capital and the transfer or diversion of bank financing and tower assets are claims that must be brought as derivative claims on behalf of the corporation and LLC.").

The bankruptcy trustee has a duty to collect assets and ensure the proper payment of creditors and distribution of excess equity, if any, to shareholders. *See In re AFI Holding, Inc.*, 355 B.R. 139, 148 (B.A.P. 9th Cir. 2006), *aff'd and adopted*, 530 F.3d 832 (9th Cir. 2008) (A trustee's "primary job is to marshal and sell assets.") (quoting *In re Reed*, 178 B.R. 817, 821

(Bankr. D. Ariz. 1995); *see also* 11 U.S.C. § 704 (duties of trustee).  It is, of course, possible that the bankruptcy process may not maximize asset value.  But defendants themselves wrongfully diverted corporate opportunities, and then initiated the bankruptcy proceeding as to the corporation.  Any potential inefficiency is not a reason to give defendants continued control over the tower assets.

Defendants argue that "this is not a typical bankruptcy proceeding" because there is, in fact, likely to be a surplus in the estate after payment of creditors and administrative expenses. (Def. S.J. Mem. at 1).  That may well be true.[6]  Nonetheless, this Court cannot simply ignore the bankruptcy proceeding and award relief directly to the shareholders rather than the corporation. Any relief awarded by the Court will become an asset of the bankruptcy estate.  *See* 11 U.S.C. § 541(a)(1), (a)(6).  With the assets collected, the bankruptcy court will then order the payment of expenses and the satisfaction of the creditors' claims.  *See* 11 U.S.C. § 726(a)(1)-(6).  If there is a surplus, it will be returned to the corporation (the debtor).  Ultimately, that surplus will be divided among the shareholders according to their ownership interests.[7]  The bankruptcy court, no less than this Court, is capable of ordering fair and equitable relief on matters within its jurisdiction.

Finally, defendants are not entitled to any compensation or credit for any financial risk they may have undertaken in their pursuit of the usurped opportunities.  It is well-established that a person who breaches a fiduciary duty, and is therefore unjustly enriched, is not entitled to keep *any* profits received from the breach.  *Durfee*, 323 Mass. at 198 ("the law . . . denies to the

---

[6] This matter is particularly unusual because there is likely to be a surplus in the estate and the bankruptcy proceeding is a liquidation proceeding brought under Chapter 7.

[7] If there is a surplus, then a substantial portion of the funds disgorged by Moore and Rosenfeld will eventually be returned to them as an equity distribution after liquidation of Eastern Towers.  That is not, however, a reason to bypass the bankruptcy process in its entirety.

betrayer all benefit and profit.") (quoting *Guth v. Loft, Inc.*, 23 Del. Ch. 255, 270 (1939)).  That remains true no matter what additional risk was undertaken or, for that matter, what business acumen was demonstrated in achieving the gain.   Defendants are likewise not entitled to credit for the opportunity cost of their investments, whether in the form of an internal rate of return or otherwise.[8]  Defendants may, however, receive credit for certain personal investments or taxes paid, as set forth below.

### C.     Constructive Trusts and Disgorgement

Relying in large part on the SJC's opinion in *Demoulas*, plaintiffs urge that the Court impose a constructive trust over the various entities, as well as distributions from those entities to Moore and Rosenfeld, including any proceeds from sales of towers.

### 1.     Constructive Trusts Generally

As the Court noted in its earlier decision, "a constructive trust is a flexible tool of equity that the court may impose where one acquires an interest in property in breach of a legal duty to one who has granted that interest."  COL at ¶ 378 (alterations and citations omitted).

In *Demoulas*, the defendants created several "new" entities for the very purpose of carrying out the same type of real estate business formerly conducted by three "original" entities whose opportunities the defendants had usurped.  424 Mass. at 540-41.  The only substantial difference between the new and original entities was their ownership structures.  *Id.*  As here, assets were transferred from the original entities to the new entities for less than fair value.  *Id.* at 541.  The Supreme Judicial Court did not analyze each individual asset acquired by the new entities to determine whether a particular asset constituted a corporate opportunity usurped from

---

[8] Defendants also appear to be seeking payment, or some unspecified form of credit, for the value of their time managing the tower assets since 2005.  Under the circumstances, the Court sees no reason to order such relief. Defendants in substance are asking to be paid for managing assets that never should have been in their exclusive control to begin with.

the original entities.  Instead, the court found that because all of the business that was carried out

by the new entities could have been carried out by the original entities, the new entities

themselves constituted corporate opportunities that were wrongfully diverted from the original

entities.  *Id.*  The court ultimately concluded that "[b]ecause the very formation of the [ ] new

companies was a diversion of corporate opportunities, the assets of those companies, which

reflect profits made since their formation, rightfully belong[ed]" to the original entities.  *Id.* at

542.

       That reasoning applies equally well to the circumstances of this case.  As in *Demoulas*,

defendants here created multiple new entities, including Eastern Properties, LLC; 5G Investment

Trust, LLC; Horizon Towers, LLC; and Tower Acquisition Trust.  The entire business of those

four entities constituted diverted corporate opportunities of Eastern Towers.[9]  Furthermore, the

accounting records of defendants' entities do not accurately attribute revenues or expenses on a

per-tower basis.  Where an entity itself represents a diverted opportunity, imposition of a

constructive trust over the entity as a whole precludes the need for the tedious, and likely

incomplete, calculation of distributions taken and offsets owed on an asset-by-asset basis.

Because the net result of those transactions are necessarily reflected in the final balance sheet of

the entity itself, imposing a trust over an entity as a whole will incorporate the various revenues

received and expenses paid.[10]

       Defendants contend that the imposition of constructive trusts would result in a windfall to

---

[9] As set forth below, defendants also created Ground Acquisitions, Inc., to acquire ground leases and/or real property in connection with the development of the tower opportunities that were diverted from Eastern Towers.

[10] The entities as to which constructive trusts are imposed may have debt or other financial obligations, whether with third parties (such as bank debt) or inter-company loans (or loans from Moore or Rosenfeld).  When the bankruptcy court liquidates the debtor, any legitimate debt obligations should be addressed before distribution of any surplus to the corporation, and ultimately to the shareholders.  Whether any inter-company loans, or loans from defendants, should be cancelled as a part of that process is a question that this Court cannot resolve on the present record, and in any event is properly for the bankruptcy court to decide.

Strachan.  In substance, defendants contend that Strachan refused to make additional capital

contributions, which would have been necessary to grow the business or keep it from failing, and

that he is now being rewarded despite not having capital at risk.  Defendants, of course, ignore

the various things that they themselves did to harm the finances of the enterprise, inhibit its

growth, and discourage Strachan from investing additional funds.  Indeed, defendants' position

seems to be that the business succeeded only because Strachan was pushed out of the way.  In

any event, defendants, not Strachan, breached their fiduciary duties to the company, and the issue

defendants raise is not a reason to avoid the imposition of constructive trusts.  The question of

whether Strachan's equity interest would likely have been diluted as the business expanded is a

separate one, addressed below.

   Accordingly, and as in *Demoulas*, constructive trusts will be imposed over various

entities in order to return assets to the estate of the corporation.

### 2.      Disgorgement Generally

   Where an asset representing a usurped opportunity has been sold to a third party, and the

proceeds have been distributed out of a corporate entity, the court may order restitution of the

sale proceeds to the relevant entity.  *See Demoulas*, 424 Mass. at 539.  Here, there appear to have

been multiple asset sales to third parties, followed by distributions either to Moore and Rosenfeld

or to entities owned or controlled by them.  Defendants will be required to disgorge any

distributions or other financial benefits received from their ownership interest in the relevant

entities.  *See Demoulas*, 424 Mass. at 556.

### 3.      Credit for Personal Investments and Taxes Paid

   Plaintiffs are not, however, entitled to an unfair windfall.  Accordingly, when calculating

the amount that the defendants have been unjustly enriched, the defendants will be entitled to

"credit for any investments that they have personally made in [the entity] and for any taxes on [ ] profits that they were required to pay." *Demoulas*, 424 Mass. at 556.  Thus, for example, to the extent that a distribution constituted a return of capital personally invested by Moore or Rosenfeld, such amounts must be accounted for, but need not be disgorged (assuming, of course, that the investment itself is not traceable to a breach of fiduciary duty).

It is likely, of course, that there will be disputes concerning the disgorgement of distributions or other proceeds to the corporation, or what amount of offsets are appropriate. Based on the Court's review of the evidence, it is not likely to be a simple task to untangle the defendants' financial affairs, including the amount of distributions and the source of defendants' contributions to the various entities; among other things, basic questions such as the amount of a distribution, or the source of a contribution, or whether the contribution was debt or equity, may require substantial additional evidence.  Moore and Rosenfeld used a great number of business entities, and did not always observe formalities with care, nor did they always follow appropriate accounting principles.  *See*, *e.g.*, Phillips Report at 6 ("transactions were not always recorded in a consistent manner.").  The final amounts may therefore need to be determined in a future proceeding.  The trustee shall bear the burden of proving the corporation's entitlement to recover for any distribution of benefits to defendants and defendants shall bear the burden of proving entitlement to any particular offset.  *Demoulas*, 424 Mass. at 556.

A discussion of the various entities and investments follows.

### 4.    Eastern Properties, LLC

Moore and Rosenfeld created Eastern Properties, LLC to purchase towers built by Eastern Towers using the TD Banknorth financing opportunity.  (*See* FOF ¶¶ 237, 241, 290; COL ¶ 147; *see* COL ¶ 261 ("The assets and creditworthiness of Eastern Properties, and indeed

its very existence, were largely the result of breaches of fiduciary duty by Moore and Rosenfeld.")).  Eastern Properties purchased four towers on June 2, 2003 (Beverly, Franklin Church, Franklin Industrial, and Weare), and five more between June 2003 and May 2004 (Webster, Pembroke, Carver, Goshen, and Loudon).  (FOF ¶¶ 289, 359).  Eastern Properties also purchased four towers from ETS on June 1, 2004 (Hopkinton, Gilmanton, Grantham (Yankee Barn Road), and North Loudon), and four towers from Minnesota Towers, Inc., on July 9, 2004 (Esko, Ivan, Bergland, and Manitowish).  (FOF ¶¶ 435, 439).  All seventeen tower purchases constituted diverted corporate opportunities that belonged to Eastern Towers.  (*See* FOF ¶¶ 435-36, 439; COL ¶¶ 128-29, 131, 255-62).

Accordingly, the Court will impose a constructive trust over the assets and liabilities of Eastern Properties in favor of the trustee.[11]  In addition, the Court will order that defendants disgorge any distributions or other financial benefits received from their ownership interest in Eastern Properties, subject to credit for any investments that they have personally made in Eastern Properties and for any taxes on profits that they were required to pay.

### 5.  5G Investment Trust and 5G Investment Trust, LLC

The formation and funding of 5G Investment Trust and 5G Investment Trust, LLC also represented corporate opportunities that were diverted from Eastern Towers.  5G Investment Trust was formed in December 2004 in order to take title to new towers in a new entity in an

---

[11] The parties agree that Eastern Properties sold four of those towers—Esko, Ivan, Bergland, and Manitowish—in an arms-length transaction on July 2, 2010, for a total price of $1,795,958.  (*See* Floyd Rpt., Ex. 3-H).  Because the proceeds of that sale will be recovered, either as assets of Eastern Properties or as distributions made to defendants, the Court need not make any further ruling at this time with respect to those towers.

The July 2, 2010 sale also included eight towers sold by defendant 5G Investment Trust, one tower sold by Tower Acquisition Trust, and one tower in Marblehead, Massachusetts.  The sales by 5G Investment Trust and Tower Acquisition Trust are discussed below.  Moore owned the Marblehead tower before the formation of Eastern Towers, and plaintiffs conceded at oral argument that it should not be subject to any remedy ordered by the Court.

attempt to insulate those holdings against claims by Strachan.  (FOF ¶¶ 13, 486).  5G Investment Trust was then added to the TD Banknorth loan facility originally intended for Eastern Towers.  (FOF ¶ 265, 486-89).  Moore and Rosenfeld thereby diverted corporate opportunities that rightfully belonged to Eastern Towers in breach of their fiduciary duties.  (COL ¶¶ 163, 256-59, 373).

From December 2004 to November 2005, 5G Investment Trust acquired eleven towers (Antigo, Hawley, Heritage Hills, Grand Rapids, Trego, Wakefield, Washington Borough, Orwigsburg, West Fergus Falls, Oakland, and Lake Nebagamon) from Minnesota Towers.  (FOF ¶ 491).  The eleven towers eventually became the property of 5G Investment Trust, LLC, which Moore and Rosenfeld created in 2006.  (FOF ¶¶ 493, 14).[12]  In July 2010, 5G Investment Trust, LLC, sold six of the towers (Antigo, Trego, Lake Nebagamon, West Fergus Falls, Grand Rapids, and Oakland).  5G Investment Trust, LLC, retained the other five towers (Hawley, Heritage Hills, Wakefield, Washington Borough, and Orwigsburg).

In 2006, 5G Investment Trust acquired two towers (Americus and Tennille), using Glover Property Management, Inc., as trustee.  (FOF ¶ 494).[13]  In July 2010, 5G Investment Trust sold those two towers.

In 2007, 5G Investment Trust, LLC developed a tower in Newburyport, Massachusetts.

---

[12] The entity was originally named 5G Towers, LLC; the name was changed to 5G Investment Trust, LLC in July 2006.  FOF ¶ 14.

[13] Glover Property Management, Inc., is a corporation owned by Moore and engaged in property management.  (FOF ¶ 12).  Glover performed accounting and bookkeeping services for Eastern Towers, for which it was paid.  (FOF ¶ 94).  Glover also served as the only manager of Eastern Properties, LLC.  (FOF ¶ 262).  It is clear that Moore and Rosenfeld used Glover in connection with the scheme to usurp and divert business opportunities belonging to Eastern Towers, Inc.  (See COL ¶ 373).  However, it does not appear that Glover itself was either created for the purpose of taking advantage an opportunity belonging to Eastern Towers, nor was Glover's business wholly given over to conducting the business of those opportunities.  Accordingly, a constructive trust over the Glover itself is not appropriate under the circumstances.

(FOF ¶ 495).[14]

Accordingly, the Court will impose a constructive trust over 5G Investment Trust, LLC in favor of the trustee.  In addition, the Court will order that defendants disgorge any distributions or other financial benefits received from their ownership interest in 5G Investment Trust, LLC, subject to credit for any investments that they have personally made in 5G Investment Trust, LLC and for any taxes on profits that they were required to pay.

5G Investment Trust (as opposed to 5G Investment Trust, LLC) is not a defendant in this proceeding.  It is therefore doubtful whether, in the current procedural posture of the case, the Court has the power to impose a constructive trust over 5G Investment Trust.  Nonetheless, the profits from the sale of the Americus and Tennille towers represent benefits derived from the breach of fiduciary duty by Moore and Rosenfeld.  It is unclear whether those assets remain in 5G Investment Trust, or whether they have been distributed or transferred to Moore or Rosenfeld or some other related entity.  In any event, Moore and Rosenfeld will be required to disgorge any distributions received from 5G Investment Trust arising out of the July 2010 sale of towers, or otherwise make restitution to the bankruptcy estate, net of any qualifying offsets.

### 6.    <u>Horizon Towers, LLC</u>

Horizon Towers, LLC was created on July 2, 2004, to permit Moore and Rosenfeld to continue the cell-tower business without the participation of Strachan or Sanford.  (FOF ¶ 443).  In August 2004, Moore and Rosenfeld caused Eastern Towers to sell the Wayland WIP to Horizon Towers for $40,000 in breach of their fiduciary duties.  (FOF ¶¶ 471, 478; COL ¶ 245).  Horizon was also used to pay the salaries of some Eastern Towers employees.  (*See* FOF ¶ 447).

---

[14] At some point, 5G Investment Trust, LLC transferred the rights to the Newburyport site to another company formed by Moore that developed a tower on the site.  (FOF ¶ 495 n.67).  The effect of that transfer will be addressed below.

In October 2004, Horizon Towers requested and received a renewal of the $1 million construction line that had originally been approved for Eastern Towers, Inc.; that transfer also constituted a breach of fiduciary duty.  (FOF ¶ 481; COL ¶ 162).  "Presumably, the construction line was then used to finance the development of the Wayland tower by Horizon Towers."  (COL ¶ 156).  Horizon eventually constructed a tower in Wayland in 2006.  (FOF ¶ 480).

Thus, the creation and business of Horizon Towers, LLC also constituted a corporate opportunity of Eastern Towers.  Accordingly, the Court will impose a constructive trust over Horizon Towers, LLC in favor of the trustee.  In addition, the Court will order that defendants disgorge any distributions or other financial benefits received from their ownership interest in Horizon Towers, LLC, net of any qualifying offsets.

### 7.    Tower Acquisition Trust

#### a.    Newburyport Tower

The Newburyport tower site was first acquired by 5G Investment Trust, LLC, in 2007. (FOF ¶ 495).  At some point, the rights to the Newburyport site were apparently transferred to Tower Acquisition Trust, another entity owned and/or controlled by Moore and Rosenfeld. (FOF ¶ 495, n. 67).  The acquisition and development of the Newburyport site and tower represented a breach of fiduciary duty to Eastern Towers.  (COL ¶¶ 256-59).

The evidence as to which entity presently owns the Newburyport site and tower is mixed. The evidence at the trial suggested that it was owned by Tower Acquisition Trust.  For example, Exhibits 931.102, 931.104, and 931.114 are photographs of the base of the tower, in which a sign is visible that indicates the tower is owned by Tower Acquisition Trust.  Exhibit 931.300 is a copy of a lease agreement between Tower Acquisition Trust and AT&T Wireless, and Exhibit 931.301 is a lease agreement between Tower Acquisition Trust and Metro PCS; both are

telecommunications companies that are tenants on the tower.  For those reasons, the Court

concluded that the tower was owned by Tower Acquisition Trust.  (FOF ¶ 495, n. 67).

Evidence submitted in connection with the summary judgment motions, however,

indicates that the Newburyport tower may in fact be owned by a corporation called Tower

Acquisitions, Inc.  (Floyd Rpt., Ex. 5-H).  Defendants have also admitted that Tower

Acquisitions, Inc., "wholly owns" Tower Acquisition Trust.  (Def. Counter-Statement of

Undisputed Material Facts, Dkt. No. 211, No. 24 at 8). [15]

Both entities (Tower Acquisition Trust and Tower Acquisitions, Inc.) were made

defendants to this action by means of the Third Amended Complaint, and therefore are subject to

the jurisdiction of the Court in fashioning a remedy.  The Court intends and expects to impose a

constructive trust over the relevant entity (or, alternatively, over the relevant assets), and to order

disgorgement of distributions and other financial benefits, subject to any relevant offsets for

investments or taxes.  It appears that Tower Acquisition Trust is the appropriate entity.  Should

the evidence indicate that in fact the appropriate entity is Tower Acquisition, Inc., the Court will

amend its order accordingly.

**b.      The South Grantham Tower**

On December 23, 2008, defendants acquired a tower site on Springfield Road in South

Grantham, New Hampshire.  (FOF ¶ 496).  The tower site in South Grantham had been identified

by Chris Tracy, an Eastern Towers employee, in the fall of 2003.  (*Id.* ¶ 433).   The South

Grantham site, like the other New Hampshire sites purchased by Eastern Properties, was a

corporate opportunity that had been brought to the attention of Eastern Towers through the

---

[15] Moore and Rosenfeld also created a limited liability company under the laws of Nevada called Tower Acquisitions, LLC.  (*Id.*, No. 25 at 8-9).  It is unclear whether the LLC has, or ever had, any ownership interest in the Newburyport tower.  Defendants have admitted that Tower Acquisitions, LLC "does not have any assets." (*Id.*, No. 27 at 9).

efforts of an employee of Eastern Towers.  The exploitation of the South Grantham opportunity was the direct product of defendants' breach of fiduciary duty.

As with the Newburyport tower, the evidence as to the ownership of the tower in South Grantham is somewhat mixed.  The evidence at the trial suggested that it was owned by Tower Acquisition Trust.  However, according to evidence submitted in connection with the summary judgment motion, the South Grantham tower was actually purchased by Tower Acquisitions, Inc. (not Tower Acquisition Trust) in December 2008 from Environmental Telecommunications Systems, LLC.  (Floyd Rpt., Ex. 5-H n.A).

In any event, the South Grantham tower has been sold.  As noted, on July 2, 2010, Midwest Towers Investment, LLC sold multiple towers, including the South Grantham tower, to a third party.  The proceeds of that sale apparently were not distributed to Midwest; instead, part of the proceeds were used to pay a broker fee and to pay off loans that had been incurred by Eastern Properties, LLC, and the remainder was distributed directly or indirectly to Moore and Rosenfeld.[16]  The proceeds from the sale of the tower will therefore be subject to disgorgement by Moore and Rosenfeld.

### D.      Whether the Remedy Should Include Ground Lease Acquisitions, Inc.

Plaintiffs also seek a constructive trust over ground lease rights and real property acquired by Ground Lease Acquisitions, Inc.  It is true, as defendants note, the Court made no liability finding as to those particular transactions or those particular defendants.

Nonetheless, it is obvious that the acquisition of ground lease rights (or the real property

---

[16] Midwest Towers Investment, LLC was made a defendant to this action by means of the Third Amended Complaint.  It is unclear whether it owns any assets, and in any event it appears that the proceeds of the South Grantham sale were distributed directly to Moore and Rosenfeld, not to Midwest Towers.  Accordingly, the Court will order that defendants disgorge any distributions or other financial benefits received from their ownership interest in the South Grantham tower, subject to any qualifying offsets.

itself) for the towers in Beverly, Loudon, Pembroke, and Hopkinton was not a separate line of business, but was an integral part of the tower business itself.  Indeed, the ground lease for the Beverly site was first located and acquired by Strachan and Sanford.  (FOF ¶¶ 46, 57).  Those acquisitions are therefore plainly within the scope of defendants' breach of fiduciary duty, and subject to an appropriate remedy.  The Court will therefore impose a constructive trust over Ground Lease Acquisitions, Inc.[17]

### E.        Whether the Remedy Should Include the Investment in 4G Towers, LLC

The parties dispute whether any remedy is appropriate with respect to 5G Investment Trust's purchase and sale of a controlling interest in 4G Towers, LLC.  In 2004, 5G Investment Trust acquired a majority ownership stake in 4G Towers, LLC, a Massachusetts limited liability company that owned and managed towers in Minnesota, Oregon, Wisconsin, and Washington. (PSMF ¶ 32; Floyd Rpt., Ex. 6-B).  At least $103,322 of that investment came from Eastern Properties.  (PSMF ¶ 33).  5G Investment Trust sold its investment in 2005.  (PSMF ¶ 32).  In 2004 and 2005, 5G Investment Trust received $3,955,009 in distributions from 4G Towers, and recorded a profit of $1,189,384 from its investment.  (PSMF ¶ 34).

Defendants seek to exclude profits and distributions received from 4G Towers on the grounds that (1) no specific evidence or findings have been made as to whether 4G Towers was a diverted corporate opportunity of Eastern Towers, Inc. and (2) § 5.2 of the Eastern Towers, LLC Operating Agreement specifically allowed defendants to purchase stock in another tower company.

The second contention has already been addressed by the Court in its Conclusions of

---

[17] Ground Lease Acquisitions, Inc., also purchased the land on which the South Grantham tower sits in 2009.  It is unclear whether that land was sold with the tower in July 2010, or whether it is still owned by Ground Lease Acquisitions, Inc.

Law: "[W]hatever effect § 5.2 may have on the fiduciary obligations of Moore and Rosenfeld as members of Eastern Towers, LLC, it ha[d] no legal effect on their fiduciary obligations to Eastern Towers, Inc.  Moore and Rosenfeld therefore owed a fiduciary duty to Eastern Towers, Inc., and to Strachan and Sanford, to present business opportunities to the corporation, regardless of the operation of § 5.2."  (COL ¶ 139).

It is true that no specific findings were made in the Findings of Fact as to 4G Towers or 5G Investment Trust's investment in that entity.  It is also true that 4G Towers is not a defendant.  However, 5G Investment Trust was formed in order to insulate the tower investments of Moore and Rosenfeld from Strachan's threat of litigation, and 5G Investment Trust used the bank loan facility originally intended for Eastern Towers.  (FOF ¶¶ 13, 265, 486-89).  Furthermore, defendants do not dispute that 5G Investment Trust acquired and sold an ownership interest in 4G Towers, and that 4G Towers was also in the business of owning towers for the cellular telephone industry.  It is also undisputed that at least $103,322 of the funds used to acquire the stake in 4G Towers came from Eastern Properties.  (*See* Def. Response to PSMF ¶ 33, Dkt. No. 211).

In substance, the purchase of a controlling interest in 4G Towers is little different than the direct purchase of towers by 5G Investment Trust from Minnesota Towers.  (*Cf.* FOF ¶¶ 491, 493).  The latter represented a corporate opportunity that should have been presented to Eastern Towers.  (COL ¶¶ 256-59).  Similarly, the purchase of an interest by 5G Investment Trust in 4G Towers also represented a corporate opportunity belonging to Eastern Towers.  Because the investment was sold, and any profit or loss from the investment in 4G Towers is presumably reflected in the balance sheet of 5G Investment Trust, it is unnecessary for the Court to impose a constructive trust over 4G Towers.  To the extent that defendants may have received proceeds,

revenues, or distributions from 4G Towers those distributions must disgorged, again subject to any qualifying offsets.

### F. Whether the Court Should Reconsider Strachan's Individual Claim for Breach of Fiduciary Duty

Strachan's termination was intended by Moore and Rosenfeld as a critical step in freezing him out of the business and usurping and diverting business opportunities for their own benefit. (COL ¶ 289). That termination, which caused both the loss of his employment and the cessation of his vesting rights, was a breach of the fiduciary duty owed to him by Moore and Rosenfeld as majority shareholders of Eastern Towers. (COL ¶ 306).

#### 1. Strachan's Loss of Employment

Defendants now seek to re-litigate the conclusion that Strachan likely would have been employed at least four years, or until April 9, 2006, if not for defendants' breaches of fiduciary duty. (*See* COL ¶ 308). The Court will not disturb that conclusion for the reasons given in its earlier findings and conclusions. Accordingly, Strachan is entitled to damages for lost wages from the date of his termination, February 26, 2004, to April 9, 2006.

It appears, however, that the Court made an arithmetical mistake in calculating that amount. Strachan is entitled to pay at an annualized rate of $75,000 for the period from February 26, 2004, to April 9, 2006, or 773 days, at a daily rate of $205.48, for a total of $158,835.62.

#### 2. Strachan's Equity Interest

There remains the difficult issue of the amount of equity interest in Eastern Towers attributable to Strachan. There are two principal questions: (1) whether that equity interest should be 25% or 20%, as fully vested, and (2) whether that interest would have likely been diluted over time.

### a.      Whether Strachan Has a 25% or 20% Equitable Interest

The Court has previously determined that Eastern Towers, Inc. and Eastern Towers, LLC should be treated as a single entity for purposes of the claims for breach of fiduciary duty.  (COL at ¶ 95).  While that disposition satisfactorily addressed a great many issues, it left at least one unresolved question:  the equity interest of Strachan in the combined enterprise.  According to the available evidence, Strachan had a 25% equity interest in the corporation, but only a 20% (when fully vested) equity interest in the LLC.  The Court left the resolution of that issue for another day, because (among other things) it was by no means clear that there would be a surplus to distribute to the equity owners once the business was liquidated.

The parties now appear to agree that if Eastern Towers recovers the assets wrongfully misappropriated by Moore and Rosenfeld, there will be a surplus to distribute after creditors and expenses are paid, and therefore the issue must be resolved.  As a practical matter, one number or the other must be selected; it is impossible to split the equity interest between the corporation and the LLC in any meaningful way.

The selection of either number has the potential for unfairness, and it is impossible to reach a perfect solution.  However, under the circumstances, it appears that assigning a 20% interest to Strachan (after full vesting on April 9, 2006) most accurately reflects the expectations and understandings of the parties as the business developed after April 2002.  Any equitable relief ordered by the Court will therefore be based on, or at least begin with, that assumption.

### b.      Whether Strachan's Interest  Would Have Been Diluted over Time

Defendants have submitted an affidavit from Wayne Brown, an expert witness, that purports to set out a calculation of the dilution over time of Strachan's equity interest, assuming that he had stayed with the company and that Eastern Towers (rather than the various Moore and

Rosenfeld entities) had acquired the 33 towers at issue.  (Brown Aff., Dkt. No. 211, Ex. 12).
According to Brown, a 20% equity interest owned by Strachan would have diluted to 4.57% over
time had all 33 towers had been acquired by Eastern Towers.

The Brown affidavit contains much that is unexplained or unsatisfactory.  It is unclear,
for example, whether he used the actual purchase price of the towers in calculating the capital
requirements, or to what extent he projected that purchases would be made on a cash basis as
opposed to using debt financing.  Most significantly for present purposes, he apparently assumed
that neither Strachan nor Sanford would ever contribute any additional capital.  Put another way,
he assumed that Strachan and Sanford would at all times have remained unhappy and mistrustful
minority partners who were reluctant to invest any more of their limited resources in the
enterprise.[18]  That is a doubtful proposition; in the but-for world in which Moore and Rosenfeld
were loyal and trustworthy partners from the onset, it is far more likely that Strachan and
Sanford would have been far more willing to undertake greater personal risk to finance the
growth of the enterprise.

Nonetheless, it may be unrealistic to assume that the interests of Strachan and Sanford
would not have been diluted as the enterprise grew.  Expanding businesses require capital.  It
appears unlikely that the growth of the business could have been based on debt financing alone,
or only from the cash flow generated by the existing towers.  Furthermore, Strachan and Sanford
were men of relatively limited means, at least compared to Moore and Rosenfeld, who were both
quite wealthy.  It therefore may be true that the business could only have expanded at such a rate
with increased capital contributions; that those contributions would have come

---

[18] Moore and Rosenfeld diverted the bank financing opportunity, withdrew their $522,000 capital
investment, and forced Eastern Towers to enter into the one-sided Tower Purchase Agreement.  It is hardly
surprising that Strachan declined to invest additional capital in the business.

disproportionately from Moore and Rosenfeld; and that Strachan and Sanford's equity interests would have been diluted to some degree as a result.  If no allowance at all is made for that fact, Strachan might receive an unfair windfall when the assets of Eastern Towers are eventually liquidated.

The question then becomes:  diluted to what extent?  On the present record, the Court cannot say.  That issue is complicated by the fact that any calculation would have to project (and account for) hypothetical capital contributions from Strachan.  Any determination of the equity interest fairly attributable to Strachan will require additional evidence, and cannot be resolved on summary judgment.

G.     **Whether the Court Should Return Professional Fees and Expenses Advanced for Defense of Moore and Rosenfeld**

The trustee seeks the return of all professional fees advanced for the defense of Moore, Rosenfeld, and the tower entities.  *See Demoulas*, 424 Mass. at 556.  Defendants appear to concede that fees spent on the defense of Moore and Rosenfeld should be returned, but contend that the trustee is not entitled to the return of fees advanced for other defendants.

It appears that no attempt was made to separate fees incurred on behalf of the entities from fees incurred on behalf of Moore and Rosenfeld individually; at the very least, there is no evidence to that effect.  In all likelihood, that was because there was no practical way to keep the amounts separate.  Although technically different defendants, the various entities were created and controlled by Moore and Rosenfeld, and were used specifically to divert opportunities away from Eastern Towers for their personal benefit.  There is no reason, based on the present state of the evidence, why all such fees should not be returned.

Accordingly, the trustee is entitled to the return of professional fees advanced for the defense of Moore; Rosenfeld; Eastern Properties, LLC; Horizon Towers, LLC; 5G Investment

Trust; and 5G Investment Trust, LLC; and any other entity named as a defendant in this litigation.  According to the Floyd Report, the amount of those fees was $3,012,714 as of December 31, 2014.  (Floyd Rpt., Ex. 8-A).  Plaintiffs contend that the amount is "inexplicably low" and that defendants have not produced the relevant invoices and other supporting documentation.  (Pl. S.J. Mem. at 16 n.11).  The precise amount of the fees, including fees expended up to the present, cannot be ascertained from the present record, and therefore summary judgment is inappropriate as to that issue.

### H.   Whether the Court Should Award Prejudgment Interest on Disgorged Funds

Plaintiffs are also entitled to pre-judgment interest on any damages award or funds disgorged by defendants.  *Demoulas*, 424 Mass. at 559.  "[I]f the funds had not been distributed, any return on those funds would now be among the business assets and liabilities" subject to the Court's remedial orders.  *Id.*  Thus, in keeping with the primary objective of the remedy for breach of fiduciary duty, an award of interest accruing from the date of the distribution or other transfer is necessary to prevent unjust enrichment.

Accordingly, the Court will order defendants to pay interest on distributions and other transfers, including payment of attorney's fees, in the amount of 6% per year, calculated from the date of distribution or transfer to the date of the filing of this suit.  *See id.* at 559, n.63 (citing Mass. Gen. Laws ch. 107, § 3).  Strachan shall also be entitled to an award of prejudgment interest on his damages award, at the applicable statutory rate, to be calculated from the date of the filing of this suit.

### V.   Conclusion

For the foregoing reasons, plaintiffs' motion for summary judgment is GRANTED in part and DENIED in part and defendants' motion for summary judgment is DENIED.

The Court hereby VACATES Part V.B ("Relief") of its March 26, 2015 Conclusions of Law.

The Court orders the following relief, subject to the resolution of certain disputed factual issues, as set forth below:

1.      The Court declares that the ownership interests and rights of the following defendants:

>       Eastern Properties, LLC;
>
>       Horizon Towers, LLC;
>
>       Tower Investors Trust;
>
>       5G Towers, LLC;
>
>       5G Investment Trust, LLC;
>
>       Tower Acquisition Trust;
>
>       Glover Property Management, Inc.; and
>
>       Ground Lease Acquisitions, Inc.,

(the "Tower Defendants"), whether currently existing or in the past, in the following properties:

>       Beverly, Massachusetts (Eastern Properties, LLC);
>
>       Franklin, New Hampshire ("Church") (Eastern Properties, LLC);
>
>       Franklin, New Hampshire ("Industrial") (Eastern Properties, LLC);
>
>       Weare, New Hampshire (Eastern Properties, LLC);
>
>       Webster, New Hampshire (Eastern Properties, LLC);
>
>       Pembroke, New Hampshire (Eastern Properties, LLC);
>
>       Carver, Massachusetts (Eastern Properties, LLC);
>
>       Goshen, Massachusetts (Eastern Properties, LLC);

Loudon, New Hampshire (Eastern Properties, LLC);

Hopkinton, New Hampshire (Eastern Properties, LLC);

Gilmanton, New Hampshire  (Eastern Properties, LLC);

South Grantham, New Hampshire ("Springfield Road") (Tower

       Acquisition Trust);

Grantham, New Hampshire ("Yankee Barn Road") (Eastern Properties, LLC);

North Loudon, New Hampshire (Eastern Properties, LLC);

Wayland, Massachusetts (Horizon Towers, LLC);

Esko, Minnesota (Eastern Properties, LLC);

Ivan, Arkansas (Eastern Properties, LLC);

Bergland, Michigan (Eastern Properties, LLC);

Manitowish, Wisconsin (Eastern Properties, LLC);

Antigo, Wisconsin (5G Investment Trust, LLC);

Hawley, Pennsylvania (5G Investment Trust, LLC);

Heritage Hills (York), Pennsylvania (5G Investment Trust, LLC);

Grand Rapids, Minnesota (5G Investment Trust, LLC);

Trego, Wisconsin (5G Investment Trust, LLC);

Wakefield, Pennsylvania (5G Investment Trust, LLC);

Washington Borough, Pennsylvania (5G Investment Trust, LLC);

Orwigsburg, Pennsylvania (5G Investment Trust, LLC);

West Fergus Falls, Minnesota (5G Investment Trust, LLC);

Oakland, Maryland (5G Investment Trust, LLC);

Lake Nebagamon, Wisconsin (5G Investment Trust, LLC);

Americus, Georgia (Glover Property Management, Inc., as Trustee for

5G Investment Trust, LLC);

Tennille, Georgia (Glover Property Management, Inc., as Trustee for

5G Investment Trust, LLC): and

Newburyport, Massachusetts (5G Investment Trust, LLC),

including any telecommunication towers and related facilities and any related real

property, leasehold interests, rents, profits, bank accounts, and intangible property (the

"Tower Assets"), were improperly acquired, by fraudulent conveyance or transfer,

wrongful diversion or usurpation of corporate or business opportunities, or both, from

Eastern Towers, Inc., and Eastern Towers, LLC by defendants Edward T. Moore,

Lawrence W. Rosenfeld, and the Tower Defendants.

2.      Any ownership interests or rights of Eastern Towers, LLC in the Tower Assets shall be

transferred and conveyed and made available as reasonably necessary to plaintiff Joseph

G. Butler, as Chapter 7 Trustee for debtor Eastern Towers, Inc., to be liquidated and

distributed or otherwise used to satisfy the creditors of debtor Eastern Towers, Inc.

3.      A constructive trust is hereby imposed against the following entities, for the benefit of

debtor Eastern Towers, Inc., to be administered by plaintiff Joseph G. Butler, as Chapter

7 Trustee for debtor Eastern Towers, Inc.:

Eastern Properties, LLC;

5G Investment Trust, LLC;

Horizon Towers, LLC;

Tower Acquisition Trust; and

Ground Lease Acquisitions, Inc.

Those entities and their assets, through the constructive trusts, shall be available to plaintiff Joseph G. Butler, as Chapter 7 Trustee for debtor Eastern Towers, Inc., as part of the estate of the debtor for distribution to creditors of the debtor and for any other valid purpose under federal bankruptcy law.  The trustee may sell, liquidate, convey, or transfer those entities or their assets as may be reasonably necessary to effectuate his duties and responsibilities as trustee; provided, however, that the trustee makes appropriate arrangements for satisfying or otherwise addressing any legitimate liabilities that those entities may have incurred.

4.    Defendants Edward T. Moore and Lawrence W. Rosenfeld shall disgorge, and pay over, to plaintiff Joseph G. Butler, as Chapter 7 Trustee for debtor Eastern Towers, Inc., all distributions, payments, dividends, interest, compensation, and other financial or monetary transfers made to or on behalf of them, or to their family members, or to entities under their direction or control, from any of the Tower Defendants, or arising out of the sale of any Tower Assets, whether made directly or indirectly.  Any such disgorgement and payment shall be subject to the following conditions:

In calculating any funds or amounts that are to be disgorged and made available to the bankruptcy estate, Edward T. Moore and Lawrence W. Rosenfeld shall be entitled to a credit or offset for (1) any funds that Moore and Rosenfeld have personally invested in the Tower Defendants and (2) any payments that Moore and Rosenfeld have made of federal, state, or local taxes on the earnings of any of the Tower Defendants, whether imposed on actual distributions or dividends from those entities or because they were treated for tax purposes as having received such distributions or dividends; provided, however, that any such invested funds, or tax payments made, are not themselves

36

traceable to the violation of any fiduciary duty owed to Eastern Towers, Inc.; Eastern Towers, LLC; or John W. Strachan.

The final amount to be disgorged by Moore and Rosenfeld pursuant to this paragraph 4 shall be determined in a future hearing in this proceeding.

5. Defendants Edward T. Moore and Lawrence W. Rosenfeld shall pay $520,000 to plaintiff Joseph G. Butler, as Chapter 7 Trustee for debtor Eastern Towers, Inc., as damages for the wrongful withdrawal of $270,000 in capital of Eastern Towers, Inc., and $250,000 in capital of Eastern Towers, LLC on June 2, 2003, in violation of their fiduciary duties.

6. Defendants Edward T. Moore and Lawrence W. Rosenfeld shall disgorge, and pay over, to plaintiff Joseph G. Butler, as Chapter 7 Trustee for debtor Eastern Towers, Inc., all payments made for professional services in defense of this litigation.  The final amount to be disgorged by defendants Moore and Rosenfeld pursuant to this paragraph 6 shall be determined in a future hearing in this proceeding.

7. Plaintiff John W. Strachan is hereby awarded compensatory damages in the amount of $158,835.62, for loss of his salary from Eastern Towers, Inc., from February 26, 2004, to April 9, 2006, at a rate of $75,000 per year.

8. The Court declares that plaintiff John W. Strachan has a 25% equity interest in debtor Eastern Towers, Inc., a 20% equity interest in Eastern Towers, LLC, and a 20% equity interest in the combined enterprise of Eastern Towers, Inc., and Eastern Towers, LLC. That equity interest may be subject to modification, as necessary or appropriate, for equitable purposes should the bankruptcy proceeding result in a surplus to be distributed to the shareholders of the debtor after liquidation pursuant to Chapter 7.  If necessary or

appropriate, that issue will be resolved in a future hearing, either in this proceeding or in the bankruptcy court proceeding.

9.     Debtor Eastern Towers, Inc., is hereby awarded prejudgment interest at the statutory rate on any amounts disgorged or transferred pursuant to paragraphs 4, 5, and 6 of this order.

10.    Plaintiff John W. Strachan is hereby awarded prejudgment interest at the statutory rate on damages payable pursuant to paragraph 7 of this order.

**So Ordered.**


                                                    /s/ F. Dennis Saylor IV
                                                    F. Dennis Saylor IV
Dated: March 30, 2017                               United States District Judge